In re INSLAW, INC., Debtor.

INSLAW, INC., Plaintiff,

v.

UNITED STATES of America and the
United States Department of
Justice, Defendants.

Bankruptcy No. 85–00070.
Adv. No. 86–0069.

United States Bankruptcy Court,
District of Columbia.

Jan. 25, 1988.

Charles R. Work, M.E. Friedlander, Philip L. Kellogg, Seth Greenstein, Washington, D.C., for debtor, plaintiff.

Dean S. Cooper, Lauren Bloom, Sandra Spooner, J. Christopher Kohn, Washington, D.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

(Counts I, II and III of the Complaint)

GEORGE F. BASON, Jr., Bankruptcy Judge.

TABLE OF CONTENTS

Page
INTRODUCTION .................................................... 93
FINDINGS OF FACT ............................................... 93
  I.  THE NATURE OF INSLAW'S BUSINESS AND ITS DEVELOPMENT OF
      PROMIS ..................................................... 93
     A.  Origins of INSLAW .................................... 93
     B.  Formation of INSLAW as a "For-Profit" Corporation and the Development of its Proprietary Enhancements ........................... 96
     C.  The Nature of the Proprietary Enhancements ...................... 97
        1.  Data Base Adjustment ........................................ 98
        2.  Batch Update ............................................... 99
        3.  The 32–Bit Architecture VAX Version Of PROMIS .............. 99
        4.  Additional Discrete PROMIS Enhancements ...................... 100
  II.  INSLAW HAS CREATED USING PRIVATE FUNDS AN ENHANCED VERSION OF PROMIS THAT IS PROPRIETARY TO INSLAW ... 101
     A.  INSLAW's Accounting System Demonstrates that INSLAW's Claimed Changes and Enhancements Were Created Using Private Funds ... 101
     B.  INSLAW has Demonstrated that the Three Major Enhancements, the Data Base Adjustment Subsystem, the Batch Update Subsystem and the 32–Bit Architecture VAX Version of PROMIS, were Created Using Private Funds and are Proprietary to INSLAW .............. 104
     C.  INSLAW has Demonstrated the Creation of Numerous Individual Proprietary Changes and Enhancements to PROMIS Using Private Funds ..................................................... 106
  III.  C. MADISON BREWER'S RELATIONSHIP TO INSLAW AND THE ORIGINS OF HIS BIAS AND LACK OF IMPARTIALITY TOWARD INSLAW . 110

**92**

TABLE OF CONTENTS                                                       Page
    A.  Brewer's Firing By Hamilton ........................................ 110
  IV.  DOJ'S DECISION TO AUTOMATE U.S. ATTORNEY'S OFFICES WITH
        PROMIS AND TO HIRE BREWER AS PROMIS PROJECT MANAGER... 112
    A.  Nature of DOJ's Case-Tracking Problem .......................... 112
    B.  INSLAW's Recommendation to Use Microcomputers Rather Than
        Word Processors in the Executive Office RFP..................... 113
    C.  DOJ's Hiring of Brewer as PROMIS Project Manager .............. 114
    D.  Brewer's Organization of DOJ's PROMIS Project Team .............. 116
   V.  INSLAW GIVES DOJ NOTICE OF ITS OWNERSHIP OF AND PROPRIE-
        TARY RIGHTS TO ENHANCED PROMIS ........................... 117
    A.  INSLAW Gives Notice of Its Proprietary Claims ................... 117
    B.  DOJ's Confusion Over Data Rights ............................... 118
    C.  Nature and Terms of the PROMIS Contract........................ 120
  VI.  BREWER'S STRATEGY FOR THE RUINATION OF INSLAW ........... 121
    A.  Brewer Informs His EOUSA/PROMIS Project Team About His Opin-
        ions of Hamilton ............................................. 121
    B.  INSLAW's Initial Problems With DOJ ............................ 122
      1.  INSLAW's Decision To Market Enhanced PROMIS And Brewer's
        Response To These Plans ...................................... 122
      2.  Morris' Recusal Of Brewer On The Proprietary Enhancements
        Issue ....................................................... 125
      3.  Brewer's Continued Involvement In DOJ's Consideration Of The
        Proprietary Enhancement Issue ................................ 126
      4.  Brewer's Strategy For The Ruination Of INSLAW ................ 127
    C.  Brewer's Renewal of the Proprietary Enhancements Issue and Termi-
        nation of Advance Payments.................................... 129
  VII.  BREWER'S USE OF MODIFICATION 12 "TO GET INSLAW'S GOODS"... 132
    A.  Negotiation of Modification 12 .................................. 132
    B.  Brewer, Rugh and Videnieks Stymie INSLAW's Efforts to Substanti-
        ate Proprietary Enhancements ................................. 136
 VIII.  DOJ'S COMMITMENT TO CONSIDER REPLACING WORD PROCESS-
        ING MACHINES WITH MICROCOMPUTERS; DOJ'S DECISION IN-
        STEAD TO ATTEMPT TO TERMINATE THE WORD PROCESSING
        PORTION FOR DEFAULT AND ITS ULTIMATE DECISION TO TER-
        MINATE "FOR CONVENIENCE" .................................. 138
  IX.  THE EFFORTS OF ELLIOT RICHARDSON AND OTHERS TO OBTAIN
        AN INDEPENDENT AND IMPARTIAL PROCESS FOR CONSIDERA-
        TION OF INSLAW'S COMPLAINT ................................ 140
    A.  Richardson Meets with Assistant Attorneys General for Administration
        Liotta and Wallace in an Attempt to Receive Unbiased Consideration
        of INSLAW's Complaints ...................................... 140
    B.  At Jensen's Suggestion, Richardson and Others Attempt to Resolve the
        DOJ Bias With Associate Deputy Attorney General Jay Stephens... 141
    C.  INSLAW's "Last Ditch Effort" to Obtain from Jensen an Independent
        Consideration and Investigation of DOJ's Bias Against INSLAW... 142
   X.  JENSEN'S BIASED ATTITUDE AGAINST INSLAW AND HIS INDIF-
        FERENCE TO INSLAW'S REPEATED COMPLAINTS OF MISCON-
        DUCT BY OTHER DOJ OFFICIALS................................ 143
    A.  Deputy Attorney General D. Lowell Jensen Had a Previously Devel-
        oped Negative Attitude About PROMIS and INSLAW .............. 143
    B.  Jensen's Close Involvement in the PROMIS Contract as Ranking DOJ
        Official on the PROMIS Oversight Committee and Immediate Orga-
        nizational Superior of the Executive Office During the Period of
        Brewer's Misconduct Against INSLAW .......................... 144
    C.  During the Period of the Automatic Stay, Jensen was Repeatedly Made
        Aware of INSLAW's Complaints About Brewer But Took No Correc-
        tive Action ................................................... 145

TABLE OF CONTENTS                                              Page

XI.  DOJ'S FAILURE TO INVESTIGATE AND REMEDY INSLAW'S CLAIMS OF BIAS PRIOR TO THE BANKRUPTCY ............................ 146

XII.  DOJ'S UNLAWFUL AND IMPROPER CONDUCT CONTINUES UNABATED THROUGHOUT THE PERIOD OF BANKRUPTCY............. 149·

XIII.  DOJ'S BAD FAITH NEGOTIATIONS AND OTHER IMPROPER CONDUCT DURING THE PERIOD OF BANKRUPTCY ................... 151

   A.  DOJ's Continued Improper Implementation and Use of PROMIS Software................................................ 151

   B.  The Effects of Bias On the 1985 Negotiations....................... 152

XIV.  DOJ'S CONTINUED FAILURE TO INVESTIGATE CLAIMS OF BIAS DURING THE PERIOD OF BANKRUPTCY ......................... 153

CONCLUSIONS OF LAW ......................................... 158

JURISDICTION AND VENUE ...................................... 158

   I.  INSLAW'S PROPRIETARY ENHANCEMENTS ARE ENTITLED TO PROTECTION AS TRADE SECRETS................................. 158

   II.  DOJ UNLAWFULLY USED INSLAW'S PROPRIETARY TRADE SECRET ENHANCEMENTS IN VIOLATION OF THE AUTOMATIC STAY...................................................... 159

   III.  DOJ'S FRAUD IN INDUCING INSLAW TO ENTER MODIFICATION 12, THE EFFECTS OF WHICH HAVE NOT BEEN CURED BY DOJ, CONSTITUTES A FURTHER VIOLATION OF THE AUTOMATIC STAY...................................................... 168

   IV.  DOJ's FAILURE TO CURE THE CONTINUING EFFECTS OF BIAS AGAINST INSLAW FURTHER VIOLATES THE AUTOMATIC STAY... 169

   V.  INSLAW IS ENTITLED TO PERMANENT INJUNCTIVE RELIEF... 170

   VI.  INSLAW IS FURTHER ENTITLED TO ITS COSTS AND ATTORNEYS' FEES...................................................... 172

## INTRODUCTION

Those claims for relief as set forth in Counts I, II and III of the Complaint herein, as modified by this Court's Order dated July 20, 1987, having come before this Court for trial during the period July 20 through August 5, 1987; the parties hereto having submitted extensive evidence, legal briefs, argument and proposed findings of fact and conclusions of law; and this Court having very carefully taken into consideration all of these submissions and having also thoroughly weighed all of the evidence, and having determined that the relevant legal principles involving non-bankruptcy law are clear, simple, basically undisputed and not requiring the expertise of any specialized agency, makes the following findings of fact and conclusions of law.

These findings of fact are based upon a very careful analysis and weighing of all the evidence presented, and after consideration and review of the proposed findings, and replies thereto, submitted by each party. In making these findings, the Court heavily relies upon its very close observation of the witnesses who testified in this matter, and the credibility of those witnesses based upon the Court's close observation of their demeanor, expressions and the inherent probability or improbability of their testimony in light of the documentary evidence and other known facts. The Court also finds that all the facts hereinafter found have been established by at least clear and convincing evidence. In some instances the evidence is overwhelming or even irrefutable. Further reference is made to the statements made from the bench in open court on September 28, 1987, which are incorporated herein.

## FINDINGS OF FACT

### I. THE NATURE OF INSLAW'S BUSINESS AND ITS DEVELOPMENT OF PROMIS

A. Origins of Inslaw

1. Plaintiff INSLAW, Inc. ("INSLAW"), a debtor-in-possession currently undergoing reorganization under Chapter 11 of the Bankruptcy Code, is a corporation organized and operated under the laws of the State of Delaware, with its principal

place of business in the District of Columbia. It is in the business of designing, manufacturing, marketing and maintaining software systems for use on computers. (Answer ¶ 1)[1]

2. In 1973, William Hamilton and Dean Merrill founded the Institute for Law and Social Research ("Institute") as a not-for-profit corporation. (Hamilton, T. 85; Merrill, T. 747–748) Thereafter, the Institute focused on the development of computer software case management programs for the automation of law enforcement offices, including a primitive version of the computer software which eventually was made available to DOJ and is at issue in this proceeding. (Answer ¶ 10) During the 1970s, the Institute obtained a number of cost-plus grants and cost-plus contracts largely from the Law Enforcement Assistance Administration ("LEAA") of DOJ, for the development and implementation of such software automation programs.[2] (Hamilton, T. 86; Merrill, T. 752)

3. In the 1970s, the Institute developed a version of a software product, known as the Prosecutor's Management Information System ("old PROMIS"), for automating certain law enforcement record keeping and case-monitoring activities (Answer ¶ 10). With the exception of the Superior Court Division of the U.S. Attorney's Office for the District of Columbia, this software system was focused on assisting state and local prosecutors. (Hamilton, T. 113; Merrill, T. 752) Accordingly, the contract between the Executive Office of U.S. Attorneys ("EOUSA") and Inslaw in March 1982, which is the subject of this litigation, was the first national effort to implement PROMIS in U.S. Attorney's offices. (Ham-

ilton, T. 113) However in 1979, the Institute conducted an EOUSA sponsored feasibility study to determine the best approach for improving the case management and information systems used by the United States Attorneys. The study identified a need for more information about the United States Attorneys' activities. (DX 8, Appendix A, p. 3; Hamilton, T. 244) That feasibility study and a "pilot project" (see F.F. ¶ 8, below) had demonstrated the workability of the nationwide effort.

4. Originally, old PROMIS was a limited function software package that permitted rudimentary case tracking functions using computer hardware. (Merrill, T. 759; PX 9, 21) It was a "batch" software system, i.e., limited in hardware applications and user accessibility, which was redesigned and reprogrammed in 1976 to become an "on-line real time" system, a change that permitted greatly expanded usage of minicomputers as well as instantaneous updating and retrieval of case files. (PX 21) PROMIS developed and was improved over the entire decade of the 1970s. The software relevant to this adversary proceeding are the Executive Office of U.S. Attorneys ("EOUSA") pilot version (which was in the public domain in 1982; see F.F. ¶ 8 below) and the enhancements financed by INSLAW's contract with DOJ's Bureau of Justice Statistics ("BJS"); see F.F. ¶ 11 below.

5. Old PROMIS, as it existed in or about 1982, was designed to provide the user with a basic system of storing, managing and retrieving certain standard types of information which would be applicable to every user. (PX 8; PX 21) However, and

1. Citation to the record will be indicated as follows: Answer ¶____; Plaintiff's Exhibit ("PX") ____; Defendants' Exhibit ("DX"); trial testimony (e.g., Hamilton, T.____); and deposition testimony (e.g., PX ____ [Name] at p. ____).

2. The Institute's grants and contracts with LEAA were often competitively awarded, and the grants were administered by LEAA in the same fashion as were the contracts. (Hamilton, T. 86) This method of contracting was largely indistinguishable from the Executive Office contract which INSLAW and DOJ entered into in March 1982. (Hamilton, T. 89) Many of the

same DOJ and LEAA Audit staff personnel who worked on the grants and contracts for the Institute also played the same role on the Executive Office contract with INSLAW and there was very little, if any, difference in the auditing procedures used. (Hamilton, T. 89–90; Schacht, T. 2450) Notwithstanding the testimony of Robert Whitely for DOJ, the record is overwhelmingly consistent with INSLAW's assertion that no differences existed in the contract/grant administration for INSLAW as compared to the contract/grant administration for the Institute. (Schacht, T. 2480–2481)

unlike most other information management software packages, Old PROMIS further permitted each individual user to tailor the software to store additional types of data to serve the user's unique needs. (PX 21) Moreover, Old PROMIS permitted each user to design the look and the contents of the video display screens used to enter and retrieve data, and the look and contents of hard copy paper reports. (PX 21) Old PROMIS was therefore designed to offer great flexibility to a wide variety of users by permitting the software system to adapt to the recordkeeping needs of each user rather than vice versa. (PX 21)

6. Old PROMIS was created using the computer Common Business Oriented Language, or ("COBOL"), in a version written by the American National Standards Institute. (PX 21) The purpose of writing PROMIS in such a standard language was to permit the PROMIS software to be easily converted or "ported" to run on numerous brands of computers which are otherwise incompatible. (PX 21)

7. Because the Institute designed Old PROMIS to be inherently versatile, adaptable and portable, Old PROMIS met with great user acceptance and success in those jurisdictions and offices that had installed PROMIS. (Hamilton, T. 106) More particularly, LEAA designated PROMIS as an exemplary project and encouraged state and local governments to consider implementing PROMIS. (Hamilton, T. 106; Gizzarelli, T. 468)

8. The EOUSA decided to test the concepts proposed in the feasibility study by implementing a "pilot project" beginning in October of 1979. (Hamilton, T. 86) In essence, this pilot program involved the extension of the state/local criminal version of old PROMIS to encompass civil litigation and legal process debt collection functions and the installation of the extended system on government-furnished minicomputers in two U.S. Attorneys offices: the District of New Jersey and the District of Southern California (San Diego). (PX 9) Due to the

Government's delay in procuring mini-computers, both of these sites initially "time-shared" the Institute's computers using remote data entry terminals and printers. (PX 9) In the summer of 1981, after a year or more of time-sharing, PROMIS was installed on each District's "Prime" brand of mini-computer. (PX 9)

9. An adjunct of the Institute's pilot program was the development of PROMIS-like case control functions on Lanier word processing equipment in two smaller U.S. Attorneys offices in 1981—the Southern District of West Virginia and the District of Vermont. (DX 8, Appendix A, pp. 3-4; Hamilton, T. 245; PX 9)

10. The pilot project was evaluated by an independent contractor and determined to be the most cost effective operational alternative. Thus, DOJ made the decision to install the system, as envisioned by the pilot project, on a nationwide basis in the remaining 89 offices. (PX 8 [Bates Stamp 022708]; DX 8, Appendix A, p. 5)[3]

11. In 1979, LEAA awarded a three-year-cost-plus contract to the Institute for PROMIS upkeep and upgrade services. (PX 21) In 1981, when LEAA was liquidated, the three year PROMIS support contract was assigned to DOJ's newly created Bureau of Justice Statistics ("BJS") which lacked funds for the final year of the contract. (PX 21; Hamilton, T. 256–258) EOUSA, through an interagency transfer of funds, allocated over $500,000 to this contract in order to finance the development of certain enhancements requested by EOUSA. (PX 21) The enhancements funded by the EOUSA through the BJS contract were added to the public domain software for use in the 1982 implementation contract.

12. The BJS contract, in essence, contained a laundry, or "wish" list of enhancements DOJ wanted to be made to Old PROMIS. (Hamilton, T. 257–258; Deroy, T. 2460–2462) DOJ chose to determine the priority for the enhancements it desired and INSLAW agreed to go forward to see how much could be done on a cost-plus

---

**3.** Of the 94 active United States Attorneys' offices, four were serviced as part of the pilot project and one (the District of Columbia) was handled as a separate project. (DX 8, Appendix A, p. 5)

basis. (Hamilton, T. 258; Deroy, T. 2460–2462)

INSLAW claims that: (1) Because the Executive Office refused to transfer $125,000 to the BJS contract needed to complete the third year of the contract, INSLAW agreed to complete the five enhancements as part of the 1982 Executive Office contract without additional compensation for development costs. (Hamilton, T. 114) (2) INSLAW completed five enhancements under the BJS contract but never received from DOJ full reimbursement of development costs for these enhancements. (Hamilton, T. 257–258) (3) Notwithstanding that DOJ failed to pay INSLAW's actual full costs for development of the five BJS enhancements, INSLAW does not claim any of them among its privately-financed proprietary enhancements. (Hamilton, T. 114)

In response, DOJ contends as follows: (1) The implication that DOJ somehow refused to pay INSLAW money owed to it for development of the BJS enhancements is untrue. (2) As it was required to do so by contract, INSLAW notified DOJ of a potential cost overrun of $125,000 on the BJS contract. (3) DOJ, as government agencies are required to do in cost-type contracts, considered whether it wanted to endure the cost overrun or avoid it by taking some action such as reducing the statement of work. (4) When it refused to agree to approve the additional work, IN-SLAW *agreed* to perform the work as part of the 1982 implementation contract at no *additional* cost to the government (Hamilton, T. 259; Brewer, T. 1640). (5) That agreement recognized that INSLAW believed that implementation costs would be reduced and that no additional funding would be necessary. Modification 6 to the 1982 implementation contract specifies the enhancements to be made and states that the $110,000 required for those enhancements be taken from other contract tasks. (PX 17)

It is not necessary for this Court to resolve this $125,000 dispute between the parties at this time.

B. Formation of INSLAW as a "For-Profit" Corporation and the Development of its Proprietary Enhancements

13. In 1980, the Institute received notice that funding for Old PROMIS through LEAA would be extinguished beginning in May 1981. (Hamilton, T. 86; Merrill, T. 759) In order to maintain the existing PROMIS user installations, as well as to expand the use of Old PROMIS, the Institute determined to become a for-profit corporation that could market its expertise and software to current and potential PROMIS users. (Hamilton, T. 86; Merrill, T. 759) In particular, this market plan focused upon local district attorney's offices which previously had received free service from the Institute at the expense of LEAA. (Hamilton, T. 86)

14. In connection with this market plan, INSLAW retained Roderick Hills, Esquire for advice on how to proceed with implementing the plan. (Hamilton, T. 86) As part of this assignment, Hills and Hamilton apprised Charles B. Renfrew, Deputy Attorney General of DOJ, of INSLAW's plans to invest private funds for enhancements to PROMIS for creation of proprietary, fee-generating products which would be sold to anyone having an interest in such products. (Hamilton, T. 87–88, 264–265; Merrill, T. 763–775) In addition, Hills informed Renfrew that INSLAW intended to make enhancements to the Old PROMIS software and to assert a proprietary interest in the enhancements financed through private funds. (Hamilton, T. 100; Merrill, T. 763–764) During this discussion, Hills asked Renfrew if DOJ would have any problem with INSLAW's plans. (Hamilton, T. 88, 264–265) Renfrew responded that DOJ had no plans to continue to finance the upkeep and upgrade of PROMIS and DOJ welcomed, and had no problems whatsoever with, INSLAW's plans in this regard. (Hamilton, T. 88)

15. In January 1981, INSLAW was organized and purchased the assets of the Institute. (Answer ¶ 10; Hamilton, T. 84) Since its inception in 1981, William A. Hamilton has been the President and Chairman

of the Board of INSLAW. (Hamilton, T. 83)

16. In an effort to obtain the private funding necessary for the survival of IN-SLAW and PROMIS, in May 1981, IN-SLAW began selling its software upkeep and upgrade services to its existing user base pursuant to annual flat fee contracts. (Hamilton, T. 99; Merrill, T. 816) These funds were combined with investments of the company's equity capital and contract monies from private companies in an effort to develop enhancements to Old PROMIS. (Hamilton, T. 100–101, 104)

17. INSLAW had two motives in going forward with privately financed enhancements of PROMIS. (Hamilton, T. 109) First, the founders of INSLAW had invested a number of years in the development of PROMIS and did not want to see that effort wasted. (Hamilton, T. 109) Second, INSLAW wanted to make a profit from its efforts to enhance the PROMIS software. (Hamilton, T. 109)

18. INSLAW also entered into a number of contracts with individual private clients to create new and important functional enhancements to PROMIS. (Hamilton, T. 102–104) These enhancements were then made available to other PROMIS users on a license basis; input and experience developed from this effort was used by INSLAW to further modify and improve the Old PROMIS system over and above the system created under the LEAA funding. (Merrill, T. 759–761)

19. As INSLAW's expert testified from his twenty-five years of experience in the software industry, it is common within the software industry for a private corporation (i) to take public domain software created using public funds, (ii) then to enhance the public domain software using private funds and (iii) finally to market the resulting product as a proprietarily enhanced version of the software. (DeLutis, T. 1299–1300; PX 233)

20. INSLAW also marketed enhanced PROMIS successfully to additional federal government offices outside of the Department of Justice, non-federal government offices, and private non-government

clients. (Hamilton, T. 98–99) These additional users permitted INSLAW to further enhance PROMIS through greater revenues, additional user input and private funding for particular changes. (Hamilton, T. 98–99; Merrill, T. 759, 761)

21. Significantly, INSLAW also began to change the structure of PROMIS by extending the basic concept to other uses. (Hamilton, T. 98–99) INSLAW thus created and began to market new PROMIS-based packages such as JAILTRAC for correctional institutions, DOCKETRAC for courts, MODULAW for insurance companies and private law firms, and CJIS for county-wide justice administration. (Holton, T. 1125; Merrill, T. 816–817) While each of these other applications contains some specific coding that relates to the particular user needs, PROMIS and these derivative application packages share much of the same COBOL software code. (Holton, T. 1125) Thus, generic enhancements to any of the packages benefit all of these applications. (Merrill, T. 816–817, 819)

22. Through its experience with PROMIS users, INSLAW further modified PROMIS pursuant to the suggestions of the in-house staff of INSLAW. (Merrill, T. 761) A number of enhancements were funded through INSLAW's profits and research and development costs, which became part of the Enhanced PROMIS—"PROMIS '82" —that INSLAW began to market aggressively to new users beginning in the Fall of 1982. (Hamilton, T. 104–105; Merrill, T. 759)

C. The Nature of the Proprietary Enhancements

23. In essence, INSLAW made two types of enhancements to PROMIS: first, changes "sewn inside" the existing old PROMIS code which permit more efficient, user-friendly and less defect-prone operation of the software; and second, changes "hooked-on" to the PROMIS code which add new functionality. (Hamilton, T. 102)

24. Enhanced PROMIS consists of a number of subsystems, *i.e.*, packages that are themselves comprised of a number of

programs or modules. (Holton, T. 1122–1124; PX 225b) Two of these subsystems, the Data Base Adjustment subsystem and the Batch Update subsystem, have been demonstrated by INSLAW to have been developed using private funds, are proprietary to INSLAW and were not deliverable under the EOUSA contract. (Hamilton, T. 125, 2571–2575; See F.F. ¶¶ 69 & 73 below) The Data Base Adjustment and Batch Update subsystems are "hook-on" systems that are independent of the remainder of PROMIS. (Holton, T. 1123–24) Although they perform additional useful and desirable functions within PROMIS, they are not themselves required to make PROMIS function, and they could have been removed from PROMIS without preventing the operation of the remaining PROMIS software system. (Holton, T. 1123–1124)

### 1. Data Base Adjustment

25. The Data Base Adjustment subsystem consists of nine programs. (Holton, T. 1126; Hamilton, T. 2589) Data Base Adjustment is used to modify the structure of a PROMIS data base that has already been in use, without causing any loss of data that would ordinarily preclude structural modifications to existing databases. (Holton, T. 1126–27) For example, if the information in a phone book is considered as a record in a data base, the existing structure of that record would include the name, address and telephone number for each listing. (Holton, T. 1126) If one then wished to expand the structure of that record by including zip codes, the Data Base Adjustment subsystem would be useful in altering the structure of the existing phone book data base to permit entry of zip codes for both new and old listings. (Holton, T. 1126–27)

26. Restructuring of a database permits the user to accommodate needs for additional information, work flow pattern changes, changes in office organizational structure, and a greater user sophistication in use of office automation. (Hamilton, T. 2577–2578) It is INSLAW's experience that PROMIS users typically will request retailoring perhaps as often as every 12–18 months, which will require the use of the

Data Base Adjustment subsystem. (Holton, T. 1120–21; Hamilton, T. 2576–2578) DOJ may be—or may not be—atypical: Mr. Rugh testified that the United States Attorneys have never needed to restructure their PROMIS data bases. (Rugh, T. 2627–28) However, this Court has found Mr. Rugh's testimony to be unbelievable. See F.F. ¶ 398 below. It is entirely possible that individual U.S. Attorneys' offices have wanted to restructure their PROMIS data bases and have been prevented from doing so by EOUSA. (See F.F. ¶ 40 below)

27. Although specific-need programs for specific restructuring of particular data bases could be created, the advantage of the PROMIS Data Base Adjustment subsystem is that it is a generic, reuseable package that requires little coding work by the programmer for each new adjustment. (Holton, T. 1126–27) Without Data Base Adjustment, users who desired to improve the structure of their data base would be required for each specific need to engage in weeks, perhaps months, of hard coding, testing and debugging of a program that would alter only one specific existing data base to one specific new data base structure. (Holton, T. 1127)

28. Although there were two programs that comprised an earlier version of the Data Base Adjustment package, they were not the same as any of the programs that comprise the nine Data Base Adjustment subsystem programs that were provided to the Department of Justice. (Holton, T. 1172–75, 2533, 2563) Unlike the Data Base Adjustment subsystem provided to DOJ by INSLAW in 1985, the two early programs did not generate code and did no comparison of the old and new database designs. (Holton, T. 1173–74) The nine-program Data Base Adjustment subsystem performs numerous additional functions not present in the early version of Data Base Adjustment. (Holton, T. 1173–74)

29. The two earlier programs are not in or among the nine-program Data Base Adjustment subsystem that INSLAW has claimed as proprietary in this litigation. (Holton, T. 1174–75; Hamilton, T. 125)

30. The nine programs in the Data Base Adjustment subsystem are in the possession and control of the government. (Gagliardi, T. 2069; Hamilton, T. 2607–2609, 2589; Holton, T. 2510; DX 212 [Holton] at pp. 210–212; see, however, Holton, T. 2530)

31. Data Base Adjustment is an extremely useful tool for PROMIS users, and is a very valuable enhancement to PROMIS. (DeLutis, T. 1281–1282; Holton, T. 1124, 1127; Hamilton, T. 2576–2578) Even Defendant's expert conceded that Data Base Adjustment is an enhancement to PROMIS, and believed that any commercially viable software program should have the capability of adjusting the data base. (Gagliardi, T. 2073–2074) Data Base Adjustment was not required to be delivered under the EOUSA (1982) Contract. (Hamilton, T. 125, 2607–2608; Holton, T. 1123)

### 2. Batch Update

32. The Batch Update subsystem permits a user to add computerized information to an existing database structure in batches (*i.e.*, without requiring the tedious input of information one record at a time through keyboards at video terminals), in a cost-effective manner, and without incurring the concomitant increased risk of introducing human data entry errors into the database. (Holton, T. 1128–1129; DeLutis, T. 1280–1281; Hamilton, T. 2572–2574)

33. Batch Update is a very significant feature of PROMIS that, according to defendant's expert, must be present in order even to begin to enter the marketplace. (Gagliardi, T. 2044–2045) Batch Update is a useful tool for PROMIS users and is a valuable enhancement to PROMIS. (DeLutis, T. 1280–81) Batch Update was not required to be delivered under the EOUSA (1982) Contract. (Hamilton, T. 2571–2575; Holton, T. 1123)

### 3. The 32–Bit Architecture VAX Version of PROMIS

34. INSLAW also created between June and September of 1981, using private funds, a third major enhancement to PROMIS, which was the redesign and porting of the PROMIS software to run on the 32–bit architecture VAX minicomputer manufactured by Digital Equipment Corporation. (Holton, T. 1132) A software "port" is the process of converting an existing software package to enable it to run on different brands and models of computers. (Holton, T. 1132) The earlier versions of PROMIS ran on other Digital Equipment Corporation computers, known as PDP 11/70, as well as on computers sold by IBM, Wang, Honeywell and Burroughs. (Holton, T. 1133; DeLutis, T. 1273–1274)

35. In 1981, INSLAW noted that Digital Equipment Corporation was replacing its 16–bit architecture PDP line of computers with the newer, state-of-the-art VAX line. (Holton, T. 1132) Because the VAX computers offered significant technological advantages over the PDP line, including 32–bit architecture as opposed to 16–bit architecture, increased work-in-storage space and faster input/output for processing of information—differences as significant as the difference between a propeller-driven airplane and a jet—INSLAW made a strategic decision to stay abreast of the technology by porting the entire PROMIS system from the 16–bit PDP to the 32–bit VAX "environment." (Holton, T. 1131–33; DeLutis, T. 1274–1280)

36. The development of a version of PROMIS to run on VAX minicomputers was a very valuable enhancement to PROMIS in terms both of INSLAW's need to stay abreast of the market and of INSLAW's customers' need and desire for faster, more capacious products. (DeLutis, T. 1274–1280)

37. The VAX version of PROMIS subsequently was used by INSLAW to provide time-sharing facilities to ten United States Attorneys' Offices, pending selection and installation by the government of on-site computer equipment. (Holton, T. 1254)

38. Whereas the "base" or "master" version of PROMIS until 1980 ran on 16–bit architecture PDP 11/70 computers, the 32–bit VAX version in about 1981 became the base or master version of PROMIS that was then used to do further development and maintenance work to PROMIS. (Holton, T. 1133–34)

39. Although the 1982 contract did not prescribe the manner in which the contractor was to create the Prime version of PROMIS to be delivered to the govern-

ment, and indeed DOJ had not yet chosen the Prime computer hardware until long after the contract had been entered into, INSLAW in fact used the VAX version of PROMIS to create the version of PROMIS that ran on the Prime computers selected by the government. (Holton, T. 1250–51; Hamilton, T. 173) INSLAW used the VAX version rather than the earlier Prime version developed by INSLAW during the Executive Office "pilot project" contract, because the differences between the new COBOL compiler on the Prime computers selected by the government and on the VAX were less significant than the differences between the COBOL compilers in the new and old models of the government-furnished Prime minicomputers. (Holton, T. 1250)

40. Both the major enhancements as well as the individual changes and enhancements to PROMIS are licensed by INSLAW to its current users. (Merrill, T. 760–761; Hamilton, T. 173) INSLAW has had requests from individual United States Attorney's Offices to obtain the latest additional PROMIS enhancements, including a request from the United States Attorney's Office for the Southern District of New York which wishes to obtain from INSLAW its most up-to-date enhancements to PROMIS created by INSLAW since the end of the Executive Office contract in March 1985. (Merrill, T. 761–762)

### 4. Additional Discrete PROMIS Enhancements

41. A number of the enhancements to PROMIS improved the Old PROMIS systems by making the software more efficient and user-friendly, and adding new functionality. (Hamilton, T. 102–103) Certain enhancements, for example, provided information to the user to assist in operation of PROMIS or diagnosis of errors encountered in entering or retrieving data. (Holton, T. 1175, 1215–1219; DeLutis, T. 1285) Other enhancements provided the user with the ability to perform tasks more quickly, either by structuring the on-screen processes to perform additional functions or by streamlining the amount of code so as to allow the program to run faster.

(Hamilton, T. 102–103; Holton, T. 1215–1216, 1219; DeLutis, T. 1285)

42. All of these enhancements became part of the enhanced PROMIS software that INSLAW sought to market to new users and to provide through maintenance updates to existing PROMIS users that had entered into maintenance contracts with INSLAW. (Holton, T. 1126–1134; Hamilton, T. 108–109)

43. These enhancements identified by INSLAW were created from private, non-federal funds expended by INSLAW for software enhancements from May of 1981 through March of 1985. (Ling, T. 1065–1066, 1073–1074, 1080; Gibson, T. 2245–2246, 2251–2252) The total spent by INSLAW during this period for software enhancements of all kinds was more than $8.3 million. This figure has been verified by an audit performed by DOJ's staff auditors. (Gibson, T. 2245–2246, 2251–2252) Although INSLAW's accounting system does not permit the identification with specificity of the cost of each particular enhancement, INSLAW had during that same time period approximately $13 million in funds from private sources that were available and could have been used to perform these and other software enhancements. (Ling, T. 1071, 1074)

44. INSLAW took a number of steps to maintain the confidentiality of the software that was created after INSLAW came into being. (Hamilton, T. 105) First, INSLAW required all of its employees to sign confidentiality and non-disclosure agreements. (Hamilton, T. 105) Second, the enhancements to PROMIS were created under maintenance contracts and private contracts that expressly provided that all proprietary rights to all of the enhancements were held exclusively as the property of INSLAW. (Merrill, T. 762–763; Hamilton, T. 104; PX 236–236a)[4] Users were further subject to restrictions precluding disclosure or dissemination of these enhancements in the absence of a license from INSLAW. (Merrill, T. 762–763; Hamilton, T. 105; PX 236–236a) Finally, INSLAW copyrighted its software and documentation. (Hamilton, T. 105)

---

**4.** Shortly after starting its privately-financed en-  hancements of PROMIS in May 1981, INSLAW

45. The PROMIS enhancements were determined by INSLAW to be privately financed and proprietary to INSLAW by analyzing the documentation of each enhancement that is contained in the source code of the programs themselves, the forms used by INSLAW to report and record software changes, and the timesheets of the employees who performed the programming work on each enhancement. (Holton, T. 1175–1177) The method used by INSLAW to track software enhancements and to account for employee time is wholly reasonable within the standards used throughout the industry, and is, in many respects, exceptionally good.[5] (DeLutis, T. 1287–1288, 1297–1298) On the basis of the foregoing and the record as a whole, this Court finds that the enhancements that INSLAW developed either with private funds, or with a combination of private funds and under government contracts specifically permitting INSLAW to retain private rights, were not in the public domain but were INSLAW's private property.

## II. INSLAW HAS CREATED USING PRIVATE FUNDS AN ENHANCED VERSION OF PROMIS THAT IS PROPRIETARY TO INSLAW

### A. INSLAW's Accounting System Demonstrates that INSLAW's Claimed Changes and Enhancements were Created Using Private Funds

46. INSLAW's accounting system tracks costs relating to software development according to unique four-character charge codes. (Ling, T. 1054; Gibson, T. 2231) The first two characters of this charge code identify the project for which the work is being performed and to which the time is being charged; the second two characters identify a particular task within that overall project. (Gibson, T. 2231)

47. These charge codes are reflected in INSLAW's accounting system in time sheets used by INSLAW employees, expense reports and journal entries, which are then summarized in monthly project control reports for each charge code, as well as in INSLAW's general ledger. (Ling, T. 1054–1058; Gibson, T. 2231)

48. INSLAW has used continuously since its inception as a private corporation the same form of time sheet for its software programmers. (Ling, T. 1055–56; PX 227) Using this time sheet, INSLAW's software programmers track on a bi-weekly basis the number of hours spent working on a particular project and task by entering the appropriate four-character charge code. (Ling, T. 1057; PX 227; Holton, T. 1139)

49. INSLAW programmers are informed at the beginning of a project of the appropriate four character charge code to be used on time sheets to charge work for that project. (Holton, T. 1139; DX 211 [Ling] at p. 70) At the end of the two-week pay period, the employee totals and checks the time sheet, signs it, and submits it for review to the director of that employee's division. (Ling, T. 1057–58; Holton, T.

---

discovered that the language of certain of its contracts did not adequately protect its proprietary rights. (Hamilton, T. 292–293) Several months after May 1981, this contract language was changed to offer INSLAW the protection that it desired. (Hamilton, T. 293) Moreover, because these people subscribed in the following year under a more restrictive contract under which all the enhancements had been commingled this problem was resolved. (Hamilton, T. 293)

5. Although this Court did not and need not rely upon the following comparison in reaching this finding, the Court takes notice that, at a hearing on November 3, 1987 concerning the claims of SG Systems, Inc. and SIR Corp. against *United Press International, Inc.,* in Case No. 85–00257, employee timesheets used by those two computer software corporations were introduced into evidence and relied upon by this Court in its holding granting the full relief requested. Mr. Siok ("Si") H. Go is president of both corporations, has 20 years' experience in computer software, including 9 years' employment with Univac, and has implemented software systems for the New York Stock Exchange and Banker Ramo Corp. Comparison of the employee timesheet form used by Mr. Go's two corporations, for Mr. Go himself and his associate Mary Ann Huang (copy attached as Appendix A), with the employee timesheet form used by INSLAW (Appendix B) shows that the INSLAW form is an immeasurably superior tracking system in every respect.

1139) The employee's time is reviewed and approved by the division director, who must sign and date the time sheet. (Ling, T. 1057–58; Holton, T. 1139) Time charged to particular projects must also be approved by the project manager, who must initial the time sheet next to the charge code. (Ling, T. 1058) The time sheet is then submitted to the accounting department for review, payroll processing and entry into INSLAW's general ledger system. (Ling, T. 1058)

50. Any INSLAW employee who attempted intentionally to mischarge time to incorrect accounts would be severely reprimanded and could very easily be terminated. (Holton, T. 1140–41) Although DOJ witness James Mennino testified to the contrary, this Court has found his testimony to be absolutely incredible, totally unsubstantiated and obviously biased, as discussed in F.F. ¶ 398 below. It appears that Mennino was attempting to excuse his own excessive time spent on a project, on which he was in charge of one aspect, by complaining about the time spent by other persons responsible for other aspects of that project, even though he had no knowledge concerning either what those other persons were doing or how long it should reasonably take them to do it.

51. INSLAW's time sheets are of the type commonly used in the software industry for recording time spent by computer programmers on software development. (DeLutis, T. 1288–1291; Gagliardi, T. 2088)

52. For major enhancements that are assigned individual charge codes, INSLAW can track its labor costs relating directly to those particular enhancements. (Ling, T. 1080–81) For smaller enhancements that are not assigned separate charge codes, INSLAW's accounting system does not permit tracking the cost of each such enhancement. (Ling, T. 1080–81; DX 211 [Ling] at pp. 84–85)

53. Each programmer also was assigned an individual computer "account," *i.e.*, a work space within the computer. (Holton 52–54) To "sign on" to the computer account, the programmer would use a code that would enable INSLAW to charge the programmer's computer time to a particular client, or to INSLAW itself. (DX 212 [Holton] at pp. 52–55; DX 211 [Ling] at p. 64)

54. However, tracking of and/or accounting by individual smaller enhancements is not done generally within the industry, and none of the witnesses called by either INSLAW or the government was aware of any software development company that maintained accounting records with that degree of detail. (DeLutis, T. 1291–1292, 1306; Gagliardi, T. 2090–2092; DX 211 [Ling] at pp. 87–89; Ling, T. 1081) The testimony by DOJ witnesses Gagliardi and Rugh, that even so INSLAW should have maintained such records (Gagliardi, T. 2083–85; Rugh, T. 1515–17), was obviously a product of their intense bias against INSLAW, which caused them to testify in whatever way they thought might defeat INSLAW's claims, without regard to the truth.

55. Although the government auditor, Alan Gibson, testified that he did not believe that INSLAW's records were sufficient to audit each of the changes and enhancements identified by INSLAW as privately funded (Gibson, T. 2114), Gibson admitted that he has no knowledge of records kept in the ordinary course of business by software developers, and has never performed any analysis of funding sources for software enhancements. (Gibson, T. 2229–2230) However good a government auditor Mr. Gibson may be, this is a specialized field in which Mr. Gibson has no expertise or competency.

56. Moreover, an accounting system that tracked software development costs by individual software changes would be unduly burdensome and expensive to set up and maintain, and would require computer memory capacity far exceeding the capabilities of even INSLAW's computers. (DX 211 [Ling] at pp. 62–63, 87–88)

57. Because INSLAW's records are within the standards for recordkeeping within the industry, including time records and documentation concerning software maintenance, and indeed are exceptionally good, the Court considers INSLAW's

records more than sufficient for the purposes of establishing the existence of and funding for the enhancements and changes claimed as proprietary by INSLAW.

58. INSLAW has demonstrated that between May 1981 and March 1985, the period from which INSLAW began developing enhancements using private funding through the end of the 1982 EOUSA contract, INSLAW expended $8,328,883, of private, non-federal funds for software development for private clients or in-house software development, exclusive of software development costs for the federal government. (PX 230; Ling, T. 1072–75; Hamilton, T. 400; Merrill, T. 815–816) The $8,328,893 reflected in Plaintiff's Exhibit 230 includes but is not limited to solely the cost to INSLAW of creating those enhancements that were delivered to DOJ pursuant to Modification 12 to the contract and that INSLAW claims as proprietary. (Ling, T. 1062) The precise cost to INSLAW of creating solely those specific enhancements has not been established but is irrelevant (even if that cost were as low as the $400,-000 to $1.4 million range testified to by DOJ witness Gagliardi—which, given Gagliardi's bias, this Court does not believe). (Gagliardi, T. 2071) The only relevant fact in this regard is that each of the enhancements was developed solely with private funds, and it has been so proven.

59. INSLAW has further demonstrated that during the same time period, it had $12,998,076 available from private funding sources to support its in-house software development and software development for private clients, exclusive of funds paid to INSLAW pursuant to federal government contracts. (PX 231; Ling, T. 1065–72, 1074–75)

60. Among the sources of those private funds is a category of fees paid by subscribers to INSLAW's maintenance program. (PX 231; Ling, T. 1066) Pursuant to separate maintenance agreements and for a fee, these subscribers receive error corrections and maintenance enhancements from INSLAW on a periodic basis. (Ling, T. 1067)

61. Two of INSLAW's maintenance customers were federal government clients, DOJ's Land and Natural Resources Division and the Occupational Safety and Health Review Commission ("OSHARC"), which contributed funds to a maintenance pool used to support general maintenance for all of INSLAW's maintenance customers. (Ling, T. 1067; PX 236) Although the government has at times contended that these contributions to an overall maintenance pool entitle the government to unlimited rights in all changes and enhancements funded through the general maintenance account, the Court rejects this contention for two reasons.

62. First, and more importantly, these two federal agencies received all maintenance enhancements pursuant to express contractual agreements with INSLAW that contain the following clause:

*Proprietary Information*

The documentation, bug fixes, enhancements and the ideas and expressions contained therein, and any copyrights thereof are acknowledged by Customer to be confidential proprietary information (hereinafter called Program Product) belonging solely to INSLAW. Customer will not for the duration of this agreement nor at any time thereafter, without the prior written permission of INSLAW: (a) permit or cause any person (i) to copy or duplicate any physical form of the Program Product from or to any media except for archival or security purposes; or (ii) to create or to re-create, or to attempt to create or recreate the source programs, object programs or any other aspect of the Program Product in whole or in part; or (iii) to gain any access to confidential information learned pursuant to this agreement; or (b) permit or cause such information to be placed into the public domain, whether pursuant to law or otherwise.

(PX 236a; Ling, T. 1068–69) Thus, the government did not obtain through these maintenance agreements any rights to copy, disclose or disseminate these changes and enhancements. Rather, the govern-

ment thereby acknowledged that all maintenance changes and enhancements were proprietary to INSLAW.

63. Second, the revenues that these two agencies contributed pursuant to the maintenance contracts amounted to less than one-half of one percent of all private funds available to INSLAW for its proprietary enhancements, which the Court finds in any event to be *de minimis*, so as not to afford the government any ownership rights in the enhancements and changes created using maintenance funds. (Ling, T. 1077)

64. Because the analysis performed by the government auditor, Alan Gibson, assumed that these maintenance accounts commingled private and government funds, without any information or understanding concerning the contracts entered into between the government clients and INSLAW, Mr. Gibson's analysis of the funding sources for INSLAW's proprietary enhancements is not entitled to great weight. (Gibson, T. 2237–2239) In fact, Mr. Gibson admitted that he had no knowledge of the substance of any of the enhancements, or of the meaning of entries on the report forms used by INSLAW to track its maintenance changes or enhancements, or of any other documents that might reflect the dates on which work was performed by INSLAW programmers.[6] (Gibson, T. 2239–2244)

65. Despite its claims that INSLAW's project code 22 was funded in part by corporate overhead which allegedly was derived in part from overhead charged to DOJ under the PROMIS Contract, DOJ has no knowledge, and has failed to demonstrate, that any government overhead or computer center funds in fact supported any software claimed by INSLAW to be developed at private expense. (Gibson, T. 2246–2249) INSLAW had sufficient private funds to support all of INSLAW's private software development, and, in any event, the amortized portion of any capitalized software was less than the difference

between INSLAW's actual overhead costs and the maximum amount that could have been contributed by the government to the overhead pool. (Ling, T. 1097–1099, 1105–1107) Moreover, because government audits have questioned the allowability of any overhead payments reflecting costs for INSLAW's independent research and development, the government has not in fact paid any allocable share of such overhead costs. (Ling, T. 1107; Gibson, T. 2227)

66. An auditor for the government has reviewed INSLAW's financial records in order to reconcile INSLAW's records with the analysis reflected in PX 230 and PX 231 and concluded that the method reflected in that analysis is reasonable, and that the figures reflected therein are correct, with the exception of minor differences that are either insignificant or in INSLAW's favor. (Gibson, T. 2245–2246, 2251–2252; Ling, T. 1075–76) The analysis reflected in PX 230 and PX 231 was performed in accordance with generally accepted accounting principles. (Ling, T. 1061)

B. *INSLAW has Demonstrated that the Three Major Enhancements, the Data Base Adjustment Subsystem, the Batch Update Subsystem and the 32–Bit Architecture VAX Version of PROMIS, were Created using Private Funds and are Proprietary to INSLAW*

67. INSLAW has created, using private funds, two subsystems of PROMIS, known as Batch Update and Data Base Adjustment, which were included neither in the pilot version of PROMIS nor among the BJS enhancements. (Holton, T. 1123)

68. Neither of these subsystems was required to be delivered to the government pursuant to the Statement of Work in the 1982 Executive Office contract. (Hamilton, T. 125, 2571–2578)

---

**6.** Mr. Gibson also admitted that although he was present at INSLAW for a period of approximately three weeks in mid-June and early July 1987, and saw Ms. Holton on numerous occasions, never once during that time did Mr. Gibson attempt to resolve any of his questions concerning INSLAW's methods and records with Ms. Holton. (Gibson, T. 2250)

69. Data Base Adjustment was created by INSLAW in late 1983 as a private research and development project, and was not requested, required or funded pursuant to a contract with any particular client. (Holton, T. 1127) (See F.F. ¶¶ 28 and 29 above as to two programs that comprised an earlier version of the Data Base Adjustment package.)

70. Development of Data Base Adjustment was assigned by INSLAW a separate charge code, 2214, which indicates that it was part of INSLAW's independent research and development project, Project 22. (Holton, T. 1128) In October 1983, at the beginning of the new fiscal year, INSLAW's accounting department assigned the Data Base Adjustment development project a different charge code, 9060, which again reflected independent research and development projects under Project 90. (DX 212 [Holton] at pp. 217–218) Charge codes 2214 and 9060 were used exclusively by INSLAW programmers when billing time to Data Base Adjustment development. (DX 212 [Holton] at pp. 492–493; Holton, T. 1128)

71. While paragraph 3.2.4.1 of the Statement of Work required INSLAW to retailor a number of the individual versions of PROMIS provided to the larger United States Attorneys' Offices, and although IN-SLAW used its Data Base Adjustment enhancements for that purpose, the contract itself does not state that INSLAW is to develop software for that purpose. (Hamilton, T. 2575–2578, 2609–2610; PX 17) In the absence of Modification 12, and if DOJ requested software for data base adjustments, INSLAW could have and no doubt would have provided hard-coded, specific-need programs to perform the specified data base retailoring services, rather than and in preference to giving up its proprietary rights to its Data Base Adjustment enhancements. (Hamilton, T. 2575–2578, 2607–2610) (See F.F. ¶ 27 above.)

72. INSLAW provided the Data Base Adjustment Subsystem to DOJ pursuant to contract Modification 12. (Hamilton, T. 2578–2579)

73. The Batch Update Subsystem was created by INSLAW in November 1981 through early 1982 as a task under a contract with a private, non-federal government client. (Holton, T. 1129–31; PX 322) INSLAW's accounting department assigned the development of Batch Update an individual charge code, 0405, which reflected that it was a task under the overall Project 04 for a private client. (Holton, T. 1131)

74. Although paragraph 3.2.2.7 of the Statement of Work refers to the transfer of information from the existing Docket and Reporting System database to a PROMIS database, and while INSLAW used the Batch Update subsystem for that purpose, the record demonstrates that the development of the Batch Update subsystem occurred prior to the execution of the 1982 Executive Office contract and that the development occurred using private funds. (Hamilton, T. 2571–2575; Holton, T. 1129–31)

75. The pre-existing Batch Update subsystem also was capable of transferring many kinds of computerized information into an existing PROMIS database, and had capabilities well beyond the input of information from the Docket and Reporting System into PROMIS. (Hamilton, T. 2574–2575)

76. Hamilton testified that in the absence of Modification 12, INSLAW would have provided the government with limited purpose software that would only have enabled the government to transfer information from a particular Docket and Reporting System database to a particular PROMIS database. (Hamilton, T. 2575, 2605–2607) In contrast, the Batch Update subsystem was capable of transferring information from numerous different kinds of data bases into the various PROMIS formats, without "hard-coding, testing and debugging" the entire program each time. (Hamilton, T. 2571–2575)

77. Batch Update was delivered to the government by INSLAW pursuant to Modification 12, and has been used by the government. (Hamilton, T. 2575)

78. INSLAW delivered to the government twenty-two separate versions of PROMIS that contained all of the individual PROMIS enhancements and changes, as well as the entire Batch Update subsystem, and one program of the Data Base Adjustment subsystem. (Hamilton, T. 2588–2589) INSLAW delivered to the DOJ a separate tape containing all nine programs in the Data Base Adjustment subsystem, and delivered in each individual version of the PROMIS software for the United States Attorneys' Offices one of the nine Data Base Adjustment programs. (Hamilton, T. 2579, 2589; Gagliardi, T. 2067, 2069)

79. INSLAW was not required to develop a 32–bit architecture VAX version of PROMIS pursuant to any contract or for any private client. (Holton, T. 1132–33) The VAX version was not required to be delivered to the government under the Statement of Work in the 1982 Executive Office contract unless the government chose to implement VAX computers in its individual offices. (Hamilton, T. 2580–2581) Because the DOJ chose to use Prime minicomputers rather than VAX computers, INSLAW was not otherwise required to deliver the VAX version of enhanced PROMIS under the 1982 Executive Office contract. (Hamilton, T. 2580–81)

80. The funding for the VAX version was channelled through INSLAW's computer center, and supported with private research and development funds. (Holton, T. 1250–51)

81. The reason that INSLAW turned over to the DOJ the VAX version of PROMIS was because of the request of the Contracting Officer in December 1982, and pursuant to Modification 12. (Hamilton, T. 2581; PX 46; PX 78) In the absence of Modification 12, INSLAW would not have provided the VAX version of PROMIS to the DOJ. (Hamilton, T. 2581)

82. It was common knowledge among INSLAW's senior personnel and was discussed at senior staff meetings that the Batch Update subsystem, Data Base Adjustment subsystem and VAX development were being created by INSLAW, and that they were being developed at private, non-federal government expense. (Holton, T. 1142–43, 1193)

C. *INSLAW has Demonstrated the Creation of Numerous Individual Proprietary Changes and Enhancements to PROMIS using Private Funds*

83. INSLAW has also demonstrated that numerous discrete proprietary changes and enhancements to PROMIS were created with private funds. They were provided to the government pursuant to Modification 12. Precisely how many such changes and enhancements there were depends on the method of counting that is used.

As Hamilton testified at trial:

[A] given change that is sewn into the software can be looked at from several different perspectives.

And you can have a single change ... that can affect multiple modules, and each time its in a different module it has—there is labor, separate labor involved to insert it, and then, within a single module, it can affect a number of different locations in the code.

And each one of those locations in the code requires independent labor to insert. So you can count them in three different ways. Each way represents a legitimate perspective, and a big part of Mr. Videnieks' quarrel, as far as the so-called errors, was not understanding the difference in the three different perspectives of counting.

(Hamilton, T. 368–369) Thus Videnieks' initial debate with INSLAW over whether the number of enhancements was 800 or 247 or whatever was based upon his fundamental lack of understanding of the nature of the enhancements themselves.

INSLAW noted in a June 11, 1987 discovery-response memorandum that a large number of the individual enhancements encompassed changes to more than one program module, and numerous changes within the same program module:

Often one change or enhancement to a particular software module will require additional changes both within that soft-

ware module and to other software modules. For example, Change Number 0270 was made to module PR4400 in one place, involving eight lines of code, but required changes as well to PN9974 in two places, involving changes to one line each; PN9972 in one place to one line; and to PN9971 in one place and six lines. Change Number 0283 originally molified module WN997a in one place, involving ten lines of code, but also involving ten lines of code, but also affected modules PN9971 and PN9961 in two places each, and for six lines for each change. Change Number 0055 involved one change to the program documentation and changes to module PR4300 in twenty-four locations for a total of ninety-four lines of code.

(DX 212e, Exh. 18 at 19) This description lists only a few of the many changes that affect numerous modules in a number of individual locations. (*See also*, change numbers 0211, 0221, 0251, 0271 of PX 224) For that reason, as Hamilton explained at trial, each change or enhancement could actually be considered as several enhancements. As INSLAW concluded in its June 11, 1987 memorandum to DOJ, "purely numerical analyses of the software enhancements are not particularly instructive and are potentially misleading." (DX 212e, Exh. 18 at 19)

With respect to the alleged "reductions" asserted by DOJ, this Court finds that IN-SLAW reduced the number of enhancements claimed as proprietary because IN-SLAW ascertained that certain enhancements, *even though they were privately funded*, were provided to the government under earlier contracts such as the Pilot project. (Holton, T. 1219–1220) For example, during the deposition of Ms. Holton, DOJ provided INSLAW with excerpts from the pilot version of PROMIS that, to Ms. Holton's mind, cast doubt on whether certain of the privately-funded enhancements previously had been included in the pilot version. Following a detailed comparison of the enhancements list and the pilot project software, INSLAW then withdrew its claims. Among the privately funded enhancements that were discovered to have

been included in the pilot project software was one of the major enhancements, *i.e.*, the Historical Purge package. Thus, even though INSLAW created those enhancements with private funds, INSLAW recognized that it could not in fairness assert proprietary rights to those enhancements against the Government and accordingly withdrew those claims from this proceeding. INSLAW similarly withdrew its claims with respect to those five discrete enhancements that at trial appeared to Ms. Holton to be included in the July 18, 1981 LEAA/BJS version of PROMIS.

This process of comparing the enhancements proofs with the previously-provided PROMIS software could have been performed easily by INSLAW with DOJ's assistance in the summer of 1983, when IN-SLAW attempted to negotiate this issue with DOJ and submitted to DOJ its memoranda proving specific enhancements. All of the documents used by INSLAW in this proceeding to identify the funding of its enhancements existed at the time the negotiations should have occurred. As Mr. Rugh conceded at trial, the proofs offered by INSLAW would have satisfied him that the enhancements were indeed privately funded. (Rugh, T. 1517–1520) DOJ was required to negotiate *then*, in 1983, as Videnieks specifically had proposed under Modification 12 (*see* PPFF 228–236), but instead it wrongfully and cynically failed either to negotiate in good faith or even to reveal to INSLAW any purported concerns of Messrs. Rugh and Videnieks at that time with INSLAW's proposed method of proof (*see* PPFF 246–250).

It is obvious and this Court finds that, contrary to DOJ's unwarranted implications, any reduction in the number of enhancements identified by INSLAW was not caused by the purported inadequacy of any assumptions employed by Ms. Holton in her analysis. The reductions, rather, were caused by INSLAW's desire to present this Court with the most conservative measure of INSLAW's enhancements, by giving DOJ the benefit of the doubt whenever there was any real question, without the "window dressing" of counting each en-

hancement as several changes, or by breaking out the literally thousands of individual components of each of the three major enhancements.

In any event, the ultimate question to be answered under the automatic stay provisions is not whether 247 or 151 or 105 enhancements were misappropriated by DOJ. The fact that DOJ unlawfully has exercised control over even one of INSLAW's proprietary enhancements constitutes a violation of the automatic stay and entitles INSLAW to judgment in its favor on the merits.

84. INSLAW's privately-funded, proprietary maintenance changes and enhancements were not required to be delivered to the government under the Statement of Work in the Executive Office contract, paragraph 3.2.4.3, because they were not responsive to requests made or errors reported to INSLAW by the Executive Office. (Hamilton, T. 2567–2571; PX 17) These changes and enhancements are being used by the Department of Justice. (Hamilton, T. 2571)

85. These changes are identified by INSLAW within the source code of PROMIS according to standards established by INSLAW, using a system of change markers as "bookends" before and after the actual changes to the PROMIS code. (Holton, T. 1177–1180; PX 229 [designated "Confidential"]) The history of all changes to the programs are also listed within a history section at the beginning of each program or program module. (Holton, T. 1176–1179; PX Confidential 229) INSLAW's documentation standards are more extensive than those generally employed by software developers in the industry. (DeLutis, T. 1287–1288)

86. Because of INSLAW's standard documentation for tracking changes and enhancements made by INSLAW to PROMIS, INSLAW is able to remove any changes or enhancements and provide an earlier version of PROMIS to a user without the changes or enhancements. (Holton, T. 1180–81)

87. Each of these individual changes or enhancements originated either with a re-quest from a user or an "in-house" suggestion from an INSLAW programmer. (Holton, T. 1181, 1184) These requests and suggestions are recorded by INSLAW on report forms, which are retained by INSLAW in a master book. (Holton, T. 1181–1185; PX 226a) The top portion of the form records the reason for the requested change, the origin of the change and the date the change was requested. (PX 226a; Holton, T. 1183–85)

88. When the change is completed, the INSLAW programmer also completes the lower portion of the report form, noting the programmer who performed the change, the date the work was completed, the programs that were changed as a result of the work and any other pertinent comments concerning the changes made to the programs. (Holton, T. 1183–87, 1259; PX 226a)

89. These report forms are maintained by INSLAW for the use of its software division, and are not used by INSLAW in financial accounting. (Holton, T. 1259–1260)

90. By matching the changes noted in the source code with the report forms, and then examining the time sheets of the programmers during the period when the programmer worked on the changes, INSLAW has demonstrated that changes and enhancements to PROMIS were created by INSLAW and funded through non-federal government, private sources. (Holton, T. 1186–1187; PX 354) The assumptions utilized by INSLAW in making such demonstration were reasonable. (DeLutis, T. 1293–1298) These changes and enhancements that INSLAW claims as proprietary are identified on PX 224.

91. Many of the individual enhancements summarized on PX 224 add to PROMIS new functionality, or efficiency, or increase the "user-friendliness" of PROMIS, i.e., make PROMIS easier to use. (Holton, T. 1215–1219; DeLutis, T. 1284–1285; PX 228) Many more of these changes and enhancements added to user confidence in PROMIS insofar as certain latent defects were discovered and corrected and PROMIS therefore became more

reliable. (DeLutis, T. 1284) No software the size of PROMIS is completely and totally "error-free", and this fact is well known and recognized among computer software companies and their customers, as demonstrated by the special, restricted definition given by DOJ to the term "error-free" in the contract which DOJ drafted and which is at issue here. (DeLutis, T. 1284; Hamilton, T. 2568; Deroy, T. 2496–2497)

92. INSLAW defined a "bug" or "software error" as a problem with the source code that stops the program from executing or generates incorrect results, and an "enhancement" as a change that expanded the capabilities of the program. (Holton, T. 1258–1259)

93. Although DOJ's expert defined "enhancement" differently from INSLAW, and although he only concentrated on eight of the more than one hundred discrete changes and enhancements claimed as proprietary by INSLAW, even DOJ's expert conceded that there was no question that among the discrete changes shown on Plaintiff's exhibit 224, INSLAW had created enhancements to PROMIS. (Gagliardi, T. 2037–2038, 2065–66, 2096; DX 207a at 18) Dr. Gagliardi also conceded that he did not spend time forming opinions as to the functional significance of any of INSLAW's enhancements and changes to PROMIS. (Gagliardi, T. 2044, 2065, 2096–2097)

94. Given the standards within the software industry for bookkeeping, accounting and documentation relating to software maintenance, and given the practices common within INSLAW and the industry at large relating to software development, INSLAW's method of proof that the individual changes and enhancements identified on PX 224 were privately funded is reasonable. (DeLutis, T. 1298)

95. Defendants' expert, Dr. Gagliardi, posited that productivity rates for INSLAW's programmers could be accurately determined by dividing the raw number of lines of code in particular changes and enhancements by the number of hours shown on programmer time sheets. (Gagliardi, T. 2020–2023; DX 207a) Although Defend-ants' expert testified that the "productivity" rates for the Batch Update and Data Base Adjustment subsystems appeared to him to call into question INSLAW's time accounting records, that testimony was based merely upon a purely numerical analysis of these subsystems, and not on any knowledge of the substance of the programs themselves. (Gagliardi, T. 2053, 2077, 2090; DX 207a) (See also F.F. ¶ 398 concerning this witness's bias, which caused him to testify in whatever way he thought might defeat INSLAW's claims, without regard to the truth.)

96. The results of Dr. Gagliardi's statistical analysis are undercut by the substance of those subsystems and the circumstances underlying the creation of those subsystems; approximately 25% of each of those subsystems consisted of unexecuted program documentation, which can be written much more quickly than lines of code. (Holton, T. 2507–2509, 2511) A great number of the lines of code in each of those subsystems was generated by other INSLAW software rather than coded manually by the programmers. (Holton, T. 2509, 2511) In addition, Dr. Gagliardi's count of the number of lines of code may well include "copy members" that already existed in the PROMIS programs and would not have been rewritten by the programmers who coded these subsystems. (Holton, T. 2526) These factors and others, including the experience, capabilities and work habits of the programmers who worked on these two subsystems, affect Dr. Gagliardi's conclusions by as much as fifty percent and perhaps more. (Holton, T. 2506–2515)

97. Even excluding the substantial number of lines of code changed or added to PROMIS as a result of the development of the 32–bit VAX version of PROMIS, Defendants' expert conceded that INSLAW's proprietary enhancements constitute at least eleven percent of the total code of PROMIS. (Gagliardi, T. 2070–2071) However, an analysis of value based solely upon the number of lines of code can be misleading because, as Defendants' expert noted, it is desirable for a programmer to devise a program that consists of as few

lines as possible so as to take up less memory space and execute more quickly. (Gagliardi, T. 2098–2100)

## III. C. MADISON BREWER'S RELATIONSHIP TO INSLAW AND THE ORIGINS OF HIS BIAS AND LACK OF IMPARTIALITY TOWARD INSLAW

### A. *Brewer's Firing by Hamilton*

98. C. Madison Brewer, III ("Brewer") was employed by the Institute as its general counsel from November 1974 to April 1976. (Answer ¶ 7; Brewer, T. 1571; Hamilton, T. 90; Merrill, T. 812) At the time of his employment, Brewer understood that Hamilton and the Institute were synonymous. (PX 324 [Brewer] at p. 49; Brewer, T. 1655)

99. Hamilton interviewed Brewer prior to hiring him. (Hamilton, T. 91) At the time, Hamilton was looking for a former prosecutor to act as general counsel whose primary responsibility would be to serve as an intermediary between the Institute and its marketplace of public prosecutors. (Hamilton, T. 91; Merrill, T. 755) In this liaison capacity, the general counsel would translate between what public prosecutors wanted and what the Institute had to offer. (Gizzarelli, T. 469; Brewer, T. 1575; Hamilton, T. 91; Merrill, T. 755) The general counsel would also be a key player in the "inner circle" of managers who were utilized by Hamilton for running the Institute. (Hamilton, T. 84, 92; Merrill, T. 751) Hamilton fully informed Brewer about these duties and responsibilities and hence Brewer must have understood the nature of the position. (Hamilton, T. 91; Gizzarelli, T. 469) Prior to accepting the position at the Institute, Brewer was also informed by the out-going general counsel that Hamilton was a fast-paced person who was an entrepreneurial type who wanted to get things done. (Gizzarelli, T. 470)

100. From the outset, Brewer was himself unhappy because of his misconception of what the job as general counsel entailed. (PX 324 [Brewer] at pp. 41, 49–50; Brewer, T. 1576) Within weeks of his joining the Institute, Brewer himself came to realize that his concept of what a general counsel was to be was radically different from Hamilton's, in that Hamilton chose to make decisions without consulting Brewer. (PX 324 [Brewer] at p. 43; Brewer, T. 1576)

101. Brewer reported to Hamilton, who observed his performance as general counsel of the Institute. (Hamilton, T. 92) On at least three specific occasions, Brewer failed to perform important tasks assigned to him. (PX 324 [Brewer] at pp. 39–45; Hamilton, T. 93–94; Merrill, T. 756) Brewer was informed on a number of occasions in 1975, beginning at least as early as April, that his work was unsatisfactory and that he would have to make efforts to improve or consider leaving his employment. (Hamilton, T. 93–95; Merrill, T. 757, 812–813) Brewer's contrary testimony is unbelievable for a variety of reasons, including his own testimony referred to in F.F. ¶¶ 103 and 106–110 below. See also F.F. ¶¶ 104 and 398.

102. Brewer himself understood that he was not performing one of his critical duties, which was to generate income for the firm. (PX 324 [Brewer] at p. 65) In addition, Brewer believed that he was a substantial "drag on the overhead," because of his failure to generate business. (PX 324 [Brewer] at pp. 64–65) He also understood that there were projects assigned to him which either were not completed or not done in a timely manner, and he was aware of Mr. Hamilton's disappointment as a result thereof. (PX 324 [Brewer] at pp. 39–45; Hamilton, T. 93, 97; Merrill, T. 756)

103. When Brewer's performance did not improve, Hamilton informed Brewer that he was not fitting in at the Institute, that he was like a "duck out of water". (Hamilton, T. 94–95; PX 324 [Brewer] at pp. 51–55; Brewer, T. 1584; Merrill, T. 756–757) Hamilton cited to Brewer the ways in which it was not working out and asked him to leave. (Hamilton, T. 94–95) Because of Hamilton's concern that firing Brewer would have a negative impact on the Institute's relationship with the local D.C. United States Attorney's Office (because the Institute originally had sup-

ported that office as a principal source of revenue and because the Institute had hired Brewer from this office), Hamilton told Henry F. Greene, then Chief of the Superior Court Operations of the United States Attorney's Office for the District of Columbia, that Brewer was not fitting in at the Institute, and sought his advice and the advice of others about how to fire Brewer painlessly. (Gizzarelli, T. 473; Hamilton, T. 95)

104. Because of his belief that Brewer's performance was not likely to improve, Hamilton told Brewer specifically to look elsewhere for work and to give Hamilton a date certain to leave. (PX 324 [Brewer] at pp. 51–55; Brewer, T. 1583; Hamilton, T. 96, 249, 252) In early April 1976, Hamilton again asked Brewer when he would be leaving the Institute for other work because of the length of time it was taking Brewer to leave. (Hamilton, T. 96; PX 324 [Brewer] at p. 67; Gizzarelli, T. 473) In April 1976, Brewer was terminated by Hamilton because of his failure to perform his job duties and responsibilities. (Hamilton, T. 97; Gizzarelli, T. 470–471; Merrill, T. 756–757)[7] Brewer finally left the Institute at the end of April 1976 and returned to his earlier position as an assistant U.S. Attorney for the District of Columbia. (PX 324 [Brewer] at pp. 66–67; Brewer, T. 1581; Hamilton, T. 97; Merrill, T. 812)[8] On the basis of all of the evidence, Brewer unquestionably knew that he was being fired for cause; he had no reason to believe that he was leaving voluntarily.[9] This

Court rejects DOJ's argument in favor of Brewer's contrary contention. Hamilton was simply being humane, as well as a good manager and a protector of IN-SLAW's own best interest, by not publicizing the fact that Brewer was being forced out, rather than leaving voluntarily. [Editor's Note: The Court has omitted portions of this paragraph from publication.]

105. Brewer understood that when he gave notice of what he characterized as his "decision to leave", he was "no longer part of Hamilton's 'select circle,' and was no longer included in meetings of any import". (PX 324 [Brewer] at p. 61; Brewer, T. 1584) He also stated that he had become a "nonperson" and "outside of the inner-circle," and that this situation, which he characterized as putting him in an awkward position, lasted from the middle of 1975 to April, 1976, when he finally left. (PX 324 [Brewer] at pp. 60–65; Brewer, T. 1584)

106. During Brewer's employment at the Institute, he developed very negative opinions about Hamilton. (PX 324 [Brewer] at pp. 61, 70–79; Brewer, T. 1587–1588) Brewer believed that Hamilton had a "messianic personality" and a very distorted view of reality. (PX 324 [Brewer] at pp. 61, 70; Brewer, T. 1649) Brewer perceived that Hamilton had a persecution complex and that Hamilton thought "there was a conspiracy to get him." (PX 324 [Brewer] at p. 70) According to Brewer, Hamilton allegedly had a "love/hate fixation about the law or lawyers" and was very hostile to lawyers and particularly prosecutors.

7. In an effort to accommodate Brewer upon his departure from INSLAW, Hamilton gave Brewer a raise in April 1976 in response to Brewer's statement that his salary at the U.S. Attorney's office would be determined by his departing salary at INSLAW. (Hamilton, T. 400–401) This was the only basis for giving Brewer the raise. (Hamilton, T. 401)

8. Immediately before joining INSLAW in November 1974, Brewer had told the U.S. Attorney in Seattle, Washington that he would accept a position with that office. (Brewer, T. 1574) Several days later he called the U.S. Attorney to say that he would not accept the position. (Brewer, T. 1574–1575) Similarly in 1976, Brewer again accepted a position with the U.S. Attorney's Office in Seattle and several days later called that office to inform them that once

again he had changed his mind and declined the offer of the position. (Brewer, T. 1579–1580)

9. Brewer testified at trial that there was a changed, hostile attitude by INSLAW employees towards him after the FBI interviewed them as part of its employment-related background investigation of him preceding his return to the U.S. Attorney's office. This Court believes that testimony was a deliberate fabrication. The Court infers that Brewer so testified because he believed or feared that an INSLAW employee may have "spilled the beans" to the FBI about the true circumstances of his departure from INSLAW; hence he feared that the FBI investigation report would significantly undercut his testimony that he left INSLAW voluntarily; and he wanted to defuse that adverse evidence to the extent possible.

(Brewer, T. 1592, 1653–1654; PX 324 [Brewer] at p. 71) Brewer also believed that Hamilton did not view facts objectively and that Hamilton considered all persons who disagreed with him as his "enemy." (PX 324 [Brewer] at pp. 70–72; Brewer, T. 1589, 1592) ·

107. On the basis of Brewer's observations, he concluded that Hamilton was "a very troubled individual". (PX 324 [Brewer] at p. 72; Brewer, T. 1651) In particular, Brewer considered that Hamilton was an "M.O.", which in prosecutor's vernacular is an individual sent away for mental observation because of bizarre behavior or a questionable capacity to comprehend court proceedings. (PX 324 [Brewer] at p. 74; Brewer, T. 1590; Gizzarelli, T. 474–475) Brewer freely characterized Hamilton as "crazy Bill" and described Hamilton's conduct as "Bill's being crazy". (PX 324 [Brewer] at p. 78; Brewer, T. 1652)

108. Brewer also believed the Institute's empirical research to be of questionable value, non-utilitarian and "kind of a joke". (PX 324 [Brewer] at pp. 75–77; Brewer, T. 1660) [10] More importantly, Brewer thought that Hamilton had a very unrealistic view of PROMIS software and its role in the world. (PX 324 [Brewer] at p. 73)

109. These were opinions that Brewer developed during the period of time that he was the Institute's general counsel. (PX 324 [Brewer] at pp. 78–79; Brewer, T. 1653) Subsequent to leaving the Institute, Brewer repeated some of these negative comments to others. (PX 324 [Brewer] at pp. 79–80; Brewer, T. 1659–1660; Gizzarelli, T. 475) More particularly, Brewer continued to refer to Hamilton as an "M.O." after Brewer rejoined the U.S. Attorney's office. (Gizzarelli, T. 475) [11]

110. On the basis of the foregoing and the evidence taken as a whole, this Court is convinced beyond any doubt that, prior to assuming his position as the PROMIS Project Director at EOUSA, and during the course of discharging his responsibilities in that position, Mr. Brewer was consumed by hatred for and an intense desire for revenge against Mr. Hamilton and INSLAW, and acted throughout this matter in a thoroughly biased and unfairly prejudicial manner toward INSLAW.

## IV. DOJ'S DECISION TO AUTOMATE U.S. ATTORNEY'S OFFICES WITH PROMIS AND TO HIRE BREWER AS PROMIS PROJECT MANAGER

### A. Nature of DOJ's Case-Tracking Problem

111. Beginning in the early 1970's, both the Office of Management and Budget ("OMB") and the Congress were criticizing DOJ for its lack of management information concerning its litigation activities. (PX 9; PX 341 [Tyson] at p. 27) In response to this criticism, DOJ attempted to develop a more responsive case management system known as the Automated Caseload and Collection System ("ACCSYS"). (PX 9) In a 1978 internal audit study, DOJ found ACCSYS to be seriously deficient in applications, inflexible in use and expensive to operate with estimated annual operating

---

10. By way of justifying his opinion, Brewer claimed that the Institute had conducted a study purportedly concluding that female prosecutors were more effective than male prosecutors and that the conclusion was unwarranted because there were only two female Assistant U.S. Attorneys at the time. (PX 324 [Brewer] at pp. 76–77) In fact, neither the Institute nor INSLAW ever published such a study, and since the gender of the government attorney is not even recorded in the PROMIS data base, it is highly unlikely that any such study could have been conducted, even by investigators acting on their own. (Hamilton, T. 2589–2591) This study was either a figment of Mr. Brewer's imagination or a construct created on the witness stand at trial in a desperate attempt to find some

factual basis for his irrefutably false allegations about INSLAW's allegedly unsatisfactory work. Notwithstanding his public criticism of the Institute's empirical research, Brewer acknowledged at trial that he privately had taken credit for some of the Institute's more celebrated research work in his successful application to become a member of the Federal Government's Senior Executive Service. (Brewer, T. 1661)

11. Although Brewer denied using the term "M.O." more than once, he did admit that he stated during the course of the PROMIS Contract that "... Hamilton has a very, very distorted view of the world and that it's not realistic, it is mentally defective." (Brewer, T. 1659)

costs of $500,000 per office. (PX 9) The system was finally abandoned in 1979. (PX 9)

112. During this same time period, LEAA was funding the PROMIS Project in the District of Columbia U.S. Attorney's Office. (PX 8; PX 9) The Old PROMIS System was also being utilized by numerous other state and local jurisdictions. (PX 9) Old PROMIS received enthusiastic endorsements from its various users because of its flexibility of use and breadth of hardware applications. (PX 9)

113. After careful study, DOJ's Justice Management Division ("JMD") and the Executive Office for United States Attorneys ("EOUSA") concluded in 1981 that the then-current docketing and reporting system should be replaced by Old PROMIS, as modified by INSLAW under the pilot project contract, in the 20 largest U.S. Attorney's Offices, and by word-processing software mimicking the functions of Old PROMIS, for the remaining 74 U.S. Attorney's Offices. (PX 2; PX 10) On August 27, 1981, Deputy Attorney General Edward C. Schmults approved a joint JMD/EOUSA proposal to implement Old PROMIS on local mini-computers in the 20 largest U.S. Attorney's Offices and on word processing equipment in the remaining 74 U.S. Attorney's Offices. (PX 4; PX 10; Hamilton, T. 109–111)

114. The PROMIS Project was understood by senior officials at DOJ to be the most important long-term improvement that could be made for U.S. Attorneys' Offices in particular, and law enforcement in general. (PX 1, PX 341 [Tyson] at p. 33) In light of the importance of the project, Schmults directed that the originally proposed procurement schedule be moved up so that work on the project could begin at the earliest possible date. (PX 6)

115. Despite this recognition of the importance of the PROMIS Project by Senior DOJ officials, it was not universally supported by staff personnel at DOJ, particularly in JMD. (PX 341 [Tyson] at p. 53; Brewer, T. 1636; PX 3)

116. As part of DOJ's overall planning on the PROMIS Project, a senior level PROMIS Oversight Committee was organized in the spring of 1981. (PX 341 [Tyson] at pp. 17–18; PX 8) As Assistant Attorney General for the Criminal Division, D. Lowell Jensen attended PROMIS Oversight Committee meetings; as Associate Attorney General and Deputy Attorney General, Jensen was ranking member of that Committee. (PX 328 [Jensen] 83–84) The PROMIS Oversight Committee decided important strategic questions, but Brewer, the Project Manager, had responsibility for and direction of day-to-day activities. (PX 341 [Tyson] at p. 99; Tyson, T. 1541; PX 10)

117. A three year implementation contract for the PROMIS Project was planned with a Request for Proposal ("RFP") scheduled for issuance in October 1981 to be responded to within six weeks. (PX 5) The award of the contract was planned for March 31, 1982. (PX 5)

B. *INSLAW'S Recommendation to Use Micro-Computers Rather than Word Processors in the Executive Office RFP*

118. Prior to DOJ's issuance of the PROMIS Project RFP, several vendors approached DOJ with recommendations against the use of word processing equipment to perform the complex case-tracking functions of Old PROMIS. (PX 341 [Tyson] at pp. 46–47, 52–53)

119. In May 1981, Hamilton and Gizzarelli, on behalf of INSLAW, met with William P. Tyson, Director of EOUSA, and his deputy, Lawrence McWhorter, in an effort to persuade them that use of word processing equipment to perform PROMIS-like case control functions was ill-advised, particularly in light of the computation-intensive requirements of legal process debt collection and the availability of inexpensive full function micro-computers that could perform both data processing (*i.e.*, case control and management information functions) and word processing functions. (Hamilton, T. 116; Gizzarelli, T. 496; Tyson, T. 1543–1545; PX 341 [Tyson] at pp. 43–44, 52–53) Moreover, INSLAW recommended that, if DOJ were not interested in

substituting micro-computers for word processors, then DOJ should split the planned procurement into two separate procurements, one for computer-based PROMIS in the 20 largest offices and one for word-processing based case tracking for the 74 smaller U.S. Attorney's Offices. (Hamilton, T. 116–117)

120. Tyson responded to INSLAW's concern by indicating that he had no reason to doubt its validity but that, due to the difficulty of getting approval of the proposal, he was not willing to change it. (Hamilton, T. 117) Tyson did say, however, that he would regard the entire contract as a success if computer-based PROMIS were implemented in the 20 largest U.S. Attorney's Offices regardless of whether implementation of word processing PROMIS was successful. (Hamilton, T. 117)[12] Hamilton's response to Tyson was that, under these circumstances, INSLAW would bid on the RFP and would do its best to make the entire project a success. (Hamilton, T. 118; PX 341 [Tyson] at p. 46)

121. OMB, in response to an INSLAW inquiry after the meeting with Tyson and McWhorter, wrote to the Deputy Attorney General enclosing and endorsing an INSLAW analysis of the reasons for using full function computers rather than word processors for the PROMIS-like case control work in the 74 smaller U.S. Attorney's Offices. (Hamilton, T. 118–119; PX 7)

122. Despite these recommendations, DOJ issued the PROMIS Project RFP on November 2, 1981. (Answer ¶ 12) The RFP sought bids for implementation of Old PROMIS on mini-computers and for PROMIS-like case control software that would work on word processing equipment. (Answer ¶ 12; Hamilton, T. 124) This proposal sought *only* the pilot project version of PROMIS plus the BJS enhancements. (Hamilton, T. 124; Merrill, T. 764–766, 840–841)

## C. *DOJ's Hiring of Brewer as PROMIS Project Manager*

123. As part of the original approval of the PROMIS Project, Deputy Attorney General Schmults also approved the appointment of a PROMIS Project Manager. (PX 10) On January 6, 1982, Schmults approved an EOUSA request for the allocation of a Senior Executive Service Position for the PROMIS Project Manager. (PX 10)

124. In essence, the PROMIS Project Manager was assigned total responsibility for the implementation and development of the PROMIS Project for EOUSA. (PX 10) The Project Manager's responsibilities were three-fold: first, responsibility for coordination with the contract to implement the system within three (3) years in offices of differing sizes; second, responsibility for coordinating the utilization of PROMIS by the U.S. Attorney's Offices, JMD and DOJ; and third, responsibility for coordinating EOUSA activity associated with the implementation of PROMIS. (PX 10) In addition, the Project Manager was responsible for organizing a staff to administer the PROMIS Project. (PX 10)

125. In August 1981, Laurence McWhorter, Deputy Director of EOUSA, approached Brewer to become the PROMIS Project Manager. When this opportunity presented itself, Brewer, believing that he had been wrongfully discharged by Hamilton and INSLAW and having developed an intense and abiding hatred for Hamilton and INSLAW as a result thereof, applied for the PROMIS Project Manager's position with the purpose of using that position to vent his spleen against INSLAW. The evidence showed conclusively, and beyond any question in the mind of this Court, that Brewer was consumed by hatred for and an intense desire for revenge against INSLAW and Hamilton. (PX 324 [Brewer] at p. 90; PX 341 [Tyson] at pp. 69–70; Tyson, T. 1539–1540) Brewer was interviewed for the position by McWhorter and Tyson of EOUSA and Rooney of JMD. (PX 341

---

12. Indeed, following completion of the Executive Office contract, a report submitted by Tyson to Stephens specifically stated that "[i]n the opinion of the project staff, ... INSLAW, Inc. successfully completed all tasks required by the ... software contract, or [was] precluded from doing so...." (PX 178)

[Tyson] at pp. 67–69, Tyson, T. 1539–1540; PX 330 [McWhorter] at pp. 21–23; Brewer, T. 1657)

126. During these interviews, Brewer did not disclose the opinions he held regarding Hamilton, because in his view they were "irrelevant." (PX 324 [Brewer] at p. 92; Brewer, T. 1647, 1657) In addition, Brewer did not disclose the reason for his termination from the Institute or the fact that he had been asked to leave. (PX 341 [Tyson] at pp. 70–71; Tyson, T. 1549; Brewer, T. 1658) Brewer also believed that his reasons for leaving the Institute were "irrelevant." (Brewer, T. 1658)

127. As of the time of these interviews, Brewer, Tyson, McWhorter and Rooney were all aware that INSLAW was the likely successful bidder for the work of performing the PROMIS Project. (PX 341 [Tyson] at p. 70; Tyson, T. 1539–1540; PX 330 [McWhorter] at p. 12; PX 324 [Brewer] at pp. 96–97) If Brewer had disclosed the actual circumstances of his termination, at least Rooney and Tyson would have made further inquiry into his employment at the Institute, and Rooney's strong inclination would have been not to hire Brewer. (PX 341 [Tyson] at pp. 71–72; Tyson, T. 1553–1554)

128. Despite this knowledge of INSLAW's role as a bidder on the Contract and DOJ's understanding that Brewer had previously been employed by INSLAW, this Court does not believe that any inquiry was made by DOJ to determine INSLAW's view of Brewer as an employee, or as to the circumstances of his termination from employment.[13] (PX 341 [Tyson] at p. 85; Tyson, T. 1551–1552, 1554; Hamilton, T. 296–297; PX 209 [Confidential])

Indeed, McWhorter and Tyson believed that Brewer's prior employment with INSLAW was a "plus" factor for DOJ, and failed to recognize that such prior employment would generally lead the former employee either to favor or to disfavor the former employer, thus preventing that person from being impartial in the discharge of his duties.

129. Despite the fact that Brewer had no prior experience with computers, computer technology, computer programming, accounting, auditing or contract administration, he was hired as the PROMIS Project Manager and began in that position in January 1982. (PX 324 [Brewer] at pp. 9–10, 92–93; Brewer, T. 1643–1644) He was in full charge of administering the PROMIS Project. (Answer ¶ 7) In essence, Brewer was given day-to-day direct responsibility for the PROMIS Project. (PX 341 [Tyson] at p. 99; Tyson, T. 1540–1541) More particularly, in exercising this responsibility he effectively was left alone to implement the PROMIS system. (PX 341 [Tyson] at p. 105; Tyson, T. 1541)

130. As part of his responsibilities as Project Manager on the PROMIS Contract, Brewer was the liaison between EOUSA and other components of DOJ and served as the spokesman for EOUSA on the Project. (Brewer, T. 1604) Brewer also dealt directly with INSLAW in connection with the contract. (Brewer, T. 1654; Tyson, T. 1540)

131. Brewer and Rugh regularly informed Tyson of their views on INSLAW's assertion of proprietary rights in Enhanced

13. DOJ points to Lawrence McWhorter's testimony that he had a 30–second telephone call with Hamilton, in which Hamilton said he felt no animosity toward Brewer and felt there would be no problem working with Brewer. This Court disbelieves McWhorter's testimony as well as the corroborative testimony of James Kelley, for the reasons set out in F.F. ¶ 398, below, and also because McWhorter never asserted having this conversation at any time prior to this litigation, notwithstanding his prior meetings with Hamilton in which Hamilton complained about Brewer's bias. McWhorter's testimony is also belied by the fact that, as soon as Hamilton found out that Brewer was being considered for the position of Project Manager, Hamilton sought to encourage others to apply for the position, hoping that someone else would be selected.

Even if such a conversation as McWhorter described had occurred, it could only have been in the context that McWhorter gave Hamilton to understand that Brewer was very likely to be hired for the position regardless of what Hamilton might say, thus leaving Hamilton little choice but to make the statements that McWhorter attributed to Hamilton. In any event, Brewer's improper conduct did not occur until well after this alleged telephone call.

PROMIS, their contingency plans for assuming control over the contract if discontinuation of advance payments caused INSLAW's insolvency, their awareness of delays in hardware procurement, and their concern that INSLAW might be entitled to additional time-sharing cost payments because of greater than anticipated use of PROMIS by the U.S. Attorney's Offices. (PX 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 248, 249) Brewer also briefed the PROMIS Oversight Committee as well as the staff of the Assistant Attorney General for the Criminal Division (who at the time was D. Lowell Jensen) in regard to the PROMIS Contract. (Brewer, T. 1604, 1661–1662) The Executive Office, including Brewer and his superiors, reported directly to Jensen when Jensen was Associate Attorney General and then began reporting directly to the Deputy Attorney General when Jensen was promoted to that position. (Brewer, T. 1661–1662; Tyson, T. 1534–1535)

### D. *Brewer's Organization of DOJ'S PROMIS Project Team*

132. Brewer began organizing his staff for the PROMIS Project shortly after his appointment to the position. (PX 324 [Brewer] at pp. 101, 108–109) At the inception of the Project, Peter Videnieks had been appointed as Contracting Officer. (PX 324 [Brewer] at p. 104; Brewer, T. 1606; PX 39; PX 342 [Videnieks] at pp. 17–20; Videnieks, T. 1805–1807) Although at all times during the contract Videnieks was an employee of DOJ's JMD, EOUSA requested that he be assigned "full time" to the PROMIS Project, reimbursed JMD in full for his services and provided Videnieks with an office and file space. (PX 39; PX 238; PX 324 [Brewer] at p. 102; Brewer, T. 1606)

133. This "extraordinary action" was taken by Brewer to insure Videnieks' undivided service on the PROMIS Project. (PX 39) In September 1982, Tyson, at Brewer's request, sought and received Rooney's permission to have Videnieks assigned essentially full-time to the PROMIS Project because of Brewer's belief that Videnieks was needed full time to "vigorously monitor the INSLAW contract". (PX 39) [14] Videnieks was described by one witness as a puppet who responded to Brewer's direction. (Gizzarelli, T. 527) Videnieks' testimony, especially at deposition, but also in Court, reveals a man keenly aware of his own limitations and the superior rank and knowledge possessed by Brewer and Rugh. Videnieks was a lower level employee who was dependent on the expertise of others, specifically Brewer and Rugh, in all areas about which he had to make decisions as the contracting officer, including accounting, computer software and computer hardware. In addition, Videnieks was dependent upon the good will and approbation of Brewer and Rugh for his professional livelihood and advancement.

INSLAW believed, with good reason, that Videnieks was not acting like a Government contracting officer in that he was not independent from the disputes or divorced from the operational aspects of the contract. (Gizzarelli, T. 527) Although a Government contracting officer is of course a representative of the Government and not a completely detached and neutral arbiter, nevertheless he has a responsibility—which it is obvious Videnieks did not fulfill in this case—to act in a statesmanlike manner, somewhat "above the fray," at least to the same extent as would a corporate president, as William Hamilton has conducted himself. (Sherzer, T. 992) Indeed, the opinion of our Court of Appeals in *Conax Florida Corp. v. United States,* 824 F.2d 1124, 1128 (1987) suggested that a contracting officer can be regarded as separate from either "party," when that Court stated, *"the parties* litigated this threshold question *before the Navy's contracting officer,"* and when the Court then held, "we may set aside the contracting officer's finding only if we determine it is arbitrary and capricious." (Emphasis added.)

---

**14.** Significantly Videnieks testified that of approximately 600 to 650 contracts that he had worked on the INSLAW contract was only one of two contracts that went to litigation. (Videnieks, T. 1804–1805)

134. Brewer interviewed and hired Michael Snyder as the Contracting Officer's Technical Representative ("COTR") in June of 1982. (PX 337 [Snyder] at p. 45) As COTR, Snyder was required to provide technical advice and assistance to the Contracting Officer in connection with the PROMIS Project. (PX 337 [Snyder] at pp. 29–30)

135. Snyder was hired as COTR despite the fact that he had very limited education, training or experience in computers, computer hardware and software, computer technology and installations. (PX 337 [Snyder] at pp. 5–9, 13) Although Snyder had some prior experience involving automated litigation systems, this was largely limited to legal research services, such as LEXIS or JURIS, and to document retrieval systems. (PX 337 [Snyder] at pp. 7–8, 17–19) In his position as COTR, Snyder discussed the PROMIS Project with Brewer on a daily basis, and his office was two doors away from Brewer's office. (PX 337 [Snyder] at pp. 28–29)

[Editor's Note: The Court has omitted paragraph No. 136 from publication.]

137. Both Rugh and Videnieks were infected by Brewer's poisonous attitude towards Hamilton and INSLAW, and they aided and assisted Brewer in his wrongful efforts to injure INSLAW. Rugh also was improperly motivated by his desire to build a small empire within EOUSA if DOJ were to take over the job of software development and maintenance with respect to PROMIS software.

## V. INSLAW GIVES DOJ NOTICE OF ITS OWNERSHIP OF AND PROPRIETARY RIGHTS TO ENHANCED PROMIS

### A. *INSLAW Gives Notice of Its Proprietary Claims*

138. By the time that DOJ issued the RFP, INSLAW had made substantial enhancements to Old PROMIS. (Hamilton, T. 105; Merrill, T. 763) These enhancements, which eventually included major new functional subsystems and substantial changes to the existing code, at a cost which INSLAW estimated to be $8.3 million, rendered Enhanced PROMIS far superior to Old PROMIS in terms of speed, flexibility, ease of use, breadth of function, and ability to be modified for particular needs. (Hamilton, T. 400; Merrill, T. 760–762; Holton. T. 1216–1219)

Both before and after the PROMIS contract was signed, INSLAW specifically advised EOUSA in writing that it had available for sale, at an additional cost, certain proprietary enhancements to PROMIS.

139. In its Technical Proposal responding to DOJ's PROMIS Project request for proposals ("RFP"), INSLAW informed DOJ that it had made enhancements to Old PROMIS which were proprietary, and as to which it had made a significant developmental and commercial commitment. (Answer ¶ 13; PX 12; Hamilton, T. 124–125; Gizzarelli, T. 482–483) In this regard, INSLAW specifically made a claim of proprietary rights in such enhancements. (Hamilton, T. 124) In response to INSLAW's proposal, Videnieks requested a clarification of INSLAW's claim of proprietary rights to PROMIS software. (PX 13; Hamilton, T. 126; Merrill, T. 766–767) In an amendment to its Technical Proposal dated January 13, 1982, INSLAW responded to Videnieks' inquiry and specifically informed DOJ that "... all of INSLAW's software is proprietary to it thus far." (PX 14; Hamilton, T. 127) Videnieks did not respond further to INSLAW's amendment of its Technical Proposal. (Gizzarelli, T. 490; Merrill, T. 767–769) INSLAW also indicated that such programs were copyrighted and that since May 1981 it had been developing privately financed enhancements to PROMIS which were the exclusive property of INSLAW, and that DOJ had no license to use these privately-financed enhancements. (PX 14)

This Court rejects DOJ's contention that INSLAW offered to give up, without fee, all its proprietary rights in PROMIS when it offered to make "available to the United States Attorneys' Offices" new enhancements and modifications to PROMIS that INSLAW planned to develop "[d]uring the life of this project—but not as part of this

project." (PX 12) DOJ's interpretation ignores the crucial language "not as part of this project," whereby INSLAW clearly indicated that the enhancements were *not* being offered for no consideration or without a claim of proprietary rights.

In addition, DOJ's interpretation would lead to an absurd result. It would require this Court to believe, contrary to all the evidence, that INSLAW was willing to give up, without fee, its corporate lifeblood—was offering, in effect, to commit corporate suicide. (See F.F. ¶ 142 below.)

140. To illustrate this point, INSLAW, in its Technical Proposal, singled out the two-program version of the data base adjustment subsystem as an enhancement which had been developed by INSLAW using private funds. (Hamilton, T. 125; PX 14)[15] The data base adjustment subsystem was not required to be delivered under the contract nor had it been required to be delivered under any prior DOJ contracts (Hamilton, T. 125, 2575-2578; Merrill, T. 768). By this January 22 amendment, INSLAW illustrated the concept that INSLAW had all the proprietary rights in Enhanced PROMIS (Gizzarelli, T. 493).

141. Subsequent to receipt of INSLAW's response to Videnieks, and prior to the execution of the contract, no one from DOJ made any further inquiry of INSLAW, or raised any questions, concerning INSLAW's right to assert its proprietary rights in Enhanced PROMIS. (Hamilton, T. 128; Merrill, T. 767-769; Gizzarelli, T. 490) Brewer was not given and had not considered INSLAW's January 13, 1982 letter, or any of the pre-contract correspondence between INSLAW and Videnieks; therefore, Brewer's subsequent positions regarding INSLAW's proprietary rights

were taken without consideration of this letter. (PX 324 [Brewer] at pp. 204-205)

### B. *DOJ'S Confusion over Data Rights*

142. After INSLAW's submission of its Technical Proposal, Gizzarelli, Kelley, Merrill and Hannon from INSLAW had several negotiating sessions with DOJ personnel including Peter Videnieks, Jack Rugh, Patricia Goodrich and Brewer (who did not attend all of the sessions). (Gizzarelli, T. 484-485) At the first negotiating session in which the contractual data rights clause was discussed, Videnieks stated that DOJ was entitled to receive unlimited rights to the PROMIS software to be delivered under the contract. (Gizzarelli, T. 488-489, 582-583) In response, Kelley conveyed Gizzarelli's view to DOJ that INSLAW could not live with that restrictive data rights clause. (Gizzarelli, T. 486) The basis for this statement was that INSLAW existed solely on the basis of its PROMIS software and that such a broad data rights clause would destroy any business potential for INSLAW because "it would have in effect delivered to the DOJ all of the assets of INSLAW, Inc." (Gizzarelli, T. 486-487, 583-584) This Court accepts Gizzarelli's testimony concerning what was said at the negotiating sessions and rejects Kelley's contrary testimony for the reasons relating to credibility that are stated in F.F. ¶ 398.

143. At the next negotiating session, the attendees discussed the data rights clause again. (Gizzarelli, T. 487) INSLAW proposed changes to the contractual data rights provisions, and eventually negotiated terms that were acceptable to DOJ and that, INSLAW understood, preserved INSLAW's rights in the software. (Gizzarelli, T. 488)[16] Under this alternative pro-

---

**15.** Despite DOJ's efforts to confuse this issue, it is clear that although DOJ funded the "design" of the earlier data base adjustment, it was INSLAW's privately funded "execution" of this design which was the materially significant task in bringing this enhancement to the marketplace. (Merrill, T. 803-805) The design of a computer program is much akin to giving a builder ideas about where a door should be or the number of windows in a house, whereas execution of that design is tantamount to preparing blueprints

and then building the house. (Merrill, T. 803-805)

**16.** There is considerable doubt as to whether INSLAW and DOJ actually agreed to the data rights language which appears in DX 8, as opposed to a marked version of such language that contained interlining and marginalia submitted by INSLAW to DOJ as being acceptable to INSLAW. (Gizzarelli, T. 577-578) In addition, there is uncertainty as to the import of the use of the term "N/A" in the data rights clause

posal it was INSLAW's intention, of which DOJ was aware, that DOJ did not gain unlimited rights to any of INSLAW's proprietary enhancements to the software. (Gizzarelli, T. 488)

Both Hamilton and Brewer were acutely aware of the fact that permitting DOJ unlimited rights to INSLAW's proprietary enhancements was tantamount to corporate suicide, and neither understood that the contract was intended to give DOJ unlimited rights to these proprietary enhancements. This is the reason that Brewer later was determined to get these enhancements and why Hamilton was equally determined not to let Brewer get INSLAW's Enhanced PROMIS.

144. There is some uncertainty as to whether INSLAW and DOJ had a meeting of the minds on the PROMIS contract; DOJ's deletion of the "Rights in Data" clause from the PROMIS Contract evidences that uncertainty, yet also demonstrates DOJ's awareness of the critical need for INSLAW to maintain its proprietary rights in its enhancements to PROMIS. (PX 15; PX 16; PX 17) Hamilton understood that DOJ had received the right to use the PROMIS computer software only in the 20 largest offices specified in the contract. (Hamilton, T. 363–364) Gizzarelli's and Merrill's understanding was similar to Hamilton's understanding. (Gizzarelli, T. 488; Merrill, T. 764, 769–770) Kelley testified that DOJ informed him that it only wanted to use the PROMIS computer software for the U.S. Attorney's Offices. (Kelley, T. 1385)[17] Rugh testified that he understood DOJ had the right to use the PROMIS software anywhere in DOJ and to distribute it to the rest of the federal government, to state and local government and even to private parties. (Rugh, T. 1434, 1463–1466) However, this Court does not believe that testimony, because Rugh acknowledged that he equally understood that INSLAW was actively attempting to market PROMIS software to

private firms and state and local prosecutors. (Rugh, T. 1463) Nor does the Court believe the similar testimony of Brewer and Videnieks. Brewer testified that he understood that DOJ had absolute rights to give the PROMIS software away to anyone it chose, including private parties. (Brewer, T. 1609, 1683–1684) Notwithstanding this purported belief, Brewer testified that he had a "gentlemen's understanding" with Kelley that DOJ would not give PROMIS away to private companies. (Brewer, T. 1686–1687) Videnieks testified that he understood that DOJ had the absolute right to give the software away to anyone, including private parties. (Videnieks, T. 1821–1823) Moreover, Videnieks believed that gentlemen's agreements or unwritten side agreements were not only unenforceable, but also would subject the government employee making such commitment to sanctions. (Videnieks, T. 1873–1878)

Neither Brewer nor Rugh nor Videnieks could fail to understand that, if INSLAW gave to DOJ the right to *give away* to *anyone* all of INSLAW's PROMIS software, INSLAW would be unable to *market* that software: Who would *buy* from INSLAW what could be gotten *free* from DOJ? Thus, Brewer, Rugh and Videnieks were bound to know that INSLAW did not intend what they now claim the contract meant.

145. In its original Technical Proposal, INSLAW also informed DOJ that completion of the scope of work contemplated in the RFP would cost approximately $14 to $15 million. (Hamilton, T. 129) INSLAW was subsequently informed that DOJ had only approximately $10 million dollars to spend but that DOJ would make certain undertakings in order to get INSLAW to perform the contract at the $10 million dollar level. (Hamilton, T. 129–130; PX 19) The negotiation memorandum prepared at the time of the negotiations shows that INSLAW's proposed costs were reduced as

which appears in DX 8. (Gizzarelli, T. 604; Di Pietro, T. 1953–1954)

**17.** According to Kelley's testimony, he also understood that DOJ had rights to use and distribute the PROMIS computer software to anyone it wanted, even a private client, but that Brewer had stated that it was not DOJ's intent to distribute it beyond DOJ. (Kelley, T. 1382–1383)

a result of lengthy and detailed negotiations. (PX 19)

146. First DOJ stated that it would be willing to make certain timely contributions of manpower in the form of PROMIS system managers during the implementation phase to reduce the cost of the overall effort to the budgeted amount. (Hamilton, T. 129–130; PX 19) [18]

147. Next DOJ assured INSLAW that it would adhere to the schedule for procuring the government furnished equipment, *i.e.*, computers and word processors, essential to timely contract performance. (Hamilton, T. 193) [19] Third, DOJ assured INSLAW that it would timely make available, which it frequently failed to do, the U.S. Attorney's Office personnel necessary to enable INSLAW to ascertain individual office procedures and requirements. (Hamilton, T. 194; *see* PX 225a, Holton, T. 1118–1119) Finally, DOJ represented to INSLAW that there would be limits on the variances in requirements among the various offices. (Hamilton, T. 195) This was the only commitment DOJ was able to fulfill. (Hamilton, T. 195) On the basis of these representations and negotiations, INSLAW agreed to a three year cost-plus incentive fee contract with a target price not to exceed $9.612 million. (Hamilton, T. 130; PX 18; PX 19; PX 20)

148. Contract No. JVUSA–82–C–0074 ("PROMIS Contract") to implement and install Enhanced PROMIS was awarded to INSLAW on March 16, 1982. (Answer ¶ 14) The contract was on a cost-plus basis which was very similar to the Institute's prior contracts with LEAA except for the addition of an incentive fee, and except that the 1982 implementation contract was by far the largest government contract with which INSLAW had ever been involved. (Hamilton, T. 130)

149. INSLAW did not participate in the drafting of the statement of work con-tained in the contract which described the nature and type of services to be performed under the competitive procurement contract. (Rugh, T. 1512; Hamilton, T. 2599) In any event, the major issue here is not over rights to what was delivered under the contract, but over rights to what was delivered *beyond* the contract.

C. *Nature and Terms of the PROMIS Contract*

150. The contract between INSLAW and DOJ involved two separate, severable and clearly distinguishable tasks:

1. To create, generate and implement software to be used on computers at twenty designated larger U.S. Attorney's Offices (with an option, admittedly never exercised, to expand this *use*, to up to thirty offices).
2. To create, generate and implement *a different kind of* software to be used on specified word processing equipment at some seventy-four smaller U.S. Attorney's Offices. (PX 17)

Thus, Paragraph 1.2 of the contract provides in part:

1.2 The Contractor shall implement PROMIS software and procedures as modified for the U.S. Attorney's environment on Government furnished mini-computers located in the larger U.S. Attorneys' Offices. Case tracking systems that have been developed to operate on Government furnished word processing equipment shall be installed in the smaller U.S. Attorneys' Offices . . . .

151. The parties clearly understood that these were separate tasks, and required the development and creation by INSLAW of two different and distinguishable kinds of software, each to be implemented only within the designated types of offices specified in the contract for that particular kind

---

**18.** In general, DOJ frequently failed to provide these PROMIS systems managers when INSLAW began implementing PROMIS at U.S. Attorney's Offices. (Hamilton, T. 130)

**19.** DOJ failed to meet this condition by failing to procure the word processing equipment until the 11th month of the contract when the con-tract called for on-site installation in the 4th month of the contract. (Hamilton, T. 193) As to the computer equipment, DOJ ran into substantial problems and delays with the General Services Administration in constructing the computer facilities. (Hamilton, T. 194)

of software. (PX 324 [Brewer] at pp. 215–217; Snider 54–56; Gizzarelli, T. 479, 488, 494–495; PX 341 [Tyson] at p. 41; Hamilton, T. 110–111, 115, 132–134; Merrill, T. 770–771)

152. The software generated for the twenty larger computer-site offices, as specified in the contract, was to be used *only* at those offices and the word processing type of software to be developed and created by INSLAW was to be used *only* at the seventy-four smaller offices. (Hamilton, T. 132–134; Merrill, T. 764; Gizzarelli, T. 488, 497–499; PX 324 [Brewer] at pp. 215–216) At no time during any meeting, either before or after the contract was signed, did anyone from DOJ inform INSLAW that DOJ believed that the computer based software could be used beyond these 20 offices. (Merrill, T. 770; Hamilton, T. 134) The contract did provide, however, that DOJ could extend the implementation of computer-based PROMIS to an additional 10 offices at an added price which the contract specified (and the parties understood) would be negotiated between the parties. (Hamilton, T. 124; PX 17; Merrill, T. 769–770; Gizzarelli, T. 496–499; PX 324 [Brewer] at pp. 215–216)

153. In effect, it was as if there were two contracts calling for two types of software to be delivered to two types of offices, a fact clearly understood by DOJ. (Hamilton, T. 110–111, 132–134; Merrill, T. 764; Gizzarelli, T. 488, 494, 497–499)

When DOJ unilaterally terminated the word processing part of the contract for the convenience of the Government, the 74 word processing offices dropped out, and all that remained was the 20 offices that were to receive the computer-based version of PROMIS (plus the never-exercised option to extend the latter version to ten additional offices at additional cost).

154. The computer-based version of PROMIS called for under the March 1982 contract was the Pilot Project PROMIS plus the five enhancements developed under a contract with DOJ's Bureau of Justice Statistics. (Hamilton, T. 114; Merrill, T. 764–765; Gizzarelli, T. 483–484, 598; Rugh, T. 1428–1429)

155. None of INSLAW's privately financed enhancements was to be delivered to DOJ under the PROMIS contract of March 1982, or under any other federal contract. (Hamilton, T. 115; Gizzarelli, T. 595) More particularly, the PROMIS contract gave DOJ no right to use these proprietary enhancements. There was no confusion expressed by any representative of DOJ at meetings in 1982 and 1983 as to what was to be delivered under the PROMIS Contract. (Merrill, T. 765, 2603–2604) [20]

156. The word processing software for case-tracking called for by the contract required taking the word processing software previously developed by INSLAW for use on EOUSA's Lanier word processing machines and altering it to run on different government-furnished word processing machines chosen by DOJ for the 74 smaller U.S. Attorney's Offices. (Hamilton, T. 133–134)

## VI. BREWER'S STRATEGY FOR THE RUINATION OF INSLAW

### A. *Brewer Informs his EOUSA/PROMIS Project Team About his Opinions of Hamilton*

157. Subsequent to joining EOUSA, Brewer's opinions about Hamilton became even more negative. (Gizzarelli, T. 477, 500–501, 522; PX 324 [Brewer] at pp. 86–87) During the course of the PROMIS Project, Brewer conveyed these opinions about Hamilton to his subordinates and superiors at EOUSA. (PX 324 [Brewer] at pp. 82–87, Brewer, T. 1659–1660) Clearly, Brewer was biased against Hamilton for having been dismissed by Hamilton from the Institute. (Gizzarelli, T. 501)

---

20. While the PROMIS Contract did have a maintenance clause which required INSLAW to maintain the software in "operational, error-free" condition, this provision did not require INSLAW to deliver Enhanced PROMIS to DOJ. (Merrill, T. 849–852) INSLAW was required only to correct any errors relevant to U.S. Attorneys and reported by EOUSA. (Merrill, T. 848–850; Hamilton, T. 2600) This provision did not require INSLAW to correct errors reported by persons other than EOUSA. (Merrill, T. 850–851; Hamilton, T. 2600)

158. In particular, Brewer informed others at EOUSA that Hamilton was "crazy," that he had a "very, very distorted view of the world," that he was not "realistic" and that he was "mentally defective." (PX 324 [Brewer] at pp. 82–84; Brewer, T. 1659) By these types of comments from the head of the project team, Brewer in essence "poisoned the well at DOJ" against INSLAW. (Gizzarelli, T. 522)

159. In a prophetic memorandum to his INSLAW superior dated July 1, 1982, just 3½ months after the start of the 3-year PROMIS contract, Gizzarelli noted that Brewer had made no secret of his dislike for Hamilton and that in his present position he was able to demonstrate his dislike. (PX 34) Although Hamilton had theretofore kept his distance from the project, Gizzarelli forecast that Brewer:

> will escalate the level of controversy until he draws Bill into the project, at which time he will be able to 'lord it over him' and show who's boss.

> I don't think Brick will ever be at peace with his feelings about Bill and, therefore, with us." (PX 34)

160. Brewer's attitude in this regard was openly manifested by his negative comments about Hamilton and INSLAW as well as EOUSA's imposition of increasingly more burdensome administrative tasks (e.g., greatly increased financial and contract reporting requirements and advance permission for contract travel), which previously had not been required in INSLAW's contracts with DOJ. (Gizzarelli, T. 522–526) These burdens were added by DOJ without explanation. (Gizzarelli, T. 524–525) In addition, Brewer personally assigned an EOUSA employee who was totally inexperienced in computerization or case management to accompany, and ultimately to harass, INSLAW employees making site visits to U.S. Attorney's Offices. (Gizzarelli, T. 525)

161. Immediately after assuming his position as PROMIS Project Manager, Brewer also conducted an inquiry about other contracts INSLAW had with DOJ with the intent of trying to scuttle as many of these contracts as possible, intending that the result of this activity would be to cut off INSLAW's funding and cash flow, and thereby drive INSLAW out of business.

## B. *INSLAW's Initial Problems with DOJ*

### 1. INSLAW's Decision to Market Enhanced PROMIS and Brewer's Response to These Plans

162. In April 1982, INSLAW formally notified DOJ of its intent to market Enhanced PROMIS as a fee-generating product to public and private sector customers. (Hamilton, T. 134–136; Merrill, T. 775) In this connection, Roderick M. Hills, an attorney for INSLAW, wrote to Associate Deputy Attorney General Stanley E. Morris, enclosing a memorandum written by Hamilton (with his counsel's assistance) describing the origin and financing of Old PROMIS, INSLAW's efforts to substantially improve the program utilizing private funds, and the need to market such privately-financed enhancements. (PX 21) Hamilton's memorandum also recited the written recommendations of DOJ task forces under both the Carter and Reagan Administrations that some way should be found to perpetuate the PROMIS software for the benefit of state and local justice when federal financial support ended. (PX 21)

163. Hill's letter solicited any questions or objections that DOJ had to INSLAW's plans. (PX 21) In essence, this inquiry was intended to provide advance notice to DOJ as to INSLAW's plans and to obtain a "sign-off" letter from DOJ to respond to concerns raised by IBM which at that time was considering a joint marketing agreement with INSLAW. (Rogers, T. 422–424; Hamilton, T. 277) The purpose of the "sign-off" letter, from INSLAW's perspective, was to give INSLAW assurance that DOJ understood what INSLAW was proposing to do, that it agreed with INSLAW's legal position, and that it would take no affirmative action to disrupt or impede INSLAW's marketing efforts. (Rogers, T. 444–445)

164. INSLAW's notice to DOJ was received by Brewer on or about April 13, 1982. (PX 22; Brewer, T. 1668)

165. This plan obviously infuriated Brewer. (Gizzarelli, T. 500–501; Brewer, T. 1666; Sherzer, T. 967–969) According to Videnieks' contemporaneous handwritten notes, on the very next day, April 14, 1982, a PROMIS Project Team meeting was held, at which Hamilton's "scurrilous" memorandum (PX 23; PX 26; Brewer, T. 1668) was a major subject of discussion. The notes reveal that, in particular, Brewer actively considered terminating for the Government's convenience the month-old PROMIS Contract in retaliation for INSLAW's letter to Morris. (Brewer, T. 1673; PX 23) At that time Videnieks advised against it. In his testimony at trial, Brewer's deputy, Rugh, acknowledged that such a termination at that time would have been "ludicrous." (Rugh, T. 1471; Brewer, T. 1673; PX 23) No resolution was reached at that time. (Brewer, T. 1673; PX 23) This Court finds and concludes that the sole reason that such termination was not carried through at that time was that it was ludicrous and absurd, as all of the government witnesses testified. In addition, Brewer discussed reprisals against INSLAW on its several other contracts with DOJ, one of which was the BJS contract for specific PROMIS enhancement development work which was not part of the PROMIS enhancements claimed as proprietary by INSLAW. (Hamilton, T. 114; PX 24)

All of the DOJ witnesses who attended the April 14, 1982 meeting professed a total lack of memory about it. They testified they had no recollection of any such meeting. This Court disbelieves that testimony. None of them could offer any credible explanation, or indeed *any* explanation, of the meaning of Videnieks' handwritten notes other than what this Court finds to be their meaning in this Finding of Fact No. 165. These notes constitute a "smoking gun" that clearly evidences Brewer's intense bias against INSLAW, his single-minded intent to drive INSLAW out of business, and Rugh's and Videnieks' complicity.

166. Another contract discussed at the April 14, 1982 meeting was awarded to INSLAW in 1981 by DOJ to perform a needs analysis and system design for PROMIS in the U.S. Attorneys office in the District of Columbia. (PX 324 [Brewer] at p. 122; Brewer, T. 1634, 1673; Hamilton, T. 141; PX 232) The authorized second phase of this contract would have been a PROMIS implementation effort by INSLAW at an estimated contract price of $600,000. (PX 324 [Brewer] at pp. 123–124; Hamilton, T. 141–142) It was noted during the April 14th meeting that DOJ was undecided about whether to proceed with the contract's second phase and that Brewer and Rugh would meet with the District of Columbia's U.S. Attorney's Office staff to decide what would be done on the contract. (PX 23) It was further noted that cancellation of the authorized second phase would adversely affect INSLAW's ability to keep its overhead rate in line with EOUSA expectations. (PX 23)

167. Stating that he wanted to discuss the BJS contract with INSLAW, Brewer demanded a meeting with INSLAW for April 19, 1982. (PX 24; Brewer, T. 1638)

168. At the outset of the meeting on April 19, 1982, Brewer informed James Kelley, INSLAW's General Counsel, and Joyce Deroy that his concern on the BJS contract arose from the "scurrilous" memorandum written by Hamilton which was attached to INSLAW's April 2, 1982 notice to Morris of its plans to market Enhanced PROMIS. (PX 25; PX 26; PX 324 [Brewer] at p. 137; Brewer, T. 1671)

169. As of this meeting, Brewer understood from Hamilton's memorandum that INSLAW was asserting its right to market Enhanced PROMIS as well as its ownership rights in Enhanced PROMIS. (PX 25; PX 324 [Brewer] at p. 141)

170. During the April 19, 1982 meeting, Brewer again referred to the Hamilton memo and launched into a very emotional, even belligerent, tirade. (PX 26; Brewer, T. 1639; Kelley, T. 1397)

171. During this part of the discussion of the Hamilton memo, Brewer made a number of specific statements regarding

the memo. (PX 324 [Brewer] at p. 143) He stated that the Hamilton memo was unnecessary because in Brewer's view DOJ had already acknowledged INSLAW's right to sell Enhanced PROMIS. (PX 324 [Brewer] at pp. 144–145) Nevertheless, and despite the obvious inconsistency, it was Brewer's further understanding, he said, that while INSLAW had the right to sell Enhanced PROMIS, DOJ had unlimited rights to such software, including the right "to give it away" to those very public and private sector entities to which INSLAW would be attempting to market PROMIS. (PX 324 [Brewer] at pp. 146–147; Brewer, T. 1683–1684) DOJ has the audacity to contend that "[it] is in no way inconsistent" for INSLAW to have "the right to sell ... PROMIS" at the same time that DOJ has "unlimited rights" to give PROMIS away to INSLAW's intended customers. (DRPPFF 167)

172. Brewer also questioned INSLAW's ability to perform the PROMIS Contract and indicated that a number of people at DOJ were upset with INSLAW and that the Hamilton memo had caused all kinds of problems. (PX 26; PX 324 [Brewer] at pp. 172, 174–175) Brewer further questioned the quality and timeliness of INSLAW's work, citing the Illinois Criminal Justice Coordinating Council, the Michigan Prosecuting Attorneys' Association and others as sources of this information. (PX 26; PX 324 [Brewer] at pp. 175–176)

173. Finally, Brewer strongly challenged INSLAW's right to claim ownership of, and complete domain over, Enhanced PROMIS. (PX 26; PX 324 [Brewer] at p. 177)

174. Another matter of discussion by Brewer at the April 19, 1982 meeting was a supplemental request for payment from INSLAW in the amount of $125,000 in regard to the BJS contract (PX 324 [Brewer] at pp. 141–142; Brewer, T. 1638, 1679;

Hamilton, T. 144, 200). Brewer contacted the superior of the contracting officer on the BJS contract and asked that a "preliminary notice" of default be issued on the contract [21] as well as a reprimand to INSLAW for failing to comply with the "Limitation of Cost Clause." (PX 27) Subsequent to the meeting and at Brewer's insistence, INSLAW agreed to absorb this $125,000 expense into the PROMIS Contract without increasing the total cost of the PROMIS Contract and without any additional payment under the BJS Contract. (PX 324 [Brewer] at pp. 276–278; Brewer, T. 1640; Hamilton, T. 145) [22]

175. Subsequent to the April 19, 1982 meeting, Brewer met with officials of the District of Columbia U.S. Attorney's Office to recommend that they not go forward with Phase II of the contract. (PX 232; PX 237; PX 324 [Brewer] at p. 123; Brewer, T. 1674) INSLAW was not formally notified of this decision until August 25, 1982, although it had successfully completed Phase I of the D.C. U.S. Attorney's Contract on May 31, 1982. (Hamilton, T. 142; PX 37; PX 38; PX 48) This formal notice was given just 13 days after INSLAW received a letter from Deputy Attorney General Stanley Morris dated August 11, 1982, which noted that INSLAW could assert proprietary rights to any privately financed PROMIS enhancements. (Hamilton, T. 138–140, 277; Merrill, T. 775–776; PX 36)

176. Brewer played a very important role in the decision not to go forward with Phase II of the D.C. U.S. Attorney's Office contract. (PX 232; PX 237; PX 324 [Brewer] at p. 124) Brewer identified the purported basis for this decision, in part, as his understanding that INSLAW was not able to perform because of the demands being made upon INSLAW under the PROMIS Contract, (PX 324 [Brewer] at pp. 124–125; Brewer, T. 1635), notwithstanding that the

21. Notwithstanding, Brewer conceded on November 24, 1982, that there was no factual support for any allegation that INSLAW did not perform its best efforts on the BJS contract. (PX 45)

22. Brewer misconstrued the BJS contract as a commitment to produce specified enhancements at a fixed price instead of a "best efforts" commitment for development of an unspecified number of enhancements within a cost-plus contract. (Hamilton, 257–258; Deroy, T. 2460–2462)

contract had been in effect only a few months.

177. Based on prior discussions with DOJ officials, INSLAW had been led to believe that it would be awarded Phase II of the contract and had planned upon $600,-000 of revenue for estimating its overhead rate for all of its DOJ contracts and grants. (Hamilton, T. 143–144; Merrill, T. 774) After the decision not to go forward with Phase II had been made, Brewer was informed by INSLAW's comptroller, Murray Hannon, that denial of the $600,000 contract resulted in a precipitous increase in INSLAW's overhead within a few months of the decision, as Brewer had been forewarned would happen. (PX 324 [Brewer] at p. 125)

2. Morris' Recusal of Brewer on the Proprietary Enhancements Issue

178. DOJ did not respond to INSLAW's April 2, 1982 inquiry until May 24, 1982. (PX 28) Although signed by Morris, the response letter had been drafted by Richard DeHaan with the assistance of Brewer and others. (PX 348 [DeHaan] at pp. 12–13) The response raised a number of the same complaints stated by Brewer during the April 19, 1982 meeting. (PX 28) First, it questioned the cost impact upon the PROMIS Contract from the marketing of Enhanced PROMIS. (PX 28) Second, the response took issue with INSLAW's claims of ownership rights in Enhanced PROMIS. (PX 28) The response concluded by directing INSLAW to Brewer for the submission of questions or proposals regarding these issues concerning the PROMIS Contract. (PX 28)

179. In an effort to assuage Morris' concerns, INSLAW's attorney, James Rogers, wrote to Morris on May 26, 1982 to explain the constituent elements of Enhanced PROMIS and to assure Morris that the program did not include any DOJ financed enhancements. (PX 29) These representations by Rogers were formulated in response to concerns expressed by DOJ. (Rogers, T. 431) Rogers thus understood that his representations were adequate to resolve Morris' concerns. (Rogers, T. 432) In a letter dated June 1, 1982, Morris re-

sponded that the Department would respond to INSLAW's request after careful review and analysis of the underlying legal and policy issues. (PX 31) INSLAW subsequently provided information to DOJ to assist DOJ's legal analysis of the enhancements issue. (PX 33)

180. During this time period, Rogers and Kelley met with Brewer concerning INSLAW's inquiry. (Rogers, T. 426–427) The purpose of the meeting was to give Brewer a briefing on INSLAW's plans and its need for a "sign-off" for IBM. (Rogers, T. 427) Brewer's response to this presentation was negative. (Rogers, T. 428) In fact, Brewer informed Rogers that he would not recommend that DOJ acquiesce in INSLAW's April 2, 1982 request for clarification. (PX 324 [Brewer] at pp. 169–171)

181. These statements by Brewer were fully consistent with views he shared with others on the PROMIS Project Team. (PX 324 [Brewer] at pp. 163–164) Brewer and Videnieks both shared the concern that Hamilton's April 1st memo was a "frontal assault" on the PROMIS Contract and an effort to achieve a novation of that contract. (PX 324 [Brewer] at pp. 150–151) These and other such views were communicated to others at DOJ. (PX 324 [Brewer] at p. 151)

182. As a result of Brewer's vehement outbursts at the April 19th meeting and his subsequent statements of his negative opinions of INSLAW personnel, its attorneys and its plans for marketing Enhanced PROMIS, INSLAW complained to Morris and informed him that Brewer had previously "been asked to leave" by INSLAW's predecessor and had lost his impartiality. (Hamilton, T. 138; Rogers, T. 437) INSLAW requested that Brewer be removed from further participation in DOJ's consideration of INSLAW's inquiry. (Hamilton, T. 138)

183. Based on a statement made by Morris in a meeting or during a telephone conversation, Rogers understood that Morris was aware that Brewer had been fired by INSLAW, and had been recused on this issue. (Rogers, T. 437)

184. On or about May 27, 1982, Morris directed McWhorter, Tyson's deputy, that Brewer should be excluded from the proprietary enhancements issue. (PX 30; PX 324 [Brewer] at pp. 166–169) Brewer expressed recognition of Morris' action to Gizzarelli by stating that he had been taken out of the loop on enhancements. (Gizzarelli, T. 548) In this regard, Brewer believed that Hamilton was responsible for Morris' action and told Gizzarelli that Hamilton had "shot himself in the foot." (Gizzarelli, T. 548)

185. Despite this express direction from the Associate Deputy Attorney General at DOJ, Brewer continued to involve himself in consideration of INSLAW's April 2nd inquiry on proprietary enhancements. (PX 330 [McWhorter] at pp. 46–51; PX 324 [Brewer] at pp. 456–458, 464; PX 348 [De-Haan] at pp. 22–24)

186. Tyson's deputy, McWhorter, who had been directed by Morris to "... take the point outside the Department on this subject" and to replace Brewer in this regard, did nothing to inhibit Brewer's involvement in the proprietary enhancements issue. (PX 330 [McWhorter] at pp. 48–51) Subsequent to this failure to act by McWhorter, Brewer purchased a $4,000 "half-interest" in a condominium in Virginia owned by McWhorter which originally had been purchased for $43,000. (PX 324 [Brewer] at p. 105; McWhorter, T. 1344–1345, 1352) Brewer purchased this half-interest from McWhorter because McWhorter was getting married and "needed cash". (PX 324 [Brewer] at p. 105; McWhorter, T. 1395) Brewer also acted as groomsman at McWhorter's wedding. (PX 324 [Brewer] at p. 106; McWhorter, T. 1345, 1352)

3. Brewer's Continued Involvement in DOJ's Consideration of the Proprietary Enhancement Issue

187. The only effect that Morris' "removal" of Brewer had was to suggest to persons outside of DOJ that Brewer was no longer involved in the proprietary enhancements issue. (PX 330 [McWhorter] at pp. 46–51) As far as EOUSA was concerned, Brewer could and did remain very active in DOJ's consideration of this issue. (PX 330 [McWhorter] at pp. 46–51)

188. Subsequent to his purported "removal" by Morris, Brewer repeatedly stated his opinion that INSLAW had no ownership or other rights in Enhanced PROMIS except for those specifically permitted under his view of the PROMIS Contract. (PX 324 [Brewer] at pp. 145–148, 157–161)

189. Despite Brewer's efforts to influence DOJ's response to the INSLAW inquiry, a response was sent to INSLAW by letter dated August 11, 1982 from Morris to INSLAW's attorney, James Rogers. (PX 36) This letter acknowledged that INSLAW had the right to assert whatever proprietary rights it had in Enhanced PROMIS to the extent the enhancements contained in the program had been privately financed. (PX 36; Rogers, T. 435) This letter further was consistent with the legal opinions on the enhancements issue rendered by INSLAW's attorneys. (PX 35)

190. Rogers understood that the Morris August 11 letter meant that if the representations stated in his letter of May 26, 1982 (which had been requested by Morris) were true, then DOJ did not have any rights that would inhibit or preclude INSLAW from asserting its rights, nor would DOJ challenge the assertion of such rights by INSLAW. (Rogers, T. 435, 437–438) Rogers viewed the Morris August 11 letter as providing the "sign-off" that INSLAW was seeking. (Rogers, T. 434) More particularly, Rogers drew the inference from the Morris letter that DOJ claimed no proprietary rights in the PROMIS 82 software. (Rogers, T. 435)

191. In this regard, Rogers understood that Morris did not attempt to limit the boundaries of INSLAW's proprietary rights and by implication did limit the extent of DOJ's rights based on the legal principle that every right has a correlative duty. (Rogers, T. 448)

192. Upon receipt of the Morris letter, INSLAW submitted it to IBM in connection with INSLAW's effort to negotiate a co-marketing contract with IBM. (Hamilton, T. 139) In this regard, IBM had requested evidence of DOJ's consent to INSLAW's

marketing plans for Enhanced PROMIS and accepted the Morris letter as evidence of the requested approval. (Hamilton, T. 139–140; Rogers, T. 436) Because of the DOJ's and LEAA's explicit descriptions of old PROMIS as being in the public domain, neither INSLAW nor IBM had any significant concern in 1982 that the government would suddenly attempt to enforce any restrictive language in INSLAW's previous government contracts with respect to INSLAW's ability to market and enhance PROMIS, and that was not a factor underlying IBM's request for a letter from DOJ. (Hamilton, T. 267–269; *see also* PX 35) Thereafter, IBM entered into the co-marketing agreement with INSLAW. (Hamilton, T. 140)

193. Upon seeing the Morris letter of August 11, 1982, Brewer told people at DOJ that Morris' decision was incorrect. (PX 324 [Brewer] at pp. 153–154) Brewer believed that the Morris letter failed to resolve the questions raised in INSLAW's April 2nd inquiry. (PX 324 [Brewer] at p. 160) Despite the Morris letter, Brewer's view continued to be that DOJ had an absolute right to any enhancement of PROMIS delivered under the PROMIS contract. (PX 324 [Brewer] at pp. 160–161) McWhorter went so far as to call the Morris letter a "rip-off" of the government. (PX 324 [Brewer] at p. 154)

#### 4. Brewer's Strategy for the Ruination of INSLAW

194. On September 10, 1982, Brewer requested Tyson to seek Rooney's approval for assigning Videnieks essentially full-time as contracting officer on the INSLAW contract. (PX 39) Brewer's basis for this request was "... that the only way to maintain our schedule within budget is to vigorously monitor INSLAW's efforts". Brewer's request was granted. (PX 324 [Brewer] at pp. 102–105; Brewer, T. 1606–1607)

195. After Videnieks' assignment as essentially full-time PROMIS Contracting Of-

ficer, he began playing an even more significant role than previously in the administration of the contract.[23] (PX 324 [Brewer] at pp. 111–114; Brewer, T. 1607) His first act in that regard was a letter to INSLAW, dated November 10, 1982, which alleged that INSLAW was in default of the advance payments clause of the PROMIS Contract. (PX 42; PX 43) The controversy over the advance payments clause was another effort to starve INSLAW of working capital and was further evidence of Brewer's continuing hostility and bias against INSLAW, and his total lack of impartiality.

196. The advance payments clause did not permit INSLAW to receive payments in advance of the completion of specified work (PX 324 [Brewer] at p. 189; Hamilton, T. 145–147; Sherzer, T. 955); rather, it was intended simply to assist under-capitalized companies, such as INSLAW, by providing *immediate* payment for work performed. (PX 324 [Brewer] at p. 189; Hamilton, T. 145–147; Sherzer, T. 955) This is as opposed to the usual format of DOJ payments whereby a contractor is paid 60 to 90 days *after* specified work is completed. (PX 324 [Brewer] at pp. 189–190; Hamilton, T. 145–146)

197. As of this time, DOJ, and particularly Brewer, were well aware of INSLAW's financial position and were equally well aware of the potential for harm to INSLAW from delayed payments on the PROMIS Contract. (PX 324 [Brewer] at pp. 188–190, 248; PX 342 [Videnieks] at pp. 184, 186–188)

198. Brewer's stated reason for considering terminating INSLAW's advance payment account was that a loan INSLAW had with the Bank of Bethesda, pursuant to which a lien was placed on payments received by INSLAW from the account (not the account itself), was contrary to the contract and placed the government in financial risk. (PX 324 [Brewer] at p. 228)

---

**23.** Mr. Videnieks played a significant role in the administration of the 1982 implementation long before it was even awarded. He issued the solicitation, was the government's representative during the proposal stage of the contract, was the government's chief negotiator during the negotiation phase and served as the contracting officer from the moment the contract was signed. (Videnieks, T. 1806–07; PX 13–15; see DPFF 21)

INSLAW was in technical violation of the advance payment clause of the contract, but the Government clearly was not placed in any financial risk as a result of this technical violation.

199. Indeed, notwithstanding this expressed concern, DOJ auditors concluded that the Bank of Bethesda loan and lien, in reality, presented no financial risk to the government. (PX 345 [Whitely] at pp. 36–38, 40–44; Whitely, T. 1673–1764; Hamilton, T. 166–167)

200. Brewer and Videnieks were also purportedly concerned about a substantial deterioration in the financial condition of INSLAW. (PX 324 [Brewer] at pp. 230–233; Brewer, T. 1630; PX 342 [Videnieks] at p. 208; Hamilton, T. 162–165) In addition, they stated that they were concerned about the possibility that fraudulent accounting had been practiced by INSLAW. (PX 324 [Brewer] at pp. 230–233; Brewer, T. 1630; PX 342 [Videnieks] at p. 208; Hamilton, T. 162–165) [24]

201. Despite these expressed concerns neither Brewer nor Videnieks could identify any evidence which led them to believe that INSLAW's financial condition had substantially deteriorated since the award of the PROMIS contract in March 1982, nor

any evidence of any fraud.[25] (PX 324 [Brewer] at pp. 232–233; 241–245; Brewer, T. 1630; Videnieks, 207–208)

202. Brewer and Videnieks were mistaken in their assumption that INSLAW's financial condition had deteriorated during the latter half of 1982; INSLAW was much stronger in December 1982 that at the time the PROMIS contract began. (Hamilton, T. 162) In fact, during that period, INSLAW was able to increase a previously existing line of credit of $700,000 with First American Bank to a $1.2 million line of credit from the Bank of Bethesda. (Hamilton, T. 159; Merrill, T. 799) In addition, between August and December 1982, INSLAW entered into the co-marketing agreement with IBM. (Hamilton, T. 160; Merrill, T. 799) Perhaps most important is the fact that INSLAW had obtained the PROMIS contract, and prospects were strong for successful completion of the contract. (Hamilton, T. 160–161; Sherzer, T. 958–959)

203. Notwithstanding the evidence to the contrary, Brewer informed Tyson, Director of EOUSA, about these same unsupported concerns. (PX 49; Hamilton, T. 156–157) In a December 9, 1982 memo, Brewer raised the following issues:

**24.** This concern was totally fallacious because it related to alleged improper accounting by INSLAW for the purchase of software from its Irish subsidiary, the accounting treatment for which INSLAW's outside auditor, Arthur Young & Co., had reviewed and had approved. (Hamilton, T. 164–165) Moreover, DOJ's attempts at trial to cast doubt on INSLAW's client billing practices with respect to the BJS contract were demonstrated to be wholly without merit. (Deroy, T. 2464–2469)

**25.** This Court rejects DOJ's contention that in 1982 the Government's auditor Whitely determined that INSLAW was insolvent and so advised Videnieks. Neither Brewer nor Videnieks at their depositions could identify any evidence to demonstrate a substantial deterioration in INSLAW's financial condition between the date of the contract and the end of 1982. (See PPFF 197–199) At no time did Whitely prepare a written report or any other document which detailed, or even alluded to, his alleged conclusions about INSLAW's purported "insolvency" (Whitely, T. 1781–1782), nor did he refer to this subject at any time during the entirety of his pre-trial deposition. Additionally, Whitely's in-court testimony concerning the alleged insol-

vency of INSLAW as of year-end 1982 also is contradicted by the testimony of his successor, Ms. Schacht, who could recall no reference to such purported insolvency in the DOJ audit files nor any discussions on this subject with DOJ's auditing group. (Schacht, T. 2452) Indeed, Mr. Whitely's conclusions in this regard, particularly concerning the Irish subsidiary receivable and the capitalization of software development costs, are directly contrary to the considered opinion of Arthur Young & Co., a recognized *independent* international auditing firm, which gave INSLAW, a "clean," unqualified audit opinion as to its financial condition, and itself was the source of INSLAW's accounting treatment of its capitalization. (Whitely, T. 1777–1779)

The Court is forced to conclude that Whitely's financial assessment of INSLAW was "manufactured" solely for use at trial to rebut the otherwise overwhelming evidence supporting the conclusion that the acts of Brewer, Rugh and Videnieks were based upon the known false pretext found in Brewer's December 9 memorandum (PX 49), and was not Whitely's view in December 1982.

a. the prospect of INSLAW's bankruptcy;

b. the possible need for in-house EOUSA personnel to take over the PROMIS Project;

c. substantial questions of fraud being raised by INSLAW's accounting practices;

d. the need for close auditing review of INSLAW's costs, particularly overhead and computer center costs; and

e. the prospect of terminating the PROMIS Contract. (PX 49; Hamilton, T. 156–156)

204. The December 9 memo also expressly detailed EOUSA's commencement of planning for carrying on the EOUSA Project in-house, using EOUSA employees "... in the event of trouble" and stated that DOJ had "demanded, as is our right, from INSLAW copies of *all* software documentation...." (PX 49) This planning was not disclosed at any time by DOJ to INSLAW. (Hamilton, T. 165) Had this planning been disclosed to INSLAW, INSLAW would not have turned its software over to DOJ pursuant to Modification 12. (Hamilton, T. 165–166)

205. The December 9, 1982 Brewer memo was based on several fundamental misconceptions. First, INSLAW had not incurred $975,000 of additional bank debt, but $275,000, and the additional borrowing was necessary to defray partially $344,000 that DOJ then owed INSLAW for its time sharing services. (Hamilton, T. 157–158) Second, Brewer misconstrued the Advance Payments provision of the contract as a mechanism for "payment-in-advance" when it was merely a contractual procedure for DOJ's *timely* payment of INSLAW's vouchers for work *already completed.* (Hamilton, T. 158) Third, Brewer erroneously concluded that INSLAW had "reprogrammed" $100,000 in DOJ's contributions to the INSLAW employee profit-sharing plan because INSLAW had not yet deposited the annual contribution, when, in fact, the deposit was not yet due and owing. (Hamilton, T. 158–159) Fourth, Brewer incorrectly concluded that the nature of INSLAW's indebtedness had become "desper-

ate" by December 1982, when, in fact, INSLAW believed it had just obtained DOJ's "sign-off" to its rights to license its privately-financed enhancements, had established its first sales and marketing unit and had consummated a national co-marketing arrangement with IBM for the public sector. (Hamilton, T. 159–161) Fifth, Brewer confused a version of PROMIS developed under the Pilot contract using a COBOL compiler that the hardware manufacturer (PRIME) had subsequently discontinued, with a version developed by INSLAW's European subsidiary based on current compiler technology; as a consequence of his lack of understanding, Brewer had suggested possible fraudulent accounting practices at INSLAW. (Hamilton, T. 162–165) INSLAW's independent public accountants had, in fact, reviewed and approved the accounting transactions. (Hamilton, T. 165)

206. These issues formed the basis for Brewer's effort to ruin INSLAW and to bring about DOJ's wrongful use of INSLAW's Enhanced PROMIS software. (PX 49)

C. *Brewer's Renewal of the Proprietary Enhancements Issue and Termination of Advance Payments*

207. At the same time that Brewer was seeking termination of the advance payment account, DOJ demanded in a letter dated November 19, 1982 that INSLAW produce to DOJ "... all computer programs and supporting documentation developed for or relating to this contract." (PX 44) This demand was repeated verbatim in a letter dated December 6, 1982 from Videnieks to INSLAW. (PX 46; Videnieks, T. 1810–1811, 1833–1834)

208. INSLAW understood these requests to require production of the source code and the object code for all of the software developed for the U.S. Attorney's offices, including both the computer version and the word processing version. (Hamilton, T. 152, 2583–2588; Merrill, T. 782, 784–785) These requests required INSLAW to produce software codes for the enhancements otherwise not deliverable un-

der the contract. (Hamilton, T. 152, 2583–2588; Merrill, T. 782, 784–785) With these source and object codes, as well as the other material sought by DOJ, DOJ was in a position to sell the software, to give it away or to commission other private companies to take it, and to further develop it without normal costs associated with this process. (Hamilton, T. 152–153)

209. Until DOJ selected and procured from other sources the minicomputer hardware that would be used to run the contracted-for minicomputer PROMIS software, INSLAW agreed to provide the largest U.S. Attorney's Offices with temporary access to PROMIS in a time-sharing arrangement. (PX 17 Article XXVI, Statement of Work at ¶¶ 3.1.1, 3.2.2.4, 3.2.5) Those U.S. Attorney's Offices would be tied into INSLAW's computers on an interim basis, to obtain the benefits of PROMIS automation until DOJ was ready to actually implement the contracted-for version of PROMIS on site. INSLAW used its proprietary VAX version of PROMIS for this temporary accommodation to DOJ, in which other proprietary enhancements also had been included. There was no contractual requirement that INSLAW provide DOJ with this time-sharing software, and therefore INSLAW had, quite properly, not anticipated that DOJ would demand the underlying software which contained these proprietary enhancements.

210. When DOJ demanded that INSLAW turn over its time-sharing PROMIS software, DOJ still had not selected either the minicomputer or word processing hardware that would ultimately be used to run minicomputer PROMIS at the 20 larger offices and the word processor-based case tracking software at the 74 smaller offices. Thus, DOJ was not at that time prepared to implement the version of PROMIS called for under the terms of the contract and, indeed, INSLAW could not prepare the contracted-for version of PROMIS for DOJ until DOJ had decided which minicomputer hardware to procure. Therefore, when DOJ used the pretense of threatened termination of advance payments as leverage to obtain the enhanced time-sharing software, it knowingly set out to obtain a version of PROMIS to which it was not entitled under the contract, and which DOJ understood contained proprietary enhancements belonging to INSLAW.

211. INSLAW made clear to DOJ and DOJ clearly understood that DOJ was demanding and receiving these proprietary enhancements only as a temporary accommodation until the contracted-for software was ready. However, INSLAW further informed DOJ and DOJ plainly understood that DOJ could choose to purchase rights to use the enhancements from INSLAW in the actual software to be delivered to DOJ. Thus, DOJ's situation here is analogous to that of a car buyer who has put in a purchase order for a stripped-down version of a car, for which the buyer will provide its own engine at a later date for installation by the car dealer. The dealer in the interim provides the buyer with another car, a top-of-the-line model, which the buyer agrees to test drive until the buyer's engine arrives for the stripped-down model, with the understanding that the buyer can then instead choose to purchase the top-of-the-line model. What DOJ has done in this case is to drive off with the top of the line. model, while refusing either to accept the lesser version or agree to pay for the better model.

212. DOJ's demands for PROMIS software tapes were initiated by Brewer, who engaged in regular conversations with his staff concerning INSLAW's alleged deteriorating financial condition and the alleged risk of financial loss by the government. (PX 324 [Brewer] at pp. 232–233, 292–293; PX 342 [Videnieks] at pp. 189–190) Brewer was instrumental in renewing the dispute with INSLAW concerning proprietary enhancements to PROMIS. (PX 52)

213. In a letter dated January 6, 1983, Brewer renewed the requests for copies of all PROMIS software and computer source codes. (PX 52)

214. At the same time that Brewer and Videnieks were demanding INSLAW's proprietary software, they were also moving ahead to suspend INSLAW's advance payments account, since they believed this

threat would coerce INSLAW into "giving up the goods." (PX 50) As part of this effort, Videnieks in late 1982 or early 1983 prepared a briefing paper on "Discontinuation of Advance Payments". (PX 50; Videnieks, T. 1866–1867; PX 324 [Brewer] at pp. 244–245) The paper outlined four alternative "DOJ Alternatives," constituting scenarios of damage to INSLAW that might result from the contemplated discontinuation of the Advance Payments. (PX 50)

215. One possible ramification of discontinuation was recognized as being a slowdown of INSLAW's PROMIS contract effort. (PX 50) The solution set forth to this situation in PX 50 was a termination for default of the PROMIS contract with completion of the Project by in-house EOUSA personnel. The paper discussed the prospect of INSLAW's bankruptcy from discontinuation of Advance Payments and concluded that termination for default and in-house implementation could again be utilized. (PX 50) Even if the discontinuation had no impact on INSLAW's contract effort, the EOUSA paper recommended that DOJ file liens against INSLAW's property. (PX 50)

216. At a meeting on January 19 or 21, 1983 with DOJ's procurement staff, INSLAW complained about harassment by Contracting Officer Videnieks and by other PROMIS Project personnel. (PX 54)

217. On January 26, 1983, Videnieks gave INSLAW notice that the government intended to suspend the advance payment account based upon alleged breaches of certain PROMIS contract clauses. (PX 53)

218. At a meeting on February 4, 1983, INSLAW personnel including Hamilton, Merrill, Jim Dimm and Murray Hannon, as well as INSLAW's government contracts counsel, Harvey Sherzer, and its outside auditor, John Hozik, met with various DOJ officials, at their request, to discuss the advance payment issue. (Hamilton, T. 148; Merrill, T. 777–779) At the outset of the meeting, DOJ auditor Robert Whitely willingly acknowledged the lack of financial risk to the Government relating to INSLAW's advance payments account. (Hamilton, T. 167, 197–198; Merrill, T. 781; Sherzer, T. 954–956; Whitely, T. 1763–1764)

219. When discussion at the February 4, meeting turned to the proprietary enhancements issue, Brewer acknowledged that all the PROMIS contract called for was the pilot version plus the five BJS enhancements. (Hamilton, T. 154, 197)

220. Indeed, Hamilton offered to provide DOJ with the privately financed enhancements to PROMIS at no cost in order to resolve the proprietary rights dispute with DOJ. (Hamilton, T. 345–346; Merrill, T. 790; PX 67) In response to this proposal, William Snider said that INSLAW did not have to give its privately financed enhancements away at no cost in order to protect its proprietary rights. (Hamilton, T. 346; Merrill, T. 790–791) Snider added that this was not the way the Government did business. (Hamilton, T. 155–346; Merrill, T. 790) Significantly, Snider advised INSLAW that if DOJ wanted INSLAW's privately financed enhancements, DOJ would pay for them. (Hamilton, T. 155, 346; PX 336 [Snider] at p. 92) Brewer and Videnieks became quite angry with INSLAW and raised their voices in objection to INSLAW's positions as to proprietary enhancements. (Hamilton, T. 196; Merrill, T. 778) Videnieks also engaged in a very hostile discussion with INSLAW personnel concerning performance of the PROMIS contract. (PX 336 [Snider] at pp. 40, 46–50)

221. In response to a DOJ request for INSLAW's software, INSLAW stated that it would not release its proprietary product to DOJ unless the data rights issue was finally resolved by DOJ agreeing to give protection to INSLAW as to any proprietary product that was turned over. (Hamilton, T. 153; PX 56; PX 67) In this regard, INSLAW explained that Morris had already recognized, and had given a "sign-off" on, INSLAW's rights to its privately-financed enhancements, and these enhancements made PROMIS a better product for the U.S. Attorneys. (Hamilton, T. 153–154)

222. Brewer responded to these comments with a remark about "[h]ow many

times does the Department of Justice have to buy this software?" (Hamilton, T. 154)

223. Because of concerns raised at the February 4th meeting and the animus exhibited by certain government officials, INSLAW's attorney, Harvey Sherzer, wrote to DOJ on February 10, 1983. (PX 58; PX 59) In this letter, Sherzer observed that there was general agreement that INSLAW's performance under the PROMIS contract had been excellent and that any breach, however meaningless, had been inadvertent. (PX 58; PX 59) Sherzer did suggest, however, that DOJ might wish to consider a change of DOJ personnel on the PROMIS contract because of the "unfounded accusation[s] and hostility evidenced by [DOJ personnel] at the February 4 meeting." (PX 58; PX 59) In this regard, Sherzer strongly complained of the negative impacts of "an atmosphere of bias or retribution" at DOJ and questioned the propriety of seeking termination of advance payments and warned against "... anyone's personal effort to seek retribution against INSLAW ..." (PX 58; PX 59)

224. Sherzer also stated that INSLAW's financial condition was not deteriorating, that in fact venture capitalists and investment bankers were interested in investing funds in INSLAW. (PX 58; PX 59) On this basis, Sherzer reasoned that the Government had less risk from the Advance Payments than it had had at the outset of the PROMIS Contract. (PX 58; PX 59)

225. Mr. Sherzer identified Brewer as the individual who exhibited such bias or "animus." (Sherzer, T. 965) Sherzer based this conclusion on derogatory comments made by Brewer against INSLAW and its president which went far beyond the boundaries of any particular contract dispute. (Sherzer, T. 965) Sherzer thought that Brewer was deeply resentful of INSLAW and Hamilton. (Sherzer, T. 967, 994)

226. DOJ's response to Sherzer's letter did not take issue with the merits of any of his contentions, but did inform INSLAW that it viewed the issues of advance payments and proprietary enhancements as interrelated. (PX 60) Moreover, it also informed INSLAW that if it did not expeditiously produce additional information with respect to INSLAW's proprietary enhancement claims, that Videnieks' decision on discontinuation of advance payments "... will be made without the benefit of additional input." (PX 60)

227. Brewer's deputy, Rugh, went so far as to perform a "programmatic risk analysis" related to an INSLAW bankruptcy. (PX 65) The March 7, 1983 study stated that the mini-computer phase of the PROMIS Contract was "essentially on schedule" but that the word processing phase was behind schedule due to DOJ delays in the award of the hardware contract and limitations in the design of the pilot version of PROMIS. (PX 40; PX 65) In order to limit programmatic risk, Rugh recommended to Brewer and Videnieks that INSLAW's time-sharing and word processing software be placed in escrow. (PX 65)

228. Despite Brewer and Rugh's preoccupation with the issue of INSLAW's "imminent" bankruptcy in the Spring of 1983, three financial institutions, including the Wall Street investment bank of L.F. Rothschild, Unterberg and Towbin, invested approximately $750,000 in INSLAW common stock in May 1983 after having valued INSLAW at $9 million for investment purposes. (Hamilton, T. 201–202)

### VII. BREWER'S USE OF MODIFICATION 12 "TO GET INSLAW'S GOODS"

#### A. *Negotiation of Modification 12*

229. The DOJ persisted in its attempts to interrelate resolution of the advance payments issue and INSLAW's assertion of proprietary rights in Enhanced PROMIS. (PX 62; PX 66) When it became clear to INSLAW in March 1983 that DOJ would not resolve the advance payment issue without first obtaining the PROMIS software, INSLAW proposed in a March 11, 1983 letter to DOJ that the parties enter into an escrow agreement pursuant to which DOJ would receive the software if,

and only if, INSLAW went into bankrupt-cy. (PX 68; Hamilton, T. 167–168; Brewer, T. 1693–1694; Merrill, T. 791) Brewer's and Videnieks' professed concern about IN-SLAW's financial viability was merely a smoke screen; such concerns would have been fully met by placing the PROMIS software in escrow with a third party. The only reason such an arrangement was not acceptable to DOJ was because it wanted to "get" INSLAW's "goods." This is further evident from the exchange of correspondence from Mr. Rugh whereby the Department having gotten the goods, pretended to find fault with INSLAW's methodology for proving private funding while refusing to divulge to INSLAW either any realistic purported defects in that methodology or any alternative methodology which would be acceptable to DOJ. DOJ thus took the tack designed to be the most harmful to INSLAW without any conceivable concomitant benefit to the Government other than the desire to get away with taking something without right.

230. Although certain DOJ personnel recommended INSLAW's third-party escrow proposal, it was rejected by Brewer and Videnieks, because they could not thereby immediately obtain the software. (PX 73) Videnieks and Brewer discussed this issue on or about March 28, 1983 and decided to propose a letter response to Sherzer indicating DOJ's intent "to back off [Advanced Payments] discontinuation and promising non-dissemination [of PROMIS software] in return for delivery of information demanded on 12/6" [PX 73] Videnieks prepared a draft of this letter which Brewer then rewrote [PX 73]. This letter was submitted to William Snider, Administrative Counsel for Procurement, who previously had indicated his preference for a bilateral agreement between the parties embodied in a contract modification. (PX 73)

231. A March 28 memo further recounts that Videnieks was in full agreement with Brewer about the letter, indicating quite significantly "... why do you need signature if you got the goods?" (PX 73; Videnieks, T. 1837–1838)

232. Snider quickly responded to the Brewer/Videnieks proposal on March 29, "sharply disagreeing on this approach." (Videnieks, T. 1838) At this point, Brewer "forbade" Videnieks from entering into a "Mod" of the contract. (PX 73)[26] Brewer did not want a bilateral agreement if he could "get the goods" without it. (Brewer, T. 1704–1705)

233. On April 5, 1983 Videnieks and Brewer had a telephone conversation in which Brewer told Videnieks that he would "protect" him from "backing down" to Sherzer and Hamilton. (PX 73) After this conversation, Videnieks checked with Snider and "MH" who confirmed that a contract modification protecting INSLAW's proprietary enhancements was a precondition to INSLAW's delivery of the software. (PX 73; Brewer, T. 1208) Brewer understood that INSLAW wanted such protection, and that INSLAW would remove any enhancements that DOJ did not want. (Brewer, T. 1708–1709)

234. DOJ's March 18, 1983 response to INSLAW's March 11 proposal dismissed the proposal of an escrow agreement, but did offer in consideration of "getting the goods" to agree not to disseminate or disclose the PROMIS software beyond EOUSA and the U.S. Attorney's offices enumerated in the PROMIS contract pending resolution and negotiation of the proprietary enhancements issue—"until the data rights of the parties to the contract are resolved." (PX 70; PX 71; Merrill, T. 792; Brewer, T. 1689–1690; Hamilton, T. 168) This proposal by Videnieks was basically the methodology proposed and discussed at the February 4, 1983 meeting. (Merrill, T. 792)

**26.** At trial, Brewer denied this fact three times. (Brewer, T. 1692, 1694, 1702) This was the only circumstance on which Videnieks could recall not following a Brewer guidance which would have resulted in a detriment to INSLAW. (Videnieks, T. 1859–1860, 1861) Even with this single exception, Videnieks acknowledged that the only reason he ignored Brewer's guidance is that DOJ's Administrative Counsel Snider applied pressure on Videnieks to proceed on the basis of a bilateral contract modification. (Videnieks, T. 1861–1862)

235. The March 18 letter also stated that once the "data rights" issue was resolved, DOJ would review INSLAW's proprietary enhancements to decide which (if any) enhancements DOJ desired to include in the Executive Office contract PROMIS software. (PX 70; PX 71)

236. Videnieks specifically stated in his March 18 letter that after the proprietary enhancements issue was resolved, DOJ:

... will review the effect of any enhancements which are determined to be proprietary, and then either direct INSLAW to delete those enhancements from the versions of PROMIS to be delivered under the contract or negotiate with INSLAW regarding the inclusion of those enhancements in that software. The Government would then either destroy or return the "enhanced" versions of PROMIS in exchange for the Government PROMIS software including only those enhancements that should be included in the software. If this course of action is acceptable to INSLAW there would be no need for an escrow agreement. (PX 70; PX 71; Videnieks, T. 1813–1815)

237. The enhancements which DOJ did not want would be removed from the software delivered to the DOJ. (PX 70; PX 71; Brewer, T. 1690–1691, 1709; Hamilton, T. 330–331)

238. INSLAW understood from Videnieks' letter that it was necessary to resolve the issue of "proprietary enhancements" as soon as possible because INSLAW was scheduled to deliver software to the 20 largest U.S. Attorney's offices beginning in the Summer of 1983. (PX 73; Hamilton, T. 169) INSLAW also understood from Videnieks' letter that it was to identify the enhancements that had been privately financed, with evidence of the source of private funding, and an indication as to why the enhancements were not required to be furnished under the terms of the contract. (Hamilton, T. 170; PX 70; PX 71)

239. Most importantly, INSLAW understood from Videnieks' letter that DOJ would negotiate with INSLAW to purchase any privately financed enhancements that it desired to keep in the software deliverable under the contract. (Hamilton, T. 171; Merrill, T. 792–793; Gizzarelli, T. 534; Sherzer, T. 977–979; PX 341 [Tyson] at pp. 205–207, 212–214; PX 336 [Snider] at pp. 91–96; PX 70; PX 71)

240. As of the time of Videnieks' letter, INSLAW was fully prepared to delete any or all enhancements that DOJ indicated it did not desire pursuant to the process laid out in Videnieks' letter. (Hamilton, T. 172–173; Merrill, T. 793)

241. INSLAW accepted Videnieks' proposal in a letter dated March 23, 1983 from its attorney, Sherzer, to William Snider, DOJ's Administrative Counsel. (PX 72; Sherzer, T. 979) Sherzer accepted Snider's proposal that the agreement take the form of a modification to the PROMIS Contract and also stated his understanding that advance payments need not be stopped, since DOJ's alleged risk would be eliminated as a result of DOJ's receipt of INSLAW's PROMIS software. (PX 72)

242. On April 11, 1983, Modification 12 to the PROMIS Contract was executed between INSLAW and DOJ pursuant to which INSLAW delivered the requested information to DOJ upon consideration of DOJ's promise to limit dissemination and use of INSLAW's proprietary software and data. (Answer ¶ 17; PX 78; PX 83) The language of Modification 12 as to the specified information to be produced was basically the same wording as used in the Videnieks March 18, 1983 letter. (Merrill, T. 786; Videnieks, T. 1843–1844; PX 70; PX 71; PX 78) The March 18 Videnieks letter to INSLAW was actually drafted by Snider, who believed that Modification 12 must be read and understood in the context of the March 18, 1983 letter. (PX 336 [Snider] at pp. 91–96; Videnieks, T. 1842) Modification 12 required INSLAW to produce all computer programs and documentation for time-sharing, computer sites and for word processing. (Merrill, T. 786; Sherzer, T. 980; Hamilton, T. 152, 2583–2588) DOJ never told INSLAW that it was not required to produce all of this under Modification 12 or that INSLAW was producing too much. (Merrill, T. 787)

243. The provisions of Modification 12 must be read consistently with the existing contract, the terms of which (Modification 12 unequivocally states) were not otherwise changed. (Gizzarelli, T. 535; Sherzer, T. 1030) Thus, DOJ's agreement not to disseminate or use the software beyond the 94 offices has to be read in the context of the two contract tasks. This means that the computer-based software would not be disseminated beyond the 20 designated larger offices for which this software was being created and developed, and the word processing software would not be disseminated beyond the 74 offices for which that type of software was being created and developed. (Merrill, T. 787–788; Hamilton, T. 177–178; Gizzarelli, T. 535) Modification 12 sought to effect delivery to DOJ of all computer programs developed under the contract, as well as INSLAW's proprietary enhancements then incorporated in the software. The statement of work defines the software for the word processing machines as computer programs, (Hamilton, T. 2583) and subparagraphs 3 and 5 of Modification 12 specify the delivery of software for operation on word processing machines (Hamilton, T. 2584–2586). In addition, Modification 12 was directly related to and fully embodies the process and intent of Videnieks' letter of March 18, 1983 (Hamilton, T. 173; Gizzarelli, T. 535–536; Merrill, T. 793–794; PX 336 [Snider] at pp. 7, 90–96).

244. INSLAW understood that Modification 12 provided breathing room for the parties to resolve the proprietary enhancements issue and for DOJ to negotiate a payment or possibly some other form of consideration to INSLAW for any proprietary enhancements that DOJ desired to be kept in the PROMIS software. (Merrill, T. 787; Hamilton, T. 177; Sherzer, T. 978–979, 1027)

245. William Snider, Administrative Counsel for JMD and a prime negotiator of Modification 12, understood that it was intended to implement Videnieks' letter of March 18 and the intent to negotiate on proprietary enhancements stated in that letter. (PX 336 [Snider] at pp. 7, 90–96) In that regard, Snider further understood that

if DOJ wanted INSLAW's proprietary enhancements, then it would pay INSLAW for such enhancements. (PX 336 [Snider] at pp. 91–96) Indeed, Snider had informed INSLAW representatives at a meeting prior to the execution of Modification 12 that DOJ would negotiate compensation to INSLAW for all such enhancements that DOJ wished to use. (Hamilton, T. 177; Sherzer, T. 977; Merrill, T. 790–791)

246. Brewer, however, had no intention to negotiate; indeed, Videnieks, Rugh and Brewer all testified that notwithstanding Modification 12 they had no understanding of any obligation on DOJ's part to negotiate with INSLAW concerning the time-sharing or any other PROMIS software. (PX 324 [Brewer] at p. 163; Brewer, T. 1691–1693) Brewer had discussed his understanding of Modification 12 with a number of people at DOJ and his views in that regard were shared by Brewer's staff and by Videnieks. (PX 324 [Brewer] at pp. 163–164)

247. In furtherance of its obligations under Modification 12, INSLAW began delivery to DOJ of the source and object codes as well as other software-related material requested by DOJ, starting in April 1983 and continuing on in August 1983 with the VAX software as modified for the PRIME computer. (Hamilton, T. 173; Merrill, T. 786–787) Thus by the end of August 1983, INSLAW had provided all software, codes and documentation related to the mini-computer part of the PROMIS contract. (Hamilton, T. 175; Gizzarelli, T. 537)

248. INSLAW expressly understood that Modification 12 required the delivery of the word processing software. (Hamilton, T. 176; Merrill, T. 785–787) As word processing versions of the criminal and civil case tracking software were completed, INSLAW delivered them to DOJ pursuant to Modification 12. (Hamilton, T. 173, 2613–2615) The last module of word processing software delivered by INSLAW pursuant to Modification 12 was the debt collection program in January 1984. (Merrill, T. 785–787; Hamilton, T. 2587–2588)

B. Brewer, Rugh and Videnieks Stymie INSLAW's Efforts to Substantiate Proprietary Enhancements

249. Shortly after Modification 12 was executed, INSLAW provided DOJ with the information Videnieks had requested concerning substantiation of INSLAW's proprietary enhancements. (PX 74; PX 75) On April 7, 1983, Videnieks demanded a clarification of the requested information to which INSLAW fully responded on April 12, 1983. (PX 76; PX 79) In its April 12 response, INSLAW provided written documentation that listed upgrades sewn into the software and certain "hook-on" subsystems, along with a rationale for concluding that these enhancements had been privately financed. (Hamilton, T. 180; Merrill, T. 794–797) INSLAW considered this to be a reasonable and satisfactory methodology for demonstrating the enhancements. (Hamilton, T. 180–181; Merrill, T. 794–797)

250. Videnieks responded on April 21, 1983 and grudgingly acknowledged that INSLAW had satisfactorily identified 251 enhancements, but dismissed INSLAW's showing as to the remaining 550 enhancements that INSLAW claimed. (PX 80) Videnieks gave INSLAW one week in which to supply more information. (PX 80)

251. In an effort to cure the deficiencies alleged by Videnieks, INSLAW's attorney Sherzer wrote to him on May 4, 1983 with a proposed methodology to perform further data accumulation which INSLAW believed would establish its claims, but which effort would be costly and time-consuming. (Hamilton, T. 182; PX 81) Sherzer also asked DOJ to either accept the methodology or to suggest whatever changes it wanted. (Hamilton, T. 182) In this letter, Sherzer also indicated INSLAW's position that it could, in fact, copyright software

"... developed at Government expense." (PX 81) [27]

252. In a telephone conversation on May 9, 1983 with Videnieks and Mike Snyder, Videnieks' COTR, Rugh reviewed the INSLAW May 4th letter. (PX 84) While concluding that INSLAW had not yet supported its claim of privately financed enhancements, Rugh believed that an acceptable methodology could be devised to do so. (PX 84) He proposed that Videnieks adopt one of these alternative responses:

a) flat out denial of INSLAW's proposed methodology and a government decision that INSLAW had failed to substantiate its claims;

b) a response that INSLAW's method is not acceptable and suggest an acceptable method; or

c) a response that INSLAW has not substantiated its claim and ask INSLAW to resubstantiate without agreeing to a methodology. (PX 84)

253. Rugh also performed an analysis of INSLAW's submission which noted the purported deficiencies in the submission and concluded that the proposed methodology was unacceptable. (PX 87; PX 88) DOJ never provided INSLAW with Rugh's analysis. (Rugh, T. 1498) Similarly, no one from DOJ ever approached INSLAW to discuss Rugh's analysis or to attempt to resolve the purported deficiencies described by Rugh. (Rugh, T. 1498–1502; Brewer, T. 1717; Videnieks, T. 1848) Rugh knew of no reason for withholding his analysis from INSLAW and Brewer admitted it was reasonable for INSLAW to ask the government either to accept the methodology or to propose alternatives. (PX 324 [Brewer] at p. 323; Rugh, T. 1513)

254. At no time during Rugh's analysis of INSLAW's proprietary enhancements did he inform Brewer that the endeavor

27. Brewer professed to think that INSLAW's position was spurious and never informed INSLAW that DOJ's counsel had agreed specifically with INSLAW's position. (Brewer, T. 1716) By Sherzer's May 4 letter, INSLAW requested DOJ's opinion in support of its position on the question of whether Enhanced PROMIS could be copyrighted and supplied in a memorandum dated April 26, 1983 to DOJ. (PX 81) On June 1, 1983, the Director of the Commercial Litigation Branch of DOJ's Civil Division issued a legal memorandum to Snider, JMD's Administrative Counsel, which agreed with INSLAW that copyright law does not prohibit a contractor from obtaining a copyright in software produced under a government contract. (PX 91) Despite this seeming unequivocal opinion, DOJ repeatedly deferred INSLAW's inquiries on the issue. (PX 93; PX 95)

was meaningless because such enhancements were called for and deliverable under the contract. (Brewer, T. 1711–1712) Similarly, at no time did Brewer ever inform INSLAW that its effort to substantiate the enhancements was unnecessary because such enhancements were called for under the contract. (Brewer, T. 1714–1715)

255. Rugh, Videnieks and Snyder all agreed that DOJ should not get involved with giving INSLAW advice as to how it could satisfy DOJ's request for substantiation of its enhancement "... since *they* made the claim proof (should be) readily available." (PX 84)

256. Brewer understood that there were several industry standard ways of documenting software development. (Brewer, T. 1713–1714) Although Brewer could not describe such industry standards, Brewer believed that Rugh was familiar with them. (Brewer, T. 1730) Notwithstanding such purported knowledge, Rugh drafted a letter for Videnieks' signature which adopted his third alternative response rejecting INSLAW's methodology and refusing to provide INSLAW any guidance as to an acceptable methodology. (PX 82; PX 95; Brewer, T. 1713–1714)

257. Videnieks gave INSLAW an ultimatum of providing additional acceptable information by July 11, 1983 or DOJ would be forced to conclude that all of INSLAW's claimed enhancements were developed within the scope of government contracts. (PX 95) Videnieks signed the letter and sent it to INSLAW on June 10, 1983. (PX 95)

258. Sherzer believed that since INSLAW had provided DOJ with a methodology, and DOJ had complete access to INSLAW's total operations to verify INSLAW's assertion, DOJ had an affirmative obligation to propose an alternative methodology. (Sherzer, T. 1033–1034)

259. Sherzer and Gizzarelli called Videnieks in June 1983 to determine what form of proof would satisfy DOJ. (DX 79; Gizzarelli, T. 536; Sherzer, T. 984) Videnieks declined to comment on this issue and stated that it was up to INSLAW to determine the method and provide the proof.

(DX 79; Sherzer, T. 985–986; Gizzarelli, T. 536; Hamilton, T. 181–183) In reality, DOJ knew that INSLAW could not choose whatever method of proof INSLAW wished; indeed, DOJ had already rejected two levels of detailed proofs and refused to consider acceptable the proposed third method. (Hamilton, T. 183; Merrill, T. 794–798; PX 76, 80, 95)

260. Sherzer concluded from this conversation, and it is obvious from the record as a whole, that DOJ would never be satisfied with any proof submitted by INSLAW to support its proprietary enhancement claims. (DX 79; Hamilton, T. 185; Sherzer, T. 989; Merrill, T. 797–798) Sherzer also concluded that DOJ intended to assert and maintain the position that the software belongs to the government in its entirety. (DX 79) Sherzer's final conclusion was that INSLAW had no choice but to contest the proprietary enhancements issue as far as was necessary. (DX 79)

261. Gizzarelli correctly believed Videnieks to be engaged in a game of "cat and mouse," that Videnieks knew of an acceptable methodology but would not tell INSLAW. (Gizzarelli, T. 536) It was well known that Videnieks had a very abrasive personality and had previous difficulty in dealing with INSLAW. (PX 336 [Snider] at pp. 46–50)

262. In an effort once again to satisfy Videnieks, Sherzer wrote to him on July 7, 1983 and stated that INSLAW would be pulling together additional supportive materials to submit to DOJ by early September 1983. (PX 97) Videnieks responded on July 21, 1983, again rejecting INSLAW's methodology and once again gave INSLAW no guidance as to how it was to satisfy Videnieks demand. (PX 99)

263. On July 18, 1983, Videnieks wrote to INSLAW informing it that he had suspended payment to INSLAW of almost a quarter of a million dollars in INSLAW's computer time sharing costs. (PX 98; Videnieks, T. 1869–1870) Videnieks copied Associate Attorney General Designate D. Lowell Jensen with his July 18 letter but stated that he has never even met Jensen

and does not know why he copied him. (PX 98; Videnieks, T. 1870)

264. INSLAW's effort to provide further substantiation of its proprietary enhancements for DOJ was abandoned when INSLAW was informed by DOJ, in a telephone conversation between Videnieks and Gizzarelli, that they would refuse to recommend acceptable computer center cost methodologies. (Gizzarelli, T. 536) INSLAW came to understand that Brewer and Videnieks would simply reject any methodology which INSLAW proposed. (Brewer, T. 1716–1717; Videnieks, T. 1844–1847; Hamilton, T. 179–183, 185; Sherzer, T. 984–985, 989)

265. Within a month after INSLAW delivered to DOJ pursuant to Modification 12 its VAX PROMIS software as modified to operate on the PRIME computer in the Los Angeles U.S. Attorney's Office, INSLAW received a letter from Videnieks notifying INSLAW that he had decided to suspend the payment of INSLAW's fees (profit) under the contract and, in fact, without previously acknowledging such, that he had deliberately withheld payment of INSLAW's monthly fee vouchers beginning in July of 1983. (Hamilton, T. 174–175)

266. Under Modification 12, it is undisputed that INSLAW delivered Enhanced PROMIS to DOJ on the basis of an explicit commitment by DOJ which had three components: first, to bargain in good faith to identify the proprietary enhancements; second, to decide within a reasonable time which enhancements it wanted to use; and third, to bargain in good faith with INSLAW as to the price to be paid for such enhancements. On the basis of the foregoing and all of the evidence taken as a whole, this Court finds and concludes that DOJ never intended to meet its commitment and that once DOJ had received Enhanced PROMIS pursuant to Modification 12, DOJ thereafter refused to bargain in good faith with INSLAW and instead engaged in an outrageous, deceitful, fraudulent game of "cat and mouse", demonstrating contempt for both the law and any principle of fair dealing.

VIII. DOJ'S COMMITMENT TO CONSIDER REPLACING WORD PROCESSING MACHINES WITH MICROCOMPUTERS; DOJ'S DECISION INSTEAD TO ATTEMPT TO TERMINATE THE WORD PROCESSING PORTION FOR DEFAULT AND ITS ULTIMATE DECISION TO TERMINATE "FOR CONVENIENCE"

267. By the end of 1983, word processing implementation and the suspension of time sharing costs had become critical issues for INSLAW. (Richardson, T. 641–643) In an effort to resolve these problems, one of INSLAW's attorneys, Elliot Richardson, contacted Edward Schmults, Deputy Attorney General, to schedule a meeting between senior DOJ officials and INSLAW. (Richardson, T. 641) Richardson believed that it was important to get a level of interest and attention at DOJ sufficient to overcome what he considered to be the consequences of bias. (Richardson, T. 641)

268. At this meeting, on December 22, 1983, Richardson stressed to Kevin Rooney, Assistant Attorney General for Administration, the need for a process that could fairly appraise the merits of questions raised by INSLAW. (Richardson, T. 642) In addition, Richardson proposed that the word processing problem could be resolved if DOJ would substitute full-function microcomputers for the word processing equipment. (Richardson, T. 642–643) As to the time sharing question, Richardson recommended that payment be made to INSLAW pursuant to the terms of the contract. (Richardson, T. 642)

269. The general tenor of the meeting was that Rooney indicated an appreciation of INSLAW's value to DOJ, that he would take an active and sympathetic interest in addressing the issue of withheld funds, and that he would actively explore INSLAW's proposal for the adaptation of the microcomputer system for smaller offices. (Richardson, T. 644) More particularly, Rooney assumed the responsibility of assuring that INSLAW would get a "fair shake." (Richardson, T. 696)

270. One week later, on December 29, 1983, a PROMIS Oversight Committee meeting was held to discuss the PROMIS Contract. (PX 328 [Jensen] at pp. 16–18; PX 339 [Stephens] at p. 19) At that meeting which was chaired by Lowell Jensen, and attended by Tyson, Rooney, Brewer, Harry Flickinger (the Deputy Assistant Attorney General for Procurement) and two other persons. (PX 328 [Jensen] at pp. 16–18; PX 339 [Stephens] at pp. 20–21) Rooney summarized his meeting with Richardson and the matters discussed thereat. (Richardson, T. 698; PX 341 [Tyson] at pp. 175–176)

271. After Rooney left the PROMIS Oversight Committee meeting, and based upon the urging of Brewer and his staff and notwithstanding Rooney's favorable conclusions about a constructive resolution to the word processing problem, and the fact that that was an initiative arranged by Deputy Attorney General Schultz, Jensen approved a decision to begin termination of the contract for default. (Richardson, T. 644, 698; PX 339 [Stephens] at pp. 25–26; PX 341 [Tyson] at pp. 175–178)

272. Videnieks issued a Show Cause notice to INSLAW in January 1984. (Richardson, T. 644; PX 324 [Brewer] at p. 385) The notice invited INSLAW to show cause why DOJ should not terminate the PROMIS contract for default. (PX 324 [Brewer] at p. 385) Brewer and his staff concurred with Videnieks' decision. (PX 324 [Brewer] at pp. 384–385)

273. After INSLAW received the "Show Cause Notice," Elliot Richardson contacted Rooney to complain that the "Show Cause" notice was inconsistent with the spirit of the December 22, 1983 meeting between Rooney and Richardson. (Richardson, T. 644)

274. Rooney was embarrassed by this inconsistency, but had no real explanation for why the order had been issued. (Richardson, T. 697, 698) Rooney did say however, that the Show Cause Order should not deter INSLAW from negotiating with DOJ along the lines discussed at the December 22nd meeting. (Richardson, T. 644)

275. Rooney advised Richardson to call Lowell Jensen who was then the Acting Deputy Attorney General. (Richardson, T. 645, 698) Rooney, however, did caution Richardson that, in effect, Jensen would not be a sympathetic listener. (Richardson, T. 645) Richardson understood at the time that Jensen had an unfriendly attitude towards INSLAW. (Richardson, T. 645)

276. Jensen believed that it was a mistake for DOJ's Law Enforcement Assistance Administration (LEAA) to have selected INSLAW's PROMIS case tracking software for nationwide diffusion when the DALITE case tracking software developed under Jensen's auspices in Alameda County, California, was also available and may, according to Jensen, have been superior to PROMIS. (PX 328 [Jensen] at pp. 48–51, 59–60) Further, in April, 1981, immediately after being appointed to the U.S. Department of Justice as Assistant Attorney General for the Criminal Division, Jensen believed that the initial two generations of INSLAW's PROMIS software were inferior to the corresponding generations of the DALITE software. (PX 328 [Jensen], at pp. 51–52) In 1981, Jensen also had expressed to Associate Deputy Attorney General Stan Morris his lack of enthusiasm about the 1981 DOJ decision to install the PROMIS software in the 20 largest U.S. Attorneys' Offices. (PX 328 [Jensen] at pp. 49–51; PX 331 [Morris] at p. 62)

277. In February 1984, DOJ Procurement Counsel William Snider issued a written legal opinion stating that DOJ lacked sufficient legal justification for a default termination of the INSLAW contract. (PX 336 [Snider] 127–131)

278. In February 1984, Brewer telephoned Hamilton to tell him that Jensen had just decided to terminate the word processing part of the INSLAW contract for convenience. (Hamilton, T. 207)

279. On February 13, 1984, INSLAW received formal written notice from Videnieks of DOJ's termination for convenience of the entire word processing portion of the 1982 Executive Office contract. (PX 131) No provision was included in that notice suggesting, permitting or requiring any in-

creased dissemination of the mini-computer PROMIS software to any site previously scheduled to implement the word processing software. (PX 131)

280. In February 1984, Donald Santarelli, an attorney for INSLAW met with Jensen to discuss the evidence of mounting difficulties in the DOJ–INSLAW relationship; Jensen assured Santarelli that he did not blame INSLAW for the word processing problems and that he would look with favor on finding the money to fund a proposal by INSLAW to expand significantly the number of full-function computer sites under the contract. (PX 328 [Jensen] at pp. 9–12)

281. Despite having assured INSLAW, through its special counsel, Santarelli, that he would look with favor on such a proposal and find the funds to implement the proposal, Jensen never told this to any of his subordinates. (PX 328 [Jensen] at pp. 9–12; Tyson, T. 1567–1568; PX 343 [Wallace] at pp. 58–59) Had Tyson known this, he certainly would have looked more favorably at the INSLAW proposal. (PX 341 [Tyson] at p. 181)

282. INSLAW acted upon Rooney's and Jensen's encouragement by meeting with Brewer on February 14, 1984, and by submitting a proposal to DOJ for finishing the implementation of PROMIS in U.S. Attorneys Offices. (Hamilton, T. 228; PX 134) The proposal recommended putting a micro-computer version of PROMIS software into the 74 offices originally intended for word processing software. (Hamilton, T. 228–229; PX 134)

283. In conjunction with INSLAW's proposal, Brewer met with INSLAW's John Gizzarelli. (Gizzarelli, T. 542) During this meeting, Brewer indicated that he saw no need for further PROMIS implementation because "... INSLAW gets nothing right." (Gizzarelli, T. 542) When Gizzarelli informed Brewer that INSLAW would have to let some of its staff go because of its contract disputes with DOJ, Brewer stated that this is exactly what he wanted; this had been Brewer's "objective." (Gizzarelli, T. 543) Brewer also implied to Gizzarelli that Gizzarelli had better also be thinking

of new employment. (Gizzarelli, T. 544; Brewer, T. 1598)

284. In April 1984, DOJ rejected INSLAW's proposal which had been submitted as a result of the Richardson and Santarelli efforts, and at the suggestion of Jensen. (Hamilton, T. 229)

IX. THE EFFORTS OF ELLIOT RICHARDSON AND OTHERS TO OBTAIN AN INDEPENDENT AND IMPARTIAL PROCESS FOR CONSIDERATION OF INSLAW'S COMPLAINT

A. Richardson Meets with Assistant Attorneys General for Administration Liotta and Wallace in an Attempt to Receive Unbiased Consideration of INSLAW's Complaints

285. At the suggestion of Carol Dinkins, the third Deputy Attorney General whom Richardson contacted in his effort to gain a fair and impartial process for INSLAW, Richardson spoke to the new Assistant Attorney General for Administration Anthony Liotta in November, 1984, seeking his help in resolving INSLAW's disputes with DOJ. (Richardson, T. 646–647) Richardson's purpose in contacting Liotta was to establish a level of responsibility at DOJ that could view the issues raised by INSLAW in a "manner that would not be infected by the bias emanating from the Executive Office of the U.S. Attorneys, and the Project Manager in that office." (Richardson, T. 648) Liotta said that once the decision from the Contracting Officer was available, that Liotta would have and would exercise the "responsibility to look at it from the perspective of what's right or wrong." (Richardson, T. 649; PX 165)

286. On December 21, 1984, Richardson met with Liotta, who promised to take a fresh look at the INSLAW situation, and assured Richardson that he had the authority to seek to find a fair resolution on the merits. (Richardson, T. 649)

287. Liotta requested a significant amount of information from INSLAW to be provided for his review, which information was in fact provided to Liotta as quickly as

INSLAW's capacities permitted. (Richardson, T. 649)

288. INSLAW's situation did not improve as a result of Richardson's working with Liotta because Liotta left his position in early 1985 without responding to INSLAW regarding the information he had requested and received. (Richardson, T. 649) Thereafter, Lawrence Wallace took over in Liotta's position. (Richardson, T. 649)

289. Between February and April 1985, Richardson had a number of conversations with Wallace. (Richardson, T. 650) Richardson pressed Wallace for a process that would address INSLAW's concerns on the merits and for a response to his suggestions to keep INSLAW afloat. (Richardson, T. 650; PX 185; PX 317) In one such conversation on March 12, 1985, Wallace told Richardson that he rejected a proposal from his staff for a "time-consuming attenuated process" for resolving the merits of the INSLAW issues, because Wallace wished to move forward as rapidly as possible. (Richardson, T. 653; DX 151) During a telephone conversation on March 13, Richardson stated to Wallace that the INSLAW situation did not reflect "great credit on the process" being pursued at DOJ. (Richardson, T. 654; DX 153)

290. Elliot Richardson and Donald Santarelli visited Acting Deputy Attorney General Jensen on March 13, 1985, to ask for an immediate investigation into INSLAW's complaints about Brewer; to request again a process for fair and expeditious resolution of the contract disputes that had propelled INSLAW into bankruptcy; and DOJ consideration of the larger public interest involved in preserving INSLAW as a unique asset for both U.S. Attorneys and the state and local prosecutors and courts. (Richardson, T. 658–660; PX 328 [Jensen] at pp. 22–24) Santarelli was emphatic about the need for an investigation into INSLAW's allegations of bias. (Richardson, T. 659–660; PX 261) The situation respecting INSLAW did not improve as a result of this meeting. (Richardson, T. 660–661)

B. At Jensen's Suggestion, Richardson and Others Attempt to Resolve the DOJ Bias with Associate Deputy Attorney General Jay Stephens

291. At this point, Richardson had become increasingly impatient about DOJ's failure fairly and expeditiously to address INSLAW's concerns. (Richardson, T. 654) Based on his experience with Rooney, Liotta and Wallace, Richardson concluded that they were afraid to take on the project manager "who was essentially in a position of controlling all the information, the technical knowledge." (Richardson, T. 655) As the basis for this conclusion, Richardson observed that he received basically the same response from each of these people, i.e., willingness to go forward but no actual movement, combined with the withholding by DOJ of ever-increasing monies due for contract costs and fees. (Richardson, T. 658) As of this time, also, Wallace advised Richardson that DOJ would be asserting counterclaims against INSLAW, an act that Richardson found extremely damaging given the fact that INSLAW had filed for bankruptcy only the month before. (Richardson, T. 658)

292. In March 1985, Richardson began a series of telephone conversations with Jensen's aide, Associate Deputy Attorney General Jay Stephens, concerning INSLAW. (DX 157; Richardson, T. 661) Richardson had been informed that Jensen had designated Stephens as the DOJ official to pursue on Jensen's behalf the matters raised by Richardson and Santarelli. (PX 328 [Jensen] at pp. 24–25, 37–38; PX 339 [Stephens] at p. 40; Richardson, T. 661; PX 269) According to Stephens, Jensen's subordinates learned to "read between the lines" to determine what Jensen expected them to do because Jensen would frequently not state his expectations explicitly. (PX 339 [Stephens] at pp. 49–50)

293. These contacts started out dealing with initiation of a negotiating process for INSLAW during the Summer of 1985. (Richardson, T. 661–662; PX 148) They also included efforts to get answers from DOJ on INSLAW's 1985 proposal for adaptation of PROMIS on microcomputers for the 74

smaller U.S. Attorney's offices. (Richardson, T. 661–662)

294. One particular conversation in midsummer 1985 between Richardson and Stephens concerned Richardson's request to Stephens for assurance that Janis Sposato, JMD's General Counsel and the lead negotiator for DOJ during the 1985 negotiations, understood that she was representing DOJ, as a whole, and not merely Brewer and the EOUSA. (Richardson, T. 662) Richardson had a concern in this regard because she seemed obliged to take, and adhere to positions that "... did not reflect the kind of reasonableness and understanding of the merits that one would expect of her." (Richardson, T. 662) Richardson also felt that Sposato felt constrained to conform to the demands of EOUSA "... rather than acting as an independent attorney on the responsibilities of the Department of Justice toward the public of the United States." (Richardson, T. 662)

295. On August 2, 1985, Donald Santarelli wrote Attorney General Edwin Meese III to apprise him generally of the dispute between INSLAW and DOJ, and to request any assistance he might be able to offer INSLAW in resolving promptly the contractual disputes with DOJ and the bias of DOJ officials against INSLAW. (PX 270)

296. On August 16, 1985, following another of these telephone conversations, Richardson wrote to Stephens again seeking a fair consideration of INSLAW's positions (PX 189; PX 190) This letter had been written out of Richardson's concern that DOJ was not engaging in serious negotiations. (Richardson, T. 666; PX 266) Stephens responded on September 27, 1985 with essentially a non-answer to Richardson's inquiry. (Richardson, T. 666) Stephens' gratuitous observation that he would not "intervene in these negotiations" was totally unrelated to Richardson's inquiries. (Richardson, T. 667; PX 266) Richardson had never suggested that Jensen, Stephens or anyone else at DOJ intervene; only that such higher officials meet their responsibility to assure a process that was expeditious and fair. (Richardson, T. 667)

297. On November 15, 1985, Sposato sent a "counter-offer" to INSLAW's earlier global settlement proposal. (Sposato, T. 2293–2294; PX 199) Sposato's letter essentially denied all of INSLAW's claims, required INSLAW to recognize the government's rights in INSLAW's proprietary PROMIS enhancements, and moreover demanded payment by INSLAW to DOJ of nearly $700,000. (PX 199) Richardson's reaction to this letter was "... that Brewer had another victim." (Richardson, T. 668)

C. INSLAW's "Last Ditch Effort" to Obtain from Jensen an Independent Consideration and Investigation of DOJ's Bias Against INSLAW

298. In response to the November 15 Sposato letter, Richardson wrote to Jensen on November 25, 1985 with his analysis of various disputes between DOJ and INSLAW. He addressed the issue of DOJ's unauthorized use of Enhanced PROMIS, specifically questioning Sposato's denial of any obligation to pay INSLAW for DOJ's use of Enhanced PROMIS, in disregard of the Morris August 11, 1982 letter and Modification 12. He renewed INSLAW's proposal to implement PROMIS on microcomputers for the smaller U.S. Attorney's Offices and requested a meeting to discuss these issues. (PX 200; Richardson, T. 670)

299. In December 1985, Richardson and Hamilton met with Jensen and others from DOJ to discuss the points raised in Richardson's November 25 letter. (Richardson, T. 672–673; Hamilton, T. 214–215; Jensen, T. 39–47) Richardson opened with a reference to the inscription in the rotunda outside the Attorney General's Office which states that the U.S. wins its point whenever justice is done to one of its citizens. Richardson said that the performance of the department in this dispute had been scandalous, and "it was hard to avoid the conclusion that an effort was being made to retaliate against Bill Hamilton personally." (Richardson, T. 674) Richardson said that in this dispute the DOJ was behaving as though it were a private litigant rather than fulfilling its obligation to "turn square corners in dealing with others." He also raised the issue of the investigation of

bias. Richardson then addressed the limited success of the negotiating process in 1985 and sought to find out whether the position conveyed to INSLAW by Sposato's letter was the official position of the Department of Justice. (Richardson, T. 676, 733; Hamilton, T. 78) Lastly, Richardson asked for a response to INSLAW's proposals for new business which had been conveyed to Mr. Jensen in March 1985. (Hamilton, T. 78; Richardson, T. 674)

300. At that meeting, Jensen referred derogatorily towards PROMIS and alluded that he did not have a "very high view" of PROMIS when he had been District Attorney of Alameda County. (Richardson, T. 675)

301. Jensen told Richardson that there was little room to negotiate on Sposato's November 15 proposal. (Hamilton, T. 402)

302. As far as Richardson was concerned, this meeting was a "last ditch effort" to follow up on his November letter. (Richardson, T. 674) In effect, Richardson was asking Jensen whether Sposato's letter of November 15 represented a final answer from DOJ. (Richardson, T. 676)

303. Richardson perceived that Jensen was tentative and noncommittal and he received no indication of what was going to happen. (Richardson, T. 674)

304. Richardson received a response to his inquiry by letter dated January 15, 1986 from Jensen in which Jensen said in effect that Sposato's November 15, 1985 letter was a serious offer and that consideration of INSLAW's proposal for expanded or revised use of PROMIS would be further delayed due to DOJ's review of its overall case management needs. (Richardson, T. 679; PX 202) Richardson considered this letter to be a "take it or leave it" letter and to be "... more of the same, i.e., more stalling on negotiations and indefinite deferment of any serious consideration of our proposals." (Richardson, T. 679) This letter was really an "offer that condemns INSLAW to death." (Richardson, T. 711)

305. Subsequent to receipt of this letter, in 1986 Richardson concluded that IN-SLAW had no other alternative but to file suit. (Richardson, T. 680; PX 204) Despite his natural proclivity to work patiently through governmental processes, Richardson decided that he had failed at every step of the way in his efforts to obtain a fair and impartial process on behalf of IN-SLAW. (Richardson, T. 680) This inaction on the part of DOJ was particularly distressing to Richardson in light of IN-SLAW's substantial contributions to the administration of justice, and because of the addition of $250 million in one year to Federal revenues due to PROMIS-generated computerized debt collections activity. (Richardson, T. 712; PX 167) In fact, Richardson believed that he may have poorly advised INSLAW in continuing on with its efforts to obtain consideration on the merits of its concerns from DOJ. (Richardson, T. 680)

306. Based on all of his observations, Richardson concluded that the strongest hypothesis was that there was some degree of bias at the higher levels of DOJ which insulated the strongly evidenced bias at lower levels of DOJ from any substantive inquiry. (Richardson, T. 737)

## X. JENSEN'S BIASED ATTITUDE AGAINST INSLAW AND HIS INDIFFERENCE TO INSLAW'S REPEATED COMPLAINTS OF MISCONDUCT BY OTHER DOJ OFFICIALS

### A. Deputy Attorney General D. Lowell Jensen Had a Previously Developed Negative Attitude About PROMIS and INSLAW

307. Jensen adopted as his own view the notion, published in 1980 in the book, *Improving Prosecution?*, that it was a mistake for DOJ's Law Enforcement Assistance Administration (LEAA) to have selected INSLAW's PROMIS case tracking software for nationwide diffusion when the DALITE case tracking software developed under Jensen's auspices in Alameda County, California, was also available and may, according to Jensen, have been superior to PROMIS. (PX 328 [Jensen] at pp. 48–51, 59–60)

308. In April, 1981, immediately after being appointed to the U.S. Department of

Justice as Assistant Attorney General for the Criminal Division, Jensen volunteered to INSLAW employees the belief that the initial two generations of INSLAW's PROMIS software were inferior to the corresponding generations of the DALITE software. (PX 328 [Jensen] at pp. 51–52)

309. In 1981, Jensen expressed to Associate Deputy Attorney General Stan Morris his lack of enthusiasm about the 1981 DOJ decision to install the PROMIS software in the 20 largest U.S. Attorneys' Offices. (PX 328 [Jensen] at pp. 49–51; PX 331 [Morris] at pp. 62)

B. Jensen's Close Involvement in the PROMIS Contract as Ranking DOJ Official on the PROMIS Oversight Committee and Immediate Organizational Superior of the Executive Office During the Period of Brewer's Misconduct Against INSLAW

310. While Assistant Attorney General for the Criminal Division, Jensen attended PROMIS Oversight Committee meetings. (PX 328 [Jensen] at pp. 83–84)

311. Brewer testified that one of his duties as PROMIS Manager for the Executive Office was briefing Jensen's staff while Jensen was head of the Criminal Division. (Brewer, T. 1604, 1661–1662)

312. The Executive Office reported directly to Jensen when he was Associate Attorney General and then began reporting directly to the Deputy Attorney General when Jensen was promoted to that position. (Brewer, T. 1661–1662; Tyson, T. 1534–1535)

313. About the time that Jensen was promoted to Associate Attorney General, ranking DOJ official on the PROMIS Oversight Committee and immediate organizational superior of the Executive Office, Videnieks first suspended the payment of costs to INSLAW under the PROMIS Contract. (PX 98) The July 18, 1983, letter to INSLAW from Contracting Officer Videnieks, that sought to justify the suspension of almost a quarter of a million dollars in payments due INSLAW under the Contract, showed Associate Attorney General Designate Jensen as the number one "cc".

(PX 98) Videnieks testified that he never met Jensen and cannot account for why he copied the payment suspension letter to Jensen but failed to copy the DOJ Director of Procurement, his immediate superior. (Videnieks, T. 1869–1871)

314. Tyson told McWhorter about a Presidential Appointee biased against INSLAW. (PX 330 [McWhorter] at pp. 76–77)

315. When Hamilton in May 1983, complained to Tyson about Brewer's misconduct against INSLAW, Tyson told Hamilton that Brewer was not INSLAW's only problem because there was a Presidential Appointee in the current Administration who was so antagonistic to PROMIS and INSLAW that the nationwide PROMIS implementation contract was in jeopardy. (Hamilton, T. 202) Hamilton deduced that Tyson was referring to Jensen, then Assistant Attorney General for Criminal and soon to be promoted to Associate Attorney General. (Hamilton, T. 203)

316. In December 1983, INSLAW counsel Richardson met with Assistant Attorney General Rooney in an attempt to resolve both the payment-suspension problem and a word processing hardware problem. There was every indication that the meeting would lead to constructive resolution of the problems. (Richardson, T. 641–644)

317. One week later, on December 29, 1983, Rooney made a favorable report on his meeting with Richardson to the PROMIS Oversight Committee meeting chaired by Jensen; Rooney then left the meeting early. Subsequent to Rooney's departure, Jensen and the other participants at the meeting approved an effort to terminate for default the word processing part of the INSLAW contract. (Richardson, T. 643–644)

318. Rooney was clearly embarrassed by the inconsistency of his report to the PROMIS Oversight Committee and the subsequent effort to terminate for default the word processing part of the INSLAW contract. (Richardson, T. 644, 697–698)

319. In February 1984, DOJ Procurement Counsel William Snider issued a written legal opinion to the effect that DOJ

lacked sufficient legal justification for a default termination of the INSLAW contract. (PX 336 [Snider] at pp. 127–131)

320. In February 1984, Brewer telephoned Hamilton to tell him that Jensen had just decided to terminate the word processing part of the INSLAW contract for convenience. (Hamilton, T. 207)

321. In February 1984, Jensen acknowledges he may have sent word to Hamilton through Donald Santarelli encouraging INSLAW to submit a proposal to expand the computer part of the contract, absolving INSLAW of blame for the word processing part of the contract, and promising to look with favor on finding the funds for the expansion. (PX 328 [Jensen] at pp. 10–13)

322. Jensen failed to reveal this communication to either of the DOJ entities that would need to know about it if it were to lead to any constructive action—the Executive Office for U.S. Attorneys (Tyson, T. 1567–1568) or the Justice Management Division (PX 343 [Wallace] at pp. 58–59).

C. During the Period of the Automatic Stay, Jensen was Repeatedly Made Aware of INSLAW's Complaints About Brewer But Took No Corrective Action

323. Elliot Richardson and Don Santarelli visited Acting Deputy Attorney General Jensen on March 13, 1985, to ask for an immediate investigation into INSLAW's complaints about Brewer; a process for fair and expeditious resolution of the contract disputes that had propelled INSLAW into bankruptcy; and DOJ consideration of the larger public interest involved in preserving INSLAW as a unique asset for both U.S. Attorneys and the state and local prosecutors and courts. (Richardson, T. 658–660; PX 328 [Jensen] at pp. 22–24)

324. Jensen appointed his aide, Jay Stephens, to follow through on the matters raised by Richardson and Santarelli. (PX 328 [Jensen] at pp. 24–25, 37–38; PX 339 [Stephens] at p. 40; Richardson, T. 661)

325. Although Jensen testified that he believed an investigation of Brewer's conduct against INSLAW had been conducted, in fact neither Stephens nor the designated agency ethics officer ever conducted such an investigation. (PX 328 [Jensen] at pp. 25–26; PX 339 [Stephens] at pp. 47–48; PX 343 [Wallace] at pp. 44–46, 210–211; Sposato, T. 2267–2270)

326. While Jensen in his deposition recognized the general principle that it is a bad idea for the government to hire an individual to supervise a contract with that individual's former employer because of the inherent bias either against or in favor of the former employer, his deposition testimony shows that, to put it most charitably, he somehow failed to recognize the obvious applicability of this general principle to Brewer and INSLAW.

Jensen became aware of the July 1985 written opinion of U.S. Bankruptcy Judge Bason questioning the motivation of the DOJ in the INSLAW case and raising the possibility of a personal vendetta on the part of Brewer, but Jensen testified that he did not think the concern rose to the level of requiring a referral to the Office of Professional Responsibility. (PX 328 [Jensen] at p. 37)

327. During the very period in the early stages of the INSLAW bankruptcy when Jensen was asked but failed to investigate Brewer, Brewer was engaged in an unlawful and unjustified effort to bring about INSLAW's liquidation through conversion to Chapter 7. (*In Re INSLAW, Inc., Debtor*, No. 85–00070 (Bankr.D.D.C., July 20, 1987), Order Granting Debtor's Motion to Obtain Independent Handling)

328. According to Jensen's aide, Jay Stephens, Jensen's subordinates learned to "read between the lines" to determine what Jensen expected them to do because Jensen would frequently not state his expectations explicitly. (PX 339 [Stephens] at pp. 49–50)

329. Brewer sought and obtained assistance for his unlawful plan from Thomas Stanton, Director of the Executive Office for U.S. Trustees. (*In Re INSLAW, Inc., Debtor*, No. 85–00070; June 12, 1987 Hearing at 1012) Stanton reported directly to the Deputy Attorney General, D. Lowell Jensen. (*In Re INSLAW, Inc., Debtor*, No. 85–00070; June 3, 1987 Hearing at 776)

330. During a December 1985 meeting with Richardson and Hamilton, Jensen failed to respond on the merits to complaints about Brewer's misconduct but did gratuitously volunteer his belief that INSLAW's PROMIS software was inferior to both the DALITE software developed under Jensen's auspices in Alameda County, California, and the case tracking software recently developed by the FBI. (Hamilton, T. 214–215; PX 328 [Jensen] at pp. 43–46)

331. In a written reply in July 1986 to the Senate Judiciary Committee, Jensen responded to a question from Senator Paul Simon about "Jay Stephen's investigation of the DOJ administration" of the INSLAW contract by stating that INSLAW representatives had sought new contracts from Jensen and Jensen's intervention in the contract dispute negotiations. Jensen failed to disclose the fact that Richardson and Santarelli had asked for an urgent investigation of Brewer's misconduct, which Jensen failed to follow through on. (PX 275)

332. In March 1987, Tyson wrote to Judge Jensen vowing to continue denying under oath that he had told Hamilton about a Presidential Appointee biased against INSLAW and that Jensen was the Presidential Appointee. (PX 208; PX 328 [Jensen] at pp. 63–64; PX 341 [Tyson] at pp. 191–194)

## XI. DOJ'S FAILURE TO INVESTIGATE AND REMEDY INSLAW'S CLAIMS OF BIAS PRIOR TO THE BANKRUPTCY

333. The record is clear beyond any doubt that both before and after the filing of INSLAW's bankruptcy petition, Hamilton and INSLAW complained repeatedly about Brewer's bias and prejudice and absolutely nothing happened at DOJ. When Hamilton personally complained, DOJ wrongly considered it to be "sour grapes" on his part. When INSLAW's outside representatives complained about Brewer's bias, such as Richardson, Jaffee and Santarelli, all of whom were persons of unquestioned integrity, DOJ wrongly considered this to be "political pressure."

Other than simplistically asking Brewer whether he had been fired by INSLAW or whether he was biased against INSLAW, DOJ did nothing whatsoever to investigate the substance of these most serious assertions. Moreover, DOJ's explanation that it did nothing because it had no substantiation is absurd, since the substantiation not only was massive and available but was indisputable.

334. During the course of the PROMIS Project, but prior to INSLAW's bankruptcy petition, a number of claims of lack of impartiality were made on behalf of INSLAW to DOJ. (Hamilton, T. 198–199, 2596–2598; Richardson, T. 659–660, 673; PX 336 [Snider] at pp. 42–44) These claims were in reference to Brewer and his colleagues, including Rugh and Videnieks. (Hamilton, T. 226, 2596–2598; Richardson, T. 659; Jensen 24–25, 68–72; Sposato, T. 2261, 2266; PX 341 [Tyson] at pp. 78–80, 136–138; Brewer, T. 1719; PX 330 [McWhorter] at p. 47)

335. The procedure for handling claims of bias or conflict of interest was well-established at DOJ. (PX 330 [McWhorter] at pp. 8–10; PX 338 [Sposato] at pp. 9–12) Oral or written, formal or informal claims were all to be referred in the first instance to the department, office or agency designated ethics official ("DEO") who generally had designated his/her assistant as the deputy DEO. (PX 330 [McWhorter] at pp. 8–10; McWhorter, T. 1347; PX 338 [Sposato] at pp. 9–12) The deputy DEO was under an obligation to then refer such claims to DOJ's Office of Professional Responsibility ("OPR") for investigation and disposition. (PX 330 [McWhorter] at pp. 8–10; McWhorter, T. 1346–1347; PX 338 [Sposato] at pp. 9–12)

Certain government regulations require referral for an independent investigation by OPR in the event of charges of conflict of interest. A claim of personal bias is the quintessential conflict of interest, particularly where it is substantiated by being linked to the individual's having been fired from a prior job. Unlike owning stock in a corporation, which sometimes may only create an *appearance* of a conflict of interest,

personal bias by definition always constitutes an *actual* conflict of interest.

336. The first charges of bias and lack of impartiality or prejudice against Brewer were made by INSLAW's attorney Roderick Hills to Morris in May 1982. (Hamilton, T. 138, 198; Rogers, T. 426) In particular, INSLAW complained of Brewer's intransigent attitude against resolution of the matter of INSLAW's proprietary rights to privately-financed enhancements, and alerted Morris to the fact that Brewer had been fired by INSLAW. (Hamilton, T. 138) On this occasion, no referral to OPR occurred, nor was any investigation of the charges conducted, although Morris directed that Brewer be removed from DOJ's consideration of the proprietary enhancements issue. (PX 324 [Brewer] at pp. 168–171) Notwithstanding this direction, Brewer remained at all times fully involved in such consideration. (PX 330 [McWhorter] at pp. 46–51; PX 324 [Brewer] at pp. 456–458, 464)

337. The next claim of bias against Brewer came in January 1983 when INSLAW's attorney Harvey Sherzer complained to Kamal Rahal, Director of Procurement for JMD, about Brewer's and Videnieks' hostility towards INSLAW. (Hamilton, T. 226) As to these claims, there is nothing in the record to suggest that Rahal referred them to OPR. (Hamilton, T. 226–227)

338. By letter of February 10, 1983, INSLAW's counsel Harvey Sherzer again complained to various officials of the DOJ about improper motivation of DOJ personnel at a February 4, 1983 meeting, and apprised them of his concern that DOJ was motivated by a desire to seek retribution against INSLAW. (Sherzer, T. 959–961; Brewer, T. 1662–1665; PX 58) In addition, Sherzer requested that the atmosphere of bias, unfounded accusation and hostility be corrected "... if need be through a change of administrative personnel on the Government's side or otherwise." (PX 58)

339. On May 2, 1983, Hamilton met with William Tyson to complain about the biased administration of the PROMIS Contract on the part of Brewer and Videnieks, and to state that Brewer's conduct may be the result of a lack of impartiality against Hamilton for having previously fired Brewer. (Hamilton, T. 199; PX 341 [Tyson] at pp. 136–138, 140–142; Tyson, T. 1531–1532, 1550–1551) Hamilton specifically identified ten to twelve incidents which appeared to have been the result of Brewer's bias, including Brewer's conduct at the April 19, 1982 meeting in connection with the BJS contract and the spreading of false information concerning INSLAW's financial condition among personnel in various U.S. Attorney's offices. (Hamilton, T. 199–201) Tyson responded that he took seriously these sort of allegations and that he would conduct an inquiry. (Hamilton, T. 202; Tyson, T. 1554–1555) Again, no referral to OPR occurred, nor did Tyson do anything other than to ask McWhorter whether Brewer had been fired by the Institute. (PX 341 [Tyson] at pp. 140–142; Tyson, T. 1552, 1556; Hamilton, T. 208) INSLAW never even got a report back from Tyson on this matter. The government began to suspend payments on its contract cost expenses later on in May 1983. (Hamilton, T. 208; Tyson, T. 1554–1555)

340. At this May 2 meeting, Tyson informed Hamilton that Brick Brewer was not INSLAW's only problem because there was a Presidential Appointee in the current Administration who was so antagonistic to PROMIS and INSLAW that Tyson had to maneuver to keep him away from meetings of the U.S. Attorneys for fear that he would jeopardize the success of the nationwide PROMIS implementation contract. (Hamilton, T. 202) INSLAW concluded that Tyson was referring to Jensen because Jensen was the only DOJ presidential appointee who had access to U.S. Attorney's meetings and who also had a prior negative opinion about PROMIS. (Hamilton, T. 203, 207) Tyson also had told McWhorter about a Presidential Appointee biased against INSLAW. (PX 330 [McWhorter] at pp. 76–77)

341. Again in 1983, a similar complaint about Brewer's bias was made to Laurence McWhorter. (Hamilton, T. 207–208) As of this time, McWhorter was the deputy DEO for EOUSA and thoroughly understood the responsibilities of that position. (PX 330

[McWhorter] at pp. 8–10) McWhorter told Hamilton that he and Tyson did not believe that Brewer was behaving in a biased fashion. (Hamilton, T. 208) Moreover, McWhorter told INSLAW that he was a good friend of Brewer, that Brewer had been a member of his wedding party and that he was an investment partner with Brewer. (Hamilton, T. 208; McWhorter, T. 1344–1345) McWhorter's only response to the Hamilton complaints was to ask Brewer if he had been fired by INSLAW. (PX 330 [McWhorter] at pp. 13–17) McWhorter did not refer the matter to OPR nor conduct any further inquiry. (PX 330 [McWhorter] at pp. 8–10; McWhorter, T. 1346–1347; Hamilton, T. 208)

342. In October 1983, Sherzer complained to the Director of DOJ's Procurement staff about the outright hostility and rampant bias of Videnieks. (Brewer, T. 1662–1665)

343. In December 1983, Richardson contacted Deputy Attorney General Schmults because of his concern with the indications of bias in the Executive Office, and Schmults arranged a meeting between Richardson and Rooney to try to address "the consequences of bias." (Richardson, T. 641, 642)

344. In the summer of 1984, INSLAW consulted with Irving Jaffee, formerly DOJ's most senior career lawyer on government contracts, and requested him to take a fresh look at the bias issue. (Hamilton, T. 210) Jaffee attempted to get DOJ to remedy this situation during several meetings with DOJ. (Hamilton, T. 210) At one such meeting, Jaffee discussed with DOJ officials, including Brewer, Videnieks, James Johnston and Jeffrey Lovitky (an attorney on the staff of JMD's General Counsel) Videnieks' lack of independence from EOUSA, the effort to drive INSLAW into bankruptcy and the obvious lack of good faith on DOJ's part in dealing with INSLAW. (Hamilton, T. 211) Jaffee was specifically referring to Brewer when he made this statement. (Hamilton, T. 211–212) No investigation was initiated. (Brewer, T. 1662–1665, 1721)

345. In August 1984, Hamilton had a discussion with Brewer during which he contended that Brewer was biased against Hamilton and INSLAW because he had been fired. (PX 324 [Brewer] at pp. 287–289; Brewer, T. 1641–1662; Hamilton, T. 209) Brewer declined to refer these claims to OPR or to any other group or individual at DOJ although he understood his obligation to do so. (PX 324 [Brewer] at pp. 87–88; Brewer, T. 1664–1665) Brewer's explanation for this failure on his part was that Hamilton's complaint was informal, as opposed to formal, and thus not reportable. (PX 324 [Brewer] at pp. 287–289; Brewer, T. 1664) Hamilton specifically asked Brewer to recuse himself which Brewer refused to do. (Hamilton, T. 209; Brewer, T. 1641)

346. Again in the summer of 1984 at Hamilton's request, John Shenefield, a law partner of Elliot Richardson and a former DOJ senior official, talked with Tyson and William Van Stavoren about Brewer's bias. (Hamilton, T. 213) No inquiry was initiated. (Brewer, T. 1662–1665)

347. In the fall of 1984, Janis Sposato, General Counsel of JMD was informed by INSLAW that Brewer had been terminated from his employment at INSLAW and accordingly harbored strong negative opinions about INSLAW. (PX 338 [Sposato] at pp. 124–127; Sposato, T. 2266; Hamilton, T. 2596–2598) Although Sposato was the deputy DAEO for JMD and was fully aware of her responsibilities in that regard, her only response to that claim was to ask Brewer whether he had been fired by INSLAW. (PX 338 [Sposato] at pp. 128–130; Sposato, T. 2258–2261, 2263) She did not question INSLAW personnel about their allegation nor did she refer the matter to OPR. (PX 338 [Sposato] at pp. 125–126; Sposato, T. 2267) [28]

---

**28.** Despite DOJ's continual failure to investigate INSLAW's repeated claims of bias by DOJ officials, DOJ officials moved quickly to allege misconduct against Joe N. Pate, a former LEAA employee who was acting briefly as a consultant to INSLAW. (PX 353; Sposato, T. 2263–2265) DOJ subsequently informed Mr. Pate that his representation of INSLAW regarding the Executive Office contract was permissible. (PX 353)

[Editor's Note: The Court has omitted paragraph no. 348 from publication.]

349. This failure even to begin to investigate INSLAW's complaints was outrageous and indefensible. It constituted an institutional decision by DOJ, consciously made at the highest level, simply to ignore serious questions of ethical impropriety, made repeatedly by persons of unquestioned probity and integrity. This failure to investigate constituted bad faith, vexatiousness, wantonness and oppressiveness.

## XII. DOJ'S UNLAWFUL AND IMPROPER CONDUCT CONTINUES UNABATED THROUGHOUT THE PERIOD OF BANKRUPTCY

350. As explained at some length in this Court's opinion in this proceeding reported at 76 Bankr. 224, 226–228 (1987), a fundamental, significant part of the Bankruptcy Code's program to assist companies out of Chapter 11 bankruptcy is an automatic stay which precludes creditors and others from exercising control over the property of the bankrupt, and stops "all harassment." The nature and existence of the automatic stay were well understood at DOJ and, on at least one occasion, Dean Cooper from DOJ's Civil Division counseled EOUSA and JMD about the effect of the automatic stay. (PX 338 [Sposato] at pp. 78–79, 192–193)

351. This Court has found, (i) in an extended bench ruling on June 12, 1987 (which is incorporated herein by reference), as a result of four days of hearings in *In re INSLAW, Inc.*, Case No. 85–00070, at which DOJ appeared and offered evidence, (ii) in an Order dated July 20, 1987, and (iii) in Findings of Fact and Conclusions of Law issued on this date in that case, and this Court incorporates into these findings in this adversary proceeding the following:

(a) INSLAW filed a petition under Chapter 11 of the Bankruptcy Code on February 7, 1987.

(b) Sometime between February 7 and February 20, 1985, Brewer discussed the INSLAW Chapter 11 bankruptcy case with Thomas J. Stanton, Director of the Executive Office of United States Trustee ("EOUST"). At the time of Brewer's discussion with Stanton, EOUSA and DOJ believed that they had an interest in seeing that INSLAW was liquidated in order to weaken or eliminate INSLAW's ability to press its contract disputes with DOJ. As a result of the discussion, Stanton made a commitment to Brewer that he would undertake to cause the conversion of INSLAW's Chapter 11 case to a Chapter 7 liquidation case.

(c) Stanton made this commitment because he wanted to curry favor with the EOUSA and with higher DOJ officials in order to win the support of these higher officials for anticipated legislation that was to make permanent the then temporary United States Trustee program which he headed.

(d) Acting on his commitment to Brewer, Stanton contacted William C. White, the local United States Trustee whose office had jurisdiction over the INSLAW bankruptcy, and pressured him to convert the case to a Chapter 7 liquidation. When White resisted, Stanton sought to have the office of Cornelius Blackshear, then the United States Trustee for the Southern District of New York, detail Blackshear's assistant trustee, Harry Jones, to EOUST, Washington, D.C., where Jones would be assigned to accomplish the conversion. Blackshear refused to permit this.

(e) Thereafter, Stanton retaliated against White for his resistance and imposed administrative retribution on White's office by refusing to approve additional staff during a period in which the office experienced a substantial increase of complex cases in its caseload.

(f) In July 1985, White was concerned that Stanton might still seek to convert or otherwise interfere with INSLAW's Chapter 11 bankruptcy, either by bringing Jones down from New York or by some other means. White requested that this Court supplement a confidentiality order proposed by INSLAW's counsel by adding language which explicitly prohibited White from disseminating any confidential infor-

mation about INSLAW to anyone associated with DOJ or EOUST. The Court incorporated the restrictive language in its July 11, 1985, confidentiality order. The purpose of White's request was to "protect" himself, his office and Jones, *i.e.*, to assure that even if Stanton succeeded in obtaining Jones' assignment to EOUST to work on the INSLAW case, Jones would be unable, under the terms of the July 11, 1985 Order, to obtain information necessary to seek conversion or otherwise interfere with INSLAW's Chapter 11 case, and White and his office would no longer be subject to Stanton's pressure.

(g) The fact of Stanton's commitment to Brewer to seek INSLAW's liquidation was relayed by Brewer to Rugh on or before February 20, 1985. Brewer told Rugh that Stanton had said the INSLAW bankruptcy would be converted to a Chapter 7 liquidation within 30 to 60 days. On February 20, 1985, acting on this information, Rugh telephoned Peter Videnieks, the Contract Officer on the PROMIS contract, and told him that Brewer had talked to Stanton and that there was "no way" the INSLAW bankruptcy would continue as a Chapter 11 case and that INSLAW probably would be liquidated within 30 to 60 days. Rugh told Videnieks that in view of the impending liquidation, DOJ would need to obtain a new site for the Government computer then on INSLAW's premises in Lanham, Maryland.

(h) On or about February 21, 1985, Rugh telephoned Gregory McKain, a senior INSLAW software programmer who had worked on the PROMIS contract since its inception, and told him that EOUSA had found out from the "trustees" that INSLAW could not make it in Chapter 11 and that the company would probably go into Chapter 7 in 30 to 60 days. Rugh then discussed with McKain the possibility of working for DOJ on the remainder of the PROMIS project under a six-month sole source contract, assuming INSLAW did go out of business.

(i) As a proximate result of Rugh's call to McKain, INSLAW's executives had to spend time calming McKain and overcoming his concern that he would be unemployed within 30 to 60 days, since he had earlier been led to believe by INSLAW and its counsel that the Chapter 11 process would likely extend for months, if not years, during which time INSLAW would be able to continue operating its business. Also, INSLAW's executives had to spend time assuring that other employees did not become similarly alarmed. Finally, INSLAW had to incur legal fees and expenses attributable to efforts by its counsel to investigate and dispute Rugh's claim.

(j) Good employee morale of a software applications company like INSLAW is a valuable asset of such a company. Good employee morale is also essential to INSLAW's submitting a feasible Chapter 11 Plan of Reorganization because of the services to be rendered by its employees to its customers, both during the Chapter 11 and after confirmation.

(k) At all times relevant, there was no factual or legal basis upon which conversion of INSLAW's Chapter 11 case could lawfully have been sought, and Stanton knew that this was so.

(*l*) At all times relevant, Stanton, Brewer, and Rugh were employees of DOJ acting within the scope of their employment.

(m) The acts of Stanton, Brewer and Rugh that are described above were done in bad faith, vexatiously, in wanton disregard of the law and the facts, and for oppressive reasons—namely, to drive INSLAW out of business and into a Chapter 7 liquidation bankruptcy.

(n) In sum, DOJ, acting through its employees, unlawfully, intentionally and willfully sought to cause the conversion of INSLAW's Chapter 11 reorganization case to a Chapter 7 liquidation case without justification and by improper means.

352. Rugh of DOJ's Executive Office attempted to recruit an INSLAW software engineer during the month INSLAW filed for protection, telling the INSLAW employee, Gregory McKain, that the "trustees" had told the Executive Office that INSLAW would probably be liquidated within 30–60 days.

## XIII. DOJ'S BAD FAITH NEGOTIATIONS AND OTHER IMPROPER CONDUCT DURING THE PERIOD OF BANKRUPTCY

### A. DOJ'S Continued Improper Implementation and Use of PROMIS Software

353. At the same time that INSLAW was desperately trying to persuade DOJ to pay its outstanding vouchers, Brewer and his staff were actively, but secretly, considering implementing PROMIS in U.S. Attorneys Offices with EOUSA in-house personnel, which consideration culminated in August of 1984 with a proposal by Snyder to Brewer for implementing PROMIS in the remaining offices. (PX 154) Rugh had also been very active in formulating this proposal. (PX 154)

354. Significantly, this proposal contemplated that "... INSLAW will provide the software which will be the basis for the standardized version of PROMIS that EOUSA will implement," *i.e.*, that EOUSA would utilize PROMIS software from INSLAW for EOUSA's in-house implementation of the remaining U.S. Attorneys Office. (PX 154)

355. This proposal was intentionally not disclosed to INSLAW, since it would have revealed the treachery of DOJ in obtaining INSLAW's "goods." (PX 73; PX 337 [Snyder] at pp. 338–339)

356. Brewer and his staff specifically recognized in their August, 1984 proposal that EOUSA would utilize PROMIS software from INSLAW for EOUSA's in-house implementation of the remaining U.S. Attorneys' Offices. (PX 154) Indeed, Brewer planned a meeting between the technical staffs of INSLAW and OMISS so that OMISS employees could "learn as much as possible about INSLAW's procedures regarding the Docket and Reporting System data base conversion process [*i.e.*, use of the Batch Update subsystem], the PROMIS data base adjustment and purge programs, and other miscellaneous PROMIS facilities." (PX 309)

357. Senior officials were aware that EOUSA was implementing and using this PROMIS software in far more than the 20 largest U.S. Attorneys Offices. (PX 166; PX 207; PX 308) On January 8, 1985, Janis Sposato, JMD's General Counsel, reminded the Deputy Assistant Attorney General for Administration in writing that EOUSA was implementing and using PROMIS software. (PX 166) In fact, at the National Administrative Officers' Conference in February 1985, OMISS distributed a paper entitled "PROMIS–An Overview," describing the plans of the Executive Office to complete the PROMIS implementation themselves, without further assistance from INSLAW. (PX 168) Notwithstanding, a report transmitted to Stephens from Tyson on April 18, 1985, admits that OMISS did not have either sufficient expertise or manpower to design or implement major software enhancements to PROMIS. (PX 178)

358. At no time prior to the institution of the instant lawsuit had anyone from DOJ informed INSLAW that it was the intention of DOJ to implement PROMIS beyond the 20 offices specified in the contract. (Hamilton, T. 234–235) On or about September 9, 1985, INSLAW learned that EOUSA was manufacturing copies of PROMIS software for its own implementation and use. (PX 193) In a letter to Assistant Attorney General Wallace, INSLAW's Hamilton complained about DOJ's unauthorized use of such software:

> The Government's continued enjoyment of and indeed manufacture of these proprietary enhancements in the absence of any negotiated agreement for payments, risks the very dissipation that I am responsible for avoiding. (PX 193)

359. INSLAW received no substantive response from DOJ on this complaint and thereafter filed a monetized claim for proprietary enhancements in the amount of $2,910,000, predicated on INSLAW's customary licensing fees for the number of DOJ PROMIS installations about which INSLAW then knew. (PX 197) This claim was rejected in its entirety by Janis Sposato on November 15, 1985 without explanation in her letter response to INSLAW's request for a global settlement. (PX 199; Sposato, T. 2292–2296)

360. In addition to its unauthorized and improper use of INSLAW's privately financed enhancements, such in-house implementation of PROMIS by EOUSA was essentially a theft of the contract option to extend the implementation to ten additional offices without any payment to INSLAW. (Gizzarelli, T. 497)

361. EOUSA has implemented PROMIS computer software in 40 U.S. Attorney's offices, with a present goal (as of the date of trial) of 45 such offices by September 30, 1987. (Rugh, T. 1509; PX 206; PX 276; PX 355) DOJ's actual implementation of such PROMIS computer software took place after INSLAW filed its bankruptcy petition. (Rugh, T. 1510; Brewer, T. 1725; PX 206; PX 264; PX 276; PX 355) DOJ made the decision to perform such implementation "willingly," "knowingly," "intentionally," and with an assumption of the risk that DOJ might be wrong in its view of INSLAW's claim of proprietary rights in PROMIS. (Brewer, T. 1725–1726)

362. DOJ converted INSLAW's Enhanced PROMIS by trickery, fraud and deceit, and DOJ has used and continues to use Enhanced PROMIS not only in the 20 U.S. Attorney's offices entitled to use a different non-proprietary version of PROMIS, but also in approximately 25 other U.S. Attorney's offices.

B. The Effects of Bias on the 1985 Negotiations

363. It was specifically understood among senior DOJ officials that proprietary enhancements were an important issue for negotiation. (Hamilton, T. 231; Wallace, T. 181–184; Sposato, T. 2299) Indeed, Hamilton specifically requested that this issue be added to the agenda. (Hamilton, T. 388; PX 176) Sposato agreed to do so but also added that DOJ had a very different view of the issue than did INSLAW. (Hamilton, T. 389; PX 176)

364. At the outset of the 1985 negotiations, DOJ and INSLAW both understood that the negotiations had to result in some payment by DOJ to INSLAW or else INSLAW would not have been negotiating. (Sherzer, T. 1043–1045) Any other conclu-

sion would have been illogical given that INSLAW was in bankruptcy. (Sherzer, T. 1043)

365. The negotiations primarily were conducted by Janis Sposato, JMD's General Counsel, and Dean Cooper, on behalf of DOJ and Harvey Sherzer and Kathy Little, attorneys for INSLAW, along with William Hamilton and Nancy Hamilton. (Hamilton, T. 229–230; PX 338 [Sposato] at p. 49; Sposato, T. 2279) At the outset of the discussions, Sposato unilaterally informed INSLAW that the negotiations would go forward on the issues, one issue at a time, and proceeding to the next issue only after final agreement had been reached concerning the preceding issue. (PX 338 [Sposato] at pp. 74, 155–156; Hamilton, T. 387–388)

366. During the course of these negotiations, Sposato relied heavily, if not exclusively, upon Brewer's staff for technical advice on the PROMIS contract. (PX 338 [Sposato] at pp. 242–248; Sposato, T. 2271, 2281, 2293, 2301–2302)

367. At the first negotiating session, Jeffrey Lovitky responded to an INSLAW complaint about Brewer's bias by stating that "... [w]hy bring up Brewer's misconduct now, it's history." (Hamilton, T. 227) Sherzer's response was "... because it has everything to do with why this company is in bankruptcy." (Hamilton, T. 227)

368. At a negotiating session on May 17, 1985, Sposato informed INSLAW that she had been under a misunderstanding about INSLAW's computer center costs. (PX 181; Hamilton T. 379–380) Specifically, Sposato had not known that 21, and not three persons billed time to INSLAW's computer center cost pool from two locations, and not one location. (PX 181; Hamilton, T. 379–380) In this regard, Sposato told INSLAW that "... this blows my mind. No wonder the two sides are so far apart." (Hamilton, T. 380)

369. In a telephone conversation after that meeting, Sposato further stated to Hamilton that "her people" would respond to this new information by arguing that it was "double billing." (Hamilton, T. 240)

370. This error had previously been made by Rugh when his 1983 analysis of INSLAW's costs resulted in the suspension of substantial amounts of payments to IN-SLAW. (PX 65)

371. Based on this revelation, INSLAW recommended to Sposato that she retain an independent outside computer consultant to advise her on the issues. (PX 181) Sposato rejected INSLAW's recommendation and continued to rely heavily upon Brewer's staff. (PX 338 [Sposato] at pp. 246–248)

372. In response to INSLAW's initiatives with senior DOJ officials, Sposato got more and more intransigent in her negotiations. (Hamilton, T. 380) When Sposato made only a modest change in the Government's position, which she described as her best and final offer, after learning of DOJ's fundamental misunderstanding regarding INSLAW's computer center costs, and when she failed to respond to IN-SLAW's request to obtain outside technical assistance, INSLAW concluded DOJ was not making a serious effort to resolve fairly the issues on the negotiation agenda. (Hamilton, T. 381–382)

373. During the course of these negotiations, Assistant Attorney General for Administration Lawrence Wallace informed Hamilton that the bias in the EOUSA office was so great that INSLAW could not get fair consideration of its proposals. (Hamilton, T. 219)

374. During these negotiations, Hamilton attempted to bring to a head IN-SLAW's claim to proprietary enhancements by proposing a global settlement offer to Sposato which included as part of the settlement a resolution of the proprietary enhancements issue. (Hamilton, T. 235; PX 95; PX 188) This proposal resulted from INSLAW's learning that DOJ intended to install PROMIS beyond the 20 contractually specified offices. (Hamilton, T. 236)

375. In this offer, Hamilton proposed to negotiate a global license with EOUSA for INSLAW's proprietary enhancements and for the use of the enhancements in all 94 U.S. Attorney's offices and by EOUSA itself for a set amount of money. (Hamilton, T. 236) This offer was limited to those enhancements not deliverable under the contract. (Hamilton, T. 236) This offer did not seek any money from DOJ for those software items deliverable under the PROMIS contract. (Hamilton, T. 236–237)

376. On the issue of proprietary enhancements in her response to INSLAW's global settlement offer, Sposato rejected any additional obligation on the part of DOJ to pay for "... software obtained pursuant to this contract." (PX 199; Sposato, T. 2294–2295, 2301) Moreover, she demanded that INSLAW recognize DOJ's unlimited right to unrestricted use of PROMIS software, including even unlimited use by other independent contractors. (PX 199) Finally, Sposato informed INSLAW that DOJ would consider FOIA requests for Enhanced PROMIS software but would first give INSLAW the standard ten days' notice prior to responding to the FOIA request. (PX 199)

377. This proposal from INSLAW's point of view was ridiculous because it was tantamount to destroying the company. (Hamilton, T. 238)

## XIV. DOJ'S CONTINUED FAILURE TO INVESTIGATE CLAIMS OF BIAS DURING THE PERIOD OF BANKRUPTCY

378. On March 13, 1985, Elliot Richardson and Donald Santarelli met with Lowell Jensen. (Richardson, T. 658–659) One issue discussed during this meeting was a fairly blunt warning about the malevolent effect on INSLAW from Brewer's bias and a description of the substantial injury to INSLAW during the course of the PROMIS contract from this bias. (Richardson, T. 659–660; Jensen 22–24; PX 339 [Stephens] at p. 52) The only result of this meeting with Jensen was the designation of Jensen's assistant, Stephens, as a person who would follow the INSLAW matter on his behalf. (Richardson, T. 661)

379. Jensen failed to initiate an investigation. (PX 328 [Jensen] at p. 24) Stephens did not conduct any inquiry into claims of bias against Brewer nor did he

refer the matter to OPR. (PX 339 [Stephens] at pp. 99–100)

380. In March 1985, INSLAW's counsel Charles Work told Jay Stephens that Brewer had a personal vendetta against INSLAW. (PX 339 [Stephens] at pp. 89–90) Stephens did not refer the complaint to OPR nor did he conduct any investigation. (PX 339 [Stephens] at p. 97)

381. In a telephone conversation on July 15, 1985, Wallace informed Hamilton that DOJ was slow in responding to a proposal for new business from INSLAW because his concern about the bias against INSLAW within DOJ prompted his decision to appoint persons outside U.S. Attorney's offices to review the proposal. (Hamilton, T. 219, 223) Hamilton concluded from this call that Wallace would keep Brewer and Videnieks out of this review process, which was a false assumption. (Hamilton, T. 220; PX 179) Brewer was deeply involved in the review process.

382. Throughout the negotiations between INSLAW and DOJ during the Spring and Summer of 1985, Hamilton complained to Sposato about Brewer's bias against INSLAW. (PX 338 [Sposato] at p. 125; Sposato, T. 2261–2266) Hamilton also made such complaints to Wallace, who was Sposato's boss. (PX 338 [Sposato] at p. 125; Sposato, T. 2267) Despite her DAEO responsibilities, Sposato took no action in response to such complaints. (PX 338 [Sposato] at p. 125; Sposato, T. 2267–2270) She did not refer these claims to OPR. (PX 338 [Sposato] at p. 126; Sposato, T. 2267–2270) Nor did Sposato remove Brewer from any activities with respect to the INSLAW contract as a result of Hamilton's complaints. (PX 338 [Sposato] at pp. 128–129; Sposato, T. 2270)

383. As a rationale for her failure to act, Sposato believed that, except for one occasion at the outset of the 1985 negotiations on which Brewer attempted to influence her thinking, Brewer was not involved in such negotiations. (PX 338 [Sposato] at pp. 247–248; Sposato, T. 2257, 2271–2272) Sposato nonetheless believed that if the allegations of bias were true, there would perhaps be a reason to remove Brewer

from administering the PROMIS contract. (Sposato, T. 2262)

384. Brewer had in fact been involved in meetings regarding DOJ negotiation strategy. (PX 179) He had also been involved in preparing a detailed analysis of a proposal INSLAW submitted during the negotiations. (PX 179)

[Editor's Note: The Court has omitted paragraph no. 385 from publication.]

386. Sposato at no time inquired of Brewer as to the nature of his involvement with, or his participation in, the negotiation process. (Sposato, T. 2272–2273)

387. Sposato was aware that Brewer's subordinates Rugh and Snyder, regularly attempted to influence her views concerning INSLAW during the course of negotiating with INSLAW in the Summer of 1985. (PX 338 [Sposato] at p. 248; Sposato, T. 2281, 2306) She met with Rugh and Snyder on a once-a-week or more frequent basis during the negotiations to obtain their technical advice concerning issues arising during such negotiations. (PX 338 [Sposato] at p. 183; Sposato, T. 2281, 2306) Videnieks also continued to press Sposato not to negotiate toward a global settlement with INSLAW but rather to stand firmly behind his final decisions denying INSLAW's claims. (PX 198)

388. During these negotiations, Sposato clearly indicated the influence being exercised over her by Rugh, Videnieks and Snyder. (Hamilton, T. 232) At one point, INSLAW's belief that a breakthrough in negotiations had occurred was dashed by further evidence that DOJ had not changed its negotiating position when Sposato told Hamilton "[m]y people feel discredited by the concessions I have already made and are unwilling to allow me to make any more concessions." (Hamilton, T. 232–233; PX 338 [Sposato] at p. 261)

389. It was during the course of these negotiations that Sposato concluded that INSLAW's claim to its privately financed enhancements had no merit. (PX 338 [Sposato] at p. 140; Sposato, T. 2292, 2298) In reaching that conclusion, she only consulted with Rugh, Snyder and Videnieks and

reviewed the contract. (PX 338 [Sposato] at p. 141; Sposato, T. 2293, 2296) She did not conduct, or cause to have conducted, any independent analysis of the privately-financed enhancements claimed by INSLAW. (PX 338 [Sposato] at p. 140; Sposato, T. 2294–2298) Nor did she make any effort or direct anyone else to corroborate INSLAW's claims to proprietary enhancements. (PX 338 [Sposato] at p. 74; Sposato, T. 2294–2298)

390. Although Jensen knew of the July 1985 opinion questioning the motivation of the DOJ in the INSLAW case and raising the possibility of a personal vendetta on the part of Brewer, Jensen testified that he did not think the concern rose to the level of requiring a referral to the Office of Professional Responsibility. (PX 328 [Jensen] at p. 37)

391. On October 23, 1985, Hamilton wrote to Sposato complaining about a course of conduct by Brewer over several years which clearly indicated a strong bias against INSLAW and which was having a materially adverse effect upon INSLAW. (PX 272)

392. The letter had been prompted by comments made by Brewer to Gizzarelli of INSLAW to the effect that INSLAW should not expect early resolution of its proprietary enhancements dispute with DOJ and that it would take years or forever to resolve the matter. (PX 272; Gizzarelli, T. 544–545)

393. Sposato did not investigate these claims of Hamilton nor did she refer the matter to OPR. (PX 338 [Sposato] at pp. 125–126, Sposato, T. 2267–2270) Her only explanation for her failure to act was that she believed the issue to be "irrelevant." (PX 338 [Sposato] at pp. 127–129; Sposato, T. 2269)

394. Significantly, Sposato specifically informed INSLAW in a letter dated November 15, 1985 that DOJ had no responsibility whatsoever to pay for the proprietary enhancements claimed by INSLAW. (PX 199; Sposato, T. 2294, 2301) Moreover, she demanded that INSLAW recognize DOJ's right to unrestricted use of PROMIS software, including even such unlimited use by DOJ's independent contractors. (PX 199) Finally, Sposato threatened INSLAW that DOJ would consider FOIA requests by the general public for the PROMIS software. (PX 199) [29]

395. In response to a letter from U.S. Senator Paul Simon dated June 18, 1986, requesting information as to what steps Jensen had taken to remedy the perceived or actual conflict between Brewer and INSLAW, Jensen responded that Stephens had conducted an inquiry into the claims of bias and had concluded that there was no bias or conflict. (PX 275) Sposato had worked closely with Jensen in preparing his response to Senator Simon's inquiry. (PX 338 [Sposato] at p. 300) In this connection, Sposato did not conduct any investigation into allegations of bias nor did she know of anyone else who conducted such an inquiry. (PX 338 [Sposato] at pp. 300–301; Sposato, T. 2267–2270)

396. Although Jensen testified that he believed an investigation of Brewer's conduct against INSLAW had been conducted, in fact neither Stephens nor the designated agency ethics officer ever conducted such an investigation. (PX 328 [Jensen] 25–26; PX 339 [Stephens] 47–48; PX 343 [Wallace] 44–46 and 210–211; Sposato, T. 2267–2270)

397. In August 1986, Hamilton sent a letter to Deputy Attorney General Arnold Burns alleging personal motivation and prejudice on the part of both Brewer and Jensen in the treatment of INSLAW prior to and since the bankruptcy, and asking his

---

**29.** Previously, Sposato's superior, Wallace, had specifically acknowledged on March 4, 1985, that in connection with a prior FOIA request: [INSLAW's codes and software documentation constitute] "trade secrets and commercial or financial information obtained from a person and privileged or confidential."
... The release of proprietary information received from INSLAW may also be prohibited by 11 U.S.C. § 362(a) which invoked an automatic stay upon INSLAW's filing a bankruptcy petition in *IN RE INSLAW*, B.R. No. 85–00070 (Bank R. D.C.), which prevents the Government from giving INSLAW's proprietary property to any other person or entity. (PX 171)

intervention to repair the damage inflicted on the Company. (PX 268)

398. During the trial of this matter, the Court observed the witnesses very closely and reached certain definite and firm convictions based on the demeanor and expressions of those witnesses, as well as on an analysis of the inherent probability or improbability of their testimony in light of the documentary evidence and other known facts. Accordingly, the Court makes the following general findings with respect to such trial witnesses, although the comments expressed herein should not be interpreted as being fully inclusive:

(a) The testimony of William Hamilton was accurate in all or almost all respects, even taking into account the natural human tendency to emphasize those things favorable to one's own cause. Mr. Hamilton was an impressive witness with an exceptionally good memory and an extraordinary ability to remember with precision details of events that occurred years ago.

(b) The testimony of John Gizzarelli was accurate in all major respects. Although his recollection was not as good as Hamilton's recollection, it is impossible for the Court to conclude that Gizzarelli was inaccurate in his detailed, and substantiated testimony describing Brewer's intense hatred of Hamilton. Gizzarelli is no longer an employee of INSLAW, and there was no reason for him to slant his testimony to one side or the other.

(c) The testimony of Elliot Richardson was very impressive. The Court found Richardson to be of high integrity and his testimony to be absolutely reliable.

(d) The testimony of James Rogers, Dean Merrill, Harvey Sherzer, Bellie Ling and Marian Holton was straightforward and consistent with the known facts.

(e) The Court was impressed with the credentials and expertise of Thomas DeLutis, INSLAW's expert witness. The Court believes DeLutis to have conducted himself with a tenable aura of impartiality and finds the DeLutis testimony to be very believable.

(f) The testimony of Laurence McWhorter was totally unbelievable for a number of reasons. First, McWhorter could not remember anything other than a 30-second telephone call that he had with Hamilton before the contract was entered into. On cross-examination, it was brought out that McWhorter had testified at his deposition that he repeatedly could not recall virtually anything related to the contractual relationship between the parties, notwithstanding that he supposedly had supervisory responsibility over this relationship and over Brewer. Second, McWhorter's testimony was contradicted by Hamilton and also by his supervisor, William Tyson. Third, Brewer was a member of McWhorter's wedding party and had advanced money to McWhorter in the form of buying into a real estate partnership with McWhorter.

(g) The testimony of James Kelley was not believable. His hatred of Hamilton oozed from every pore; it was tangible and palpable. The Court finds that Kelley was a very bitter man who was eager to find any loophole that might exist to evade his ethical responsibilities as a lawyer not to reveal the confidences of a former client. Kelley showed that he was eager to say *anything* to harm Hamilton as long as it would sound plausible. In addition, Kelley is heavily involved with a company at least partially in competition with INSLAW and he is a friend or acquaintance of Brewer.

(h) The testimony of Jack Rugh also was not believable. Rugh was a biased witness whose testimony was tainted by the negative effect Mr. Brewer and his lack of impartiality had upon Mr. Rugh. Mr. Rugh also was biased in view of his ambitions to carry on the PROMIS Project in-house. Moreover, his testimony is at odds with the written PROMIS contract in several important particulars. For example, § 3.2.4.3. of the contract provides that IN-SLAW was required to provide "error-free" software which Rugh mistakenly believed required INSLAW to fix any "bugs" in the software regardless of who reported such bugs. This is contrary to the contract and is totally inconsistent with the logic of competitive bidding. As Hamilton pointed out in his testimony, INSLAW would be at a

significant disadvantage to another company attempting to get the PROMIS contract because the other company would have no other customers making bug fix demands whereas INSLAW would have to be including in DOJ's software all bug fix demands made by its customers or third parties other than DOJ. In addition, Rugh "interpreted" the contract to continue in effect as to all 94 offices even after the 74 office word processing phase of the contract was cancelled. This construction is implausible, as was Rugh's denial of Brewer's bias which was evidenced again and again during the course of the contract. Finally, Rugh suffered from the collective amnesia that many of DOJ's witnesses were suffering from and this is further evidence of his unreliability.

(i) The testimony of William Tyson was not believable. His testimony that Brewer's attitude toward INSLAW was positive, constructive and favorable is so ludicrous in light of the evidence taken as a whole that it was difficult for this Court to believe any of Mr. Tyson's testimony. Tyson displayed an extraordinarily blase attitude toward serious allegations of personal bias by Brewer towards Hamilton and INSLAW, and did little, if anything, to discharge his responsibilities as Brewer's superior to investigate these allegations.

(j) The testimony of C. Madison Brewer was most unreliable, and entirely colored by his intense bias and prejudice against Hamilton and INSLAW.

(k) The testimony of Robert Whiteley and Vito DiPietro was generally truthful, although they tended to slant certain of their testimony in favor of their employer.

(l) The testimony of Peter Videnieks was substantially unreliable. Videnieks was under Brewer's domination and was thoroughly affected by Brewer's bias. In addition, Videnieks displayed an amazing lack of recollection of pertinent facts, especially in regard to the very detailed notes which he maintained in respect to this matter. It is obvious that Videnieks acted at the bidding of Brewer and that his attitude toward INSLAW was directly the consequence of Brewer's influence on him.

(m) The testimony of James Mennino was absolutely incredible. It was totally unsubstantiated and obviously biased. The Court infers from the evidence as a whole that Mennino sought to obtain a copy of PROMIS software from DOJ by offering to provide DOJ with false information that Mennino believed would injure INSLAW. Mennino failed to substantiate his charges against INSLAW at the time these charges were originally made, even though DOJ requested substantiation at that time. Moreover, Mennino failed to bring any substantiating information to trial, notwithstanding his testimony that such information was available.

(n) The testimony of Ugo Gagliardi, DOJ's expert witness, is entitled to little weight and should be thoroughly discounted for several reasons. First, Gagliardi was heavily influenced in his view of the case by a viciously inaccurate characterization of INSLAW's position in this case provided by Rugh. Second, Gagliardi assumed the role of an advocate for the government and there was not even a pretense of impartiality in his testimony. Finally, Gagliardi reached speculative conclusions on the basis of inadequate factual premises.

(o) The testimony of Alan Gibson was basically believable, except as otherwise noted in these Findings, although he is not an expert qualified to give an opinion concerning the adequacy of INSLAW's methodology for determining the source of funding for individual enhancements to the premised software.

(p) The testimony of Janis Sposato is to be viewed with considerable skepticism. Given Sposato's position as a DOJ ethics officer, her casual treatment of repeated serious allegations of outrageous misconduct by Brewer can only be described, even charitably, as willful blindness to the obvious.

(q) The testimony of Geraldine Schacht and Joyce DeRoy was substantially believable, and the Court has no indication that they were biased or would have any reason to favor either party.

399. The acts of DOJ as described in the foregoing findings of fact were done in bad faith, vexatiously, in wanton disregard of the law and the facts, and for oppressive reasons—to drive INSLAW out of business and to convert, by trickery, fraud and deceit, INSLAW's PROMIS software.

## CONCLUSIONS OF LAW

### JURISDICTION AND VENUE

■ 1. This Court has jurisdiction over this adversary proceeding to remedy violations of the automatic stay of 11 U.S.C. § 362(a), as a core proceeding under 28 U.S.C. § 157(b). *Budget Service Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 292 (4th Cir.1986). This Court may also exercise jurisdiction over INSLAW's requests for declaratory and injunctive relief as core proceedings under 28 U.S.C. § 157(b)(2)(A) and (E).

2. This action for declaratory judgment and injunctive relief for violations of the automatic stay is "not 'at its essence' a contract action" and is properly before this Court. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C.Cir.1982). *See also Conax Florida Corp. v. United States*, 824 F.2d 1124 (D.C.Cir.1987); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (D.C.Cir. 1984). The Court thus has ruled on the government's Motion to Dismiss that the government's contention that this action is merely a contract claim is without merit. INSLAW is seeking to establish and protect its proprietary rights to software that was developed using private funds and that was not required to be delivered under the March 1982 contract. Although the government is here attempting to justify its actions under the terms of the contract, as in *Megapulse*, the *government's* reliance on the contract does not alter the nature of the relief requested *by INSLAW*.

■ 3. As this Court has discussed at some length in its opinion on denial of the Government's motion to dismiss, 76 Bankr. 224, 228–237 (1987), the Government cannot rely on the doctrine of sovereign immunity. The use of the trigger-word "governmental unit" in § 362 itself indicates that the

Government is equally subject to suit for violations of the automatic stay, pursuant to 11 U.S.C. § 106(c). *See, e.g., Matter of McVey Trucking, Inc.*, 812 F.2d 311, 326 (7th Cir.1987); *Lee v. Schweiker*, 739 F.2d 870 (3d Cir.1984); *In re Neavear*, 674 F.2d 1201 (7th Cir.1982); *In re Davis*, 20 B.R. 519 (Bankr.M.D.Ga.1982).

4. Venue is proper in this forum pursuant to 28 U.S.C. § 1408.

## I. INSLAW'S PROPRIETARY ENHANCEMENTS ARE ENTITLED TO PROTECTION AS TRADE SECRETS

5. "Old PROMIS," created by the Institute pursuant to LEAA funding prior to May 15, 1981, is admitted by both INSLAW and DOJ to be part of the public domain. When a work passes into the public domain, "anyone can copy, distribute or sell it for his own benefit." *Burke v. NBC*, 598 F.2d 688, 691 (1st Cir.1979), *cert. denied*, 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1980). Therefore, INSLAW, as anyone, has every right to market PROMIS and to prepare derivative works based upon the public domain software.

6. Aside from the physical media that may be used to store or represent software code (*e.g.*, magnetic tape, floppy disk, printout of source code), software code constitutes intellectual property that may be protected under trade secret laws. *See, e.g.*, Restatement of Torts § 757; Uniform Trade Secrets Act § 1(4).

■ 7. Computer programs may be protected and maintained as trade secrets. *Dickerman Associates, Inc. v. Tiverton Bottled Gas Co.*, 594 F.Supp. 30 (D.Mass. 1984). Under the definition of "trade secret" accepted in this jurisdiction, "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors, who do not know or use it." *Ashland Oil, Inc. v. FTC*, 409 F.Supp. 297, 303 (D.D.C.), *aff'd* 548 F.2d 977 (D.C.Cir.1976), *quoting* 4 *Restatement of Torts* § 757 (1939). *See also, Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815

(1984); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 474–475, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974). Several factors, none individually dispositive, aid in the determination of whether information constitutes a trade secret:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. 4 Restatement of Torts § 757, Comment b, p. 6 (1939).

*Ashland Oil, supra*, 409 F.Supp. at 303; (footnote omitted). Thus, the owner of a program "need only show that the particular architecture of its program is valuable, that it is not a matter of common knowledge or readily duplicated, and that it was developed and has been kept secret through plaintiff's efforts." *Dickerson Associates, supra*, 594 F.Supp. at 35. Whether the PROMIS enhancements constitute a trade secret is a question of fact. *See, e.g., Lear Siegler, Inc. v. Ark–Ell Springs, Inc.*, 569 F.2d 286 (5th Cir.1978); *Kodekey Electronics, Inc. v. Mechanex Corp.*, 486 F.2d 449 (10th Cir.1973).

■ 8. Even though INSLAW has licensed the software and provided the source code to its users, the restrictions on their use and disclosure by INSLAW's licensees entitles the enhancements to trade secret protection. "This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another 'in confidence, and under an implied obligation not to disclose it.' ... Often the recipient of confidential knowledge of the subject of a trade secret is a licensee of its holder." *Kewanee Oil v. Bicron, supra*, 416 U.S. at 475, 94 S.Ct. at 1883; (citations omitted). *See also Management Science America, Inc. v. Cyborg Systems, Inc.*, 6 C.L.S.R. 921, 925 (N.D.Ill.1978) [Available on WESTLAW,

1978 WL 1312] (summary judgment for defendants denied where plaintiff's trade secret payroll system software programs were distributed under limited lease agreements); *Data General Corp. v. Digital Computer Controls, Inc.*, 357 A.2d 105, 110–111 (Del.Ch.1975) (trade secret protection upheld where complete set of maintenance drawings showing computer design was disseminated with confidentiality restrictions).

9. As set forth fully in the preceding Findings of Fact, INSLAW is therefore entitled to claim the enhancements as its proprietary trade secrets. These trade secret protections accord INSLAW the right to exclude DOJ from copying, using, selling or otherwise disseminating the protected trade secret software.

## II. DOJ UNLAWFULLY USED INSLAW'S PROPRIETARY TRADE SECRET ENHANCEMENTS IN VIOLATION OF THE AUTOMATIC STAY

■ 10. None of these enhancements was to be delivered to the government under the Statement of Work in the competitive procurement solicitation and incorporated into the 1982 Executive Office contract between INSLAW and DOJ. INSLAW was to provide three services to DOJ, *i.e.*, time-sharing, input of existing data from the Docket and Reporting System, and retailoring of the installed PROMIS sites as often as once per year.

11. This Court rejects DOJ's contention that its unlawful use of INSLAW's privately funded enhancements should be sanctioned under Clause 74 of the Executive Office contract, which sets forth the policies and procedures promulgated by the Department of Defense ("DOD") in the Armed Services Procurement Regulations. In DOJ's view, if INSLAW used any software during the course of its performance of the contract, regardless of whether development of that software has been privately financed and is otherwise owned by INSLAW, DOJ obtains unlimited rights thereto pursuant to Clause 74. The essential criterion of Clause 74, however, focuses not on whether that software was actually

used, but rather, whether the software was *required to be developed* under the express terms of the contract. None of those privately funded enhancements shown by INSLAW to be proprietary meets that criterion.

12. Under subsection (b)(1)(i) of Clause 74, unlimited rights apply to "software resulting directly from performance of *developmental or research work which was specified as an element of performance* in this or any other Government contract or subcontract." One of the few points the parties have always agreed upon is that the Executive Office contract required INSLAW (or any other company that might have won the competitive procurement) not to develop software, but *to implement the already existing pilot project version of PROMIS, with the five BJS enhancements.* (PPFF 151)

13. Clause 74(b)(1)(iii) provides for unlimited rights in "computer software *required to be originated or developed under a Government contract,* or generated as a necessary part of performing a contract." The Statement of Work clearly identifies what, if any, software was "required to be developed or originated." None of the more than one hundred discrete enhancements were "required" because they were not created in response to any request from DOJ. (PPFF 83) The 32-bit VAX version of PROMIS already existed before the contract began, was developed with private funds for internal strategic marketing reasons, and would have been required to be provided to DOJ only in the event that DOJ chose to install VAX minicomputers in the U.S. Attorney's Offices, which it did not. (PPFF 33–39, 78–79) The Batch Update subsystem was developed for a private client prior to the execution of the Executive Office contract. (PPFF 72–76) Although INSLAW used Batch Update to perform an enumerated service under the contract, INSLAW was not required to do so; moreover, had DOJ

not entered into Modification 12, INSLAW would instead have coded individual programs to perform the service rather than relinquish any rights in its generic proprietary software. (PPFF 73–76) The Data Base Adjustment subsystem also was created from scratch as an independent research and development project by INSLAW. (PPFF 68–69) Even though INSLAW may have used the Data Base Adjustment subsystem to perform services enumerated in the Statement of Work, the Statement of Work contains no requirement that any software be developed for that purpose. (PPFF 70) Rather, as Mr. Hamilton testified, the Data Base Adjustment subsystem, and indeed all of INSLAW's proprietary enhancements, were provided to the Government *only* because of, and pursuant to, the express limitations of Modification 12, and DOJ's obligation to negotiate in good faith over the terms for use of those enhancements by DOJ. (PPFF 70–71, 75–76, 80)

14. Similarly, subsection (b)(1)(v), which grants unlimited rights to "computer software *required to be prepared under this or any other Government contract* or subcontract and constituting corrections or changes to Government-furnished data or computer software," gives to DOJ no right in INSLAW's numerous discrete enhancements. Those enhancements and changes were not requested by the Government and, therefore, were not required to be prepared under the Statement of Work. (PPFF 83)

15. Subsection (b)(1)(viii), which grants unlimited rights in software that is in the public domain or that is "normally furnished without restriction by the Contractor or subcontractor," is inapplicable, inasmuch as INSLAW has taken all reasonable steps to assure adequate trade secret protection for its enhancements through specific contractual limitations on their disclosure, dissemination and use by INSLAW's licensees.[30] (PPFF 43, 61)

---

**30.** Although DOJ incorrectly asserts that INSLAW has introduced no evidence that the enhancements are copyrighted (*cf.* PPFF 43), INSLAW makes no claim relating to copyrights in this adversary proceeding. (INSLAW Complaint; INSLAW Post–Hearing Brief at 17, n. 2) Notwithstanding, Clause 74(c)(1), grants DOJ a license to use only copyrighted computer soft-

16. In short, DOJ cannot assert that the contract itself *required* INSLAW to provide its enhancements to DOJ. thus the central criterion under Clause 74—the requirement to develop the software pursuant to the Statement of Work—is *not* satisfied with respect to INSLAW's proprietary enhancements.[31]

17. Moreover, the irreconcilable and conflicting testimony of Brewer, Kelley, and Videnieks, as well as the testimony of Hamilton, Merrill and Gizzarelli (all cited in PPFF 141) succinctly demonstrates that, contrary to DOJ's new *post hoc* reading of Clause 74, *there was no mutual understanding in 1982 as to what data rights applied to the PROMIS software.* Brewer testified to a "gentlemen's agreement" with INSLAW, whose terms differed sharply from the "understanding" testified to by Kelley. Videnieks denied any awareness of such an agreement and stated that he would have declared it invalid at any rate. INSLAW's understanding was clearly the same then as it is now, that DOJ obtained under the contract no rights whatsoever in any of the privately financed proprietary PROMIS enhancements.

18. Both parties agreed that this lack of any "meeting of the minds" concerning those rights was cured through Modification 12. For that reason, it is incredible that DOJ would seek to interpret Clause 74 in a vacuum and without reference to Modification 12.

19. *A fortiori,* any argument that DOJ obtained rights to any of the enhancements under Clause 74 is thoroughly eviscerated by DOJ's assent to the terms of Modification 12. Having notified DOJ of the existence of the enhancements months before the contract was signed, again in April through August 1982 and in February 1983, INSLAW hardly "slipped" these enhancements into the PROMIS software "secretly," in order "to defeat the government's rights." (DOJ Proposed Conclusions at 62) DOJ agreed explicitly to review the enhancements and to negotiate with INSLAW *before the implementation of the first U.S. Attorney's Office PROMIS site* as to which enhancements DOJ wanted to include in the Executive Office version of the software. (PPFF 228–232) At that time, had DOJ performed its obligations under Modification 12, INSLAW would have removed any or all of its enhancements at its own expense. DOJ instead foreclosed all of INSLAW's attempts to negotiate in good faith concerning the enhancements, and intentionally expanded its misappropriation of INSLAW's proprietary enhancements to 45 offices. DOJ's opportunity to have INSLAW remove the enhancements at INSLAW's expense *before* implementation expired long ago *and is gone forever.* It would have been a relatively simple matter for INSLAW to have removed any of the enhancements before the first version was delivered. Now, some four years and 44 additional versions later, it is far too late for DOJ to impose that requirement on INSLAW.

20. With respect to the 32–bit architecture VAX version of PROMIS (the "VAX port"), INSLAW was under no obligation whatsoever to deliver the time-sharing VAX version of the software to DOJ under the contract unless the government selected VAX minicomputers under the computer procurement for the twenty offices.

21. Concerning the Batch Update subsystem enhancement, paragraph 3.2.2.7 of the Statement of Work required that INSLAW provide the service of transferring information from the existing Docket and Reporting System database to the new min-

ware that was *"prepared or required to be delivered under the contract,"* and DOJ obtained no rights thereby to any of INSLAW's privately-funded copyrighted software.

**31.** DOJ's argument to the contrary was made *for the first time* during Mr. Rugh's "technical interpretation" of the Statement of Work at trial. (PPFF 151, 152, 248) If DOJ's new-found argument had any real merit, DOJ surely would have raised it timely when the issue first arose

in the spring of 1983. Moreover, the argument that INSLAW was required to furnish its privately-financed software enhancements is inconsistent with the fact that DOJ awarded the PROMIS contract on the basis of a competitive procurement with other prospective bidders unable to offer privately-financed enhancements to the PROMIS software because such bidders would not have other PROMIS-related business.

icomputer PROMIS database formats for each U.S. Attorney's Office. Although INSLAW used the Batch Update subsystem for that purpose, there was no requirement that INSLAW develop or use for that purpose a reusable, multi-function software subsystem. The testimony demonstrated that in the absence of Modification 12, INSLAW would have developed for the government a hard-coded "disposable" limited purpose program for transferring D & R data into particular PROMIS database formats specific to individual U.S. Attorney's Offices; and that the only reason that INSLAW provided Batch Update to the DOJ rather than "hard-coding" a limited purpose program was because of DOJ's agreement to review INSLAW's PROMIS enhancements pursuant to Modification 12. In light of the parties' understanding, evident even before the inception of the contract, and embodied in the Response to the Request for Proposal (which is incorporated into the contract by reference), that INSLAW would retain all rights to privately-financed PROMIS enhancements, this is the only interpretation of the contract consistent with the provisions of the contract and the intentions of the parties at the time of its execution.

22. With respect to the Data Base Adjustment subsystem, pursuant to paragraph 3.2.4.1 of the Statement of Work, INSLAW was to perform the service of retailoring a number of the individual versions of PROMIS provided to the twenty largest United States Attorneys' Offices, as often as on an annual basis. Although INSLAW used its Data Base Adjustment enhancements for that purpose, the contract itself does not require INSLAW to develop or provide software for that purpose. The testimony demonstrates that in the absence of Modification 12, INSLAW would have developed for the government a hard-coded "disposable" limited purpose program for restructuring each individual database; and that the only reason that INSLAW provided the Data Base Adjustment subsystem to the DOJ rather than "hard-coding" numerous limited purpose programs was because of DOJ's agreement to review INSLAW's PROMIS enhance-

ments pursuant to Modification 12. In light of the parties' understanding, evident even before the inception of the contract, and embodied in the Response to the Request for Proposal (which is incorporated into the contract by reference), that INSLAW would retain all rights to privately-financed PROMIS enhancements, this is the only interpretation of the contract consistent with the provisions of the contract and the intentions of the parties at the time of its execution.

23. The discrete "maintenance" changes and enhancements were also not required to be delivered to the government under the Statement of Work in the Executive Office contract, paragraph 3.2.4.3. That paragraph requires only that INSLAW provide to the government maintenance corrections that resulted from reports and suggestions from the Executive Office or individual USAOs. Because the proprietary discrete changes and enhancements were not reported to INSLAW by the Executive Office, INSLAW was not required to provide those changes under the Executive Office contract.

■ 24. These above-referenced provisions of the Executive Office contract and the Statement of Work are clear and unambiguous on their face. However, to the extent that DOJ contends the Statement of Work is ambiguous in specifying whether INSLAW's PROMIS enhancements were deliverable under the Executive Office contract, the basic rule of *contra preferentem* —equally applicable to government contracts—requires that the contract be interpreted most strongly against the drafter. *See, e.g., Standard Oil Co. of California v. Hickel,* 317 F.Supp. 1192 (D.Alaska 1970), *aff'd* 450 F.2d 493 (9th Cir.1971). It is undisputed that the government alone drafted the Statement of Work, without input from or negotiation with INSLAW, and in advance of DOJ's competitive procurement that INSLAW ultimately won. Any ambiguities must therefore be resolved in INSLAW's favor, such that INSLAW's proprietary enhancements were *not* deliverable to the DOJ under the Exec-

utive Office contract, *but for* Modification 12.

25. INSLAW has further demonstrated that its trade secret enhancements were created using private funds. Thus, the government obtained no rights to those privately funded enhancements under Clause 74 of the Executive Office contract.

26. DOJ contends that the government has contributed funds to the PROMIS maintenance pool and to overhead costs supporting INSLAW's research and development that, according to DOJ, defeat INSLAW's proprietary rights in the PROMIS enhancements. The Court does not agree with either of these contentions either as matters of fact or as issues of law.

■ 27. Although two government agencies, DOJ Lands Division and OSH-ARC, contributed to a maintenance pool that funded general maintenance for all of INSLAW's maintenance customers, these two federal agencies, as all of INSLAW's maintenance customers, received INSLAW's PROMIS enhancements pursuant to express contractual agreements that acknowledge INSLAW's proprietary interests in the enhancements as the sole property of INSLAW, and agree not to disclose, disseminate, copy or use the enhancements without the express prior written permission of INSLAW. Thus, the government did not obtain through these maintenance agreements *any* rights to disclose or disseminate these changes and enhancements, even within the government.

28. Similarly, the facts presented at trial fail to demonstrate that the government has made *any* contributions to INSLAW's overhead pool. Although overhead contributions to independent research and development are expressly permissible and allocable costs under government contracts (*see, e.g.,* 41 C.F.R. § 1–15.107(g)(5) (1982), in this instance the government refused to remunerate INSLAW for any overhead allocable to research and development. These costs were specifically questioned in government audits, and no allocable share of those costs has been paid by the government to date.

■ 29. Even assuming that the government has contributed to development of INSLAW's enhancements through overhead payments, such contributions are of no legal consequence. Government contributions to overhead grant no rights in technical data, because "government funding" does not include independent research and development ("IR & D") costs whose funds came in part from Government reimbursement of overhead. "DOD policy for many years has regarded IR & D programs as 'private expense' for technical data rights purposes, even if partly reimbursed through overhead." *Bell Helicopter Textron,* 85–3 BCA ¶ 18415, 92,355, 92,405 (Armed Services Bd. Contract App.1985). "[I]t appears to be long established DOD policy—and the Government has not put the matter in issue here—that IR & D costs which are reimbursed in part through indirect cost allocations to Government contracts nevertheless represent 'private expense' for purposes of the data rights clause." *Id.,* at 92,423. " 'At private expense' has been defined by the Department of Defense to mean entirely at private expense *unless the item, component or process is developed with independent research and development funds or with other indirect funds such as profits earned on Government contracts.*" R. Nash, J. Cibinic, 1 *Federal Procurement Law* at 736 (3rd ed. 1977); (emphasis added).

30. This policy of treating costs reimbursed by the Government through indirect cost allocations, including overhead payments, as the contractor's private expense appears to date back at least as far as January 29, 1965, in Defense Procurement Circular, Number 22. The Department of Defense therein criticized a draft General Accounting Office report that proposed acquisition of data rights by the Government in a contractor's IR & D where the Government had indirectly supported the contractor's IR & D through overhead. Summarizing the Government's position, the Circular states:

1. The Government does not—and should not—automatically acquire rights in technical data resulting from a con-

tractor's independent research and development, even though the costs may be said to have been substantially paid for by the Government through the Government's purchase of the company's products or services.

2. In the interest of competition the Government may, and in many cases should, seek to negotiate with contractors for rights in the technical data resulting from independent R & D. ... Such negotiation, however, must be real negotiation and not compulsion. The contractor should not be legally bound to give or sell its rights to the Government and should not be penalized for refusing to do so, as for example, by being subjected to disallowance of its R & D costs under contracts with the Government ...

3. Whether or not a contractor is willing to transfer its privately developed data to the Government, it is in the Government's interest to continue to support the contractor's independent R & D by permitting a reasonable allowance for IR & D costs in the prices of the products and services bought by the Government. As in the case of any other customer and of the public at large, the benefit that the Government gains by paying prices that include a pro rata share of the seller's independent research and development costs is the assurance of a continued flow of new and better products oriented toward the customer's requirements.

Defense Procurement Circular Number 22, at 6.

31. This policy has recently been codified in regulations promulgated by DOD specifically relating to technical data rights in computer software. Effective May 1987, the Armed Services Procurement Regulations limit the government's rights in computer software developed in whole or in part at private expense, and offer greater proprietary protections to private software developers. *See* 52 Fed.Reg. 12,391 (April 16, 1987) (to be codified at 48 C.F.R. § 227.4).

It is Department of Defense policy to acquire only such rights to use, duplicate, and disclose computer software developed at private expense as are necessary to meet Government needs. Such rights should be designed to allow the Government flexibility while, at the same time, adequately preserving the rights of the contractor. Computer software developed at private expense may be purchased or leased.

48 C.F.R. § 227.481–1(c) (1987). Also, for the first time the regulations codify expressly DOD's long-standing definition of "private expense":

'Private expense', as used in this subpart, means that the cost of development has not been paid in whole or in part by the Government and that such development was not required as an element of performance under a Government contract or subcontract; provided, however, *independent research and development* and bid and proposal *costs are deemed to be at private expense.*

48 C.F.R. § 227.471 (1987); (emphasis added). *See also* 10 U.S.C. § 2320(a) (1986).

32. Although this policy was promulgated by the Department of Defense, this policy applies equally to the Executive Office contract between the Department of Justice and INSLAW. The 1982 Executive Office contract expressly incorporates the Rights in Technical Data provisions from the Armed Services Procurement Regulations—the policies and procedures created by the Department of Defense. Moreover, as noted previously, 41 C.F.R. § 1–15.107 (1982) of the Federal Acquisition Regulations in effect prior to the execution of the Executive Office contract provides that parties ordinarily should attempt to reach advance understandings as to the treatment of IR & D costs, which presupposes that the DOD policy was recognized as applicable to all federal agency contracts. Finally, this policy is also reflected in recent revisions to the Federal Acquisition Regulations with respect to the Department of Justice. In 48 C.F.R. § 2827.402, adopted on July 22, 1985, the Department of Justice articulates as *its* policy the need to strike a balance between Government data requirements and the promotion of innovation by recognizing and protecting

the contractor's commercial and proprietary interests in software. Under these new regulations, where works are created even during the course of contractual performance and funded partially through government and private expense, DOJ's express policy is to negotiate with the contractor concerning the scope of rights to be accorded each party. *Id.*

33. These federal procurement policies, implemented first in the 1960's and still in force today, all lead to the conclusion that DOJ's assertions of contributions to overhead pools, even if proved, would not grant DOJ any rights in INSLAW's proprietary and privately funded enhancements.

34. The property comprising the estate of the debtor encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). As a threshold matter, trade secret rights in software created and owned by the debtor possess the essential attributes of property cognizable under 11 U.S.C. § 541. *See, e.g., In re Bedford Computer Corp.,* 62 B.R. 555 (Bankr.D.N.H.1986) (adversary proceeding brought by creditor to reclaim software property from debtor); *In re Uniservices, Inc.,* 517 F.2d 492 (7th Cir.1975) (trade secret passes as property right to the bankrupt estate).

35. The automatic stay provisions of the Bankruptcy Code prohibit "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate". 11 U.S.C. § 362(a)(3). The stay provisions are "applicable to all entities," including the United States, pursuant to 11 U.S.C. § 106(c). Therefore, INSLAW is entitled to automatic stay protection for its enhancements under the bankruptcy laws, and appropriate relief for violations of the automatic stay by DOJ.

36. Under 11 U.S.C. § 362(h), "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages." By using the words *"shall* recover," Congress intended that the award of actual damages, costs and attorneys' fees is mandatory and not within the discretion of the Court. *See, e.g., Rodriguez v. Compass Shipping Co.,* 451 U.S. 596, 602, 101 S.Ct. 1945, 68 L.Ed.2d 472 (1981) (use of "shall" in Longshoremen's and Harbor Workers' Compensation Act denotes mandatory operation).

37. A "willful violation" does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. *In re Allen,* 69 B.R. 461 (Bankr.E.D.Pa.1987); *In re Mewes,* 58 B.R. 124 (Bankr.D.S.D.1986); *In re Tel–A–Communications Consultants, Inc.,* 50 B.R. 250 (Bankr.D.Conn.1985). Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded. *In re AM International, Inc.,* 46 B.R. 566 (Bankr.M.D.Tenn.1985).

38. Although section 362(h) mandates recovery of actual damages by "an individual," the statute has been held to apply equally to violations of the automatic stay that injure corporations. *Budget Service Co. v. Better Homes of Virginia, Inc.,* 804 F.2d 289 (4th Cir.1986); *In re Tel–A–Communications Consultants, supra.* As the Fourth Circuit noted, the broad remedial purposes of § 362(h) would be poorly served if corporations were denied relief:

We agree with the reasoning of the bankruptcy court in [*In re Tel–A–Communications*] that § 362(h) must be read in conjunction with the rest of § 362 and that its sanctions are not limited to the relief of an 'individual' in the literal sense. The Bankruptcy Code does not define the word individual. We agree that it seems unlikely that Congress meant to give a remedy only to individual debtors against those who willfully violate the automatic stay provisions of the Code as opposed to debtors which are corporations or other like entities. Such a narrow construction of the term would

defeat much of the purpose of the section, and we construe the word "individual" to include a corporate debtor. *Budget Service Co.*, 804 F.2d at 292.

■ 39. In addition, this Court agrees with the statement in *In re Stephen W. Grosse, P.C.*, 68 Br. 847, 851 (Bkrtcy.E.D. Pa.1987), that "[p]rior to the addition of 11 U.S.C. § 362(h) to the Code in 1984, most courts concluded that debtors could seek compensatory damages by an adversary proceeding ..." *Dashner v. Cate*, 65 Br. 492, 495 (D.N.D.Iowa 1986), holds that "former § 362 [prior to the addition of § 362(h)] does not provide a private cause of action *outside the bankruptcy court* for violations of the automatic stay" (emphasis added), citing *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). This Court believes and holds that, whatever may be the case "outside the bankruptcy court," a debtor does have a private cause of action *in the bankruptcy court* for violations of the automatic stay, and that private cause of action is enforceable not only by a contempt-of-court proceeding but also and alternatively at the debtor's option by an adversary proceeding. The *Dashner v. Cate* court acknowledges that the first and fourth factors of *Cort v. Ash* are met.[32] In this Court's view, the second and third factors are also present, at least with respect to an adversary proceeding in a bankruptcy court:

(1) There is implicit "indication of legislative intent ... to create such a remedy" in the forceful statement, "[t]he automatic stay is one of the fundamental debtor protections provided by the bankruptcy law." (S.Rep. No. 95–989 (1978), pp. 54–55) The *Dashner v. Cate* court itself states that "[t]he legislative history *does* reveal that Congress intended to provide the Bankruptcy Court with the power to enforce the automatic stay." 65 Br. at 495.

(2) It is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for plaintiff"/debtor in the bankruptcy court, and numerous cases

have so held. *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir.1986) (preliminary injunction to enforce automatic stay upheld in debtor's adversary proceeding against personal injury claimants), and cases cited therein. There is nothing in the legislative history or elsewhere to suggest that Congress intended to restrict debtors solely to the use of contempt-of-court proceedings in order to enforce their rights under § 362(a), and in *Robins* the debtor did not seek a contempt-of-court remedy. Thus, this Court concludes that, even apart from § 362(h), this Debtor has an implied cause of action against DOJ in this Court as a core proceeding for DOJ's violation of the automatic stay imposed by § 362(a).

■ 40. In this case, the defendants were fully cognizant of INSLAW's claim of ownership regarding the PROMIS software and of the filing of INSLAW's bankruptcy petition. It is further undisputed that the defendants' continued use and dissemination of that property following the bankruptcy, in the words of C. Madison Brewer, the defendants' PROMIS Project Manager, was done "willingly", intentionally, and with the willingness "to take the risk" of that conduct being found a violation of the law. The DOJ has continued over a long period of time to use INSLAW's trade secret enhancements despite the fact that they are property of the estate, while refusing to pay for them. These acts constitute the willful exercise of control over the property of the estate, and thus violate the automatic stay under the Bankruptcy Code, 11 U.S.C. § 362(a)(3), the violation of which is actionable pursuant to the remedies provided under § 362 generally and especially § 362(h).

41. The contract between INSLAW and the Department of Justice involved two separate and clearly distinguishable tasks. INSLAW was to implement Old PROMIS, as adapted during the pilot and BJS contracts, on minicomputers at twenty designated larger U.S. attorney's offices (with an option, admittedly never exercised, to

**32.** The plaintiff/debtor is "one of the class for whose special benefit the statute was enacted"; and "it would [not] be inappropriate to infer a cause of action based solely on federal law ..." 422 U.S. at 78, 95 S.Ct. at 2088.

expand this use to up to thirty offices). Second, INSLAW was to create, generate and implement *a different kind* of PROMIS software to be used on specified word processing equipment at some seventy-four smaller U.S. attorney's offices.

42. The software generated for the twenty larger computer-site offices, as specified in the contract, was to be used *only* at those offices, and the word-processing type of software to be developed and created by INSLAW was to be used only at the seventy-four smaller offices. In effect, it was as though there were two contracts calling for two types of software to be delivered to two types of offices—a fact clearly understood by DOJ.

43. When DOJ chose to terminate the word-processing part of the contract, all that was left under the contract was the creation of the software for use and implementation at the twenty larger offices. Thus, the DOJ had no right to continue to use or disseminate the computer-type software beyond the twenty offices agreed upon by the parties for which this software was created.

44. Modification 12, as clearly explained by Mr. Videnieks in his March 18, 1983 letter offering this dispute mechanism to resolve the ownership rights issue, precluded the government, consistent with the parties' rights and terms otherwise under the contract, from disseminating or disclosing either of the two types of PROMIS software requested by him beyond the "94 U.S. attorneys offices covered by the subject contract until the data rights of the parties to the contract are resolved."

■■ 45. Fundamental to an analysis of the meaning of Modification 12 is the legal principle that "a contract is read as a harmonious whole which gives a reasonable, lawful and effective meaning to the whole; an interpretation that leaves portions of the instrument superfluous is disfavored." *Armada, Incorporated,* 84–3 BCA ¶ 17,694, 88,230, 88,239 (1984); (citations omitted). *See also Martin Lane Co. v. United States,* 193 Ct.Cl. 203, 432 F.2d 1013, 1019 (1970). In other words, selected sections of a contract can only be interpret-

ed correctly in the context of the entire document. Thus, in ascertaining the reasonable meaning of a contract, great weight is to be given to the purpose of the contract. *Appeal of Mil–Pak Co., Inc.,* GSBCA 5850, 81–2 BCA 15637 (1981), *citing Benjamin v. United States,* 172 Ct.Cl. 118, 348 F.2d 502 (1965). Because the purpose of the Executive Office contract by its own terms was to provide the minicomputer version of PROMIS to twenty offices, Modification 12 must be read in light of that express contract purpose.

■ 46. To the extent that an interpretation of individual clauses or modifications conflicts with the meaning of the contract as a whole, such an interpretation must be rejected. For example, in *Armada,* the contractor attempted to interpret a contract modification by itself to contend that it was entitled to fees for work for which fees were not payable under the basic contract. The Board properly rejected the contractor's contentions, holding that the whole of the contract still manifested the parties' intention that fees be paid according to the original contract terms.

■ 47. Thus, the non-dissemination and use provisions of Modification 12 must be read consistent with the existing contract, the terms of which Modification 12 unequivocally states were not otherwise changed. DOJ's agreement not to disseminate or use the software beyond the ninety-four offices had to be read within the context of the two contract tasks. The meaning of Modification 12, therefore, is that the minicomputer software would not be disseminated beyond the twenty designated larger offices for which this software was being created and developed, and the word-processing software would not be disseminated beyond the seventy-four offices for which that type of software was being created and developed. Any other interpretation would render meaningless the provision of the contract giving DOJ an option (which it never exercised) to expand the minicomputer software to ten additional large offices by paying an additional fee.

48. The government has admitted that, following the bankruptcy, it already has begun to implement the minicomputer version of PROMIS in a total of forty-five United States Attorneys' Offices. The DOJ, therefore, has disseminated IN-SLAW's privately funded proprietary enhancements to minicomputer PROMIS to some twenty-five additional locations, or more than a 125% increase over the terms of the March 1982 contract. This action, in the absence of any agreement (and, indeed, any of the prescribed negotiations) concerning INSLAW's privately funded enhancements, constitutes an unlawful exercise of control by the DOJ over the property of the debtor, INSLAW, in violation of the automatic stay.

49. Thus, DOJ's continuing dissemination of INSLAW's proprietary enhancements to PROMIS violates the automatic stay and entitles INSLAW to injunctive relief and damages under 11 U.S.C. § 362, especially § 362(h).

### III. DOJ'S FRAUD IN INDUCING IN-SLAW TO ENTER MODIFICATION 12, THE EFFECTS OF WHICH HAVE NOT BEEN CURED BY DOJ, CONSTITUTES A FURTHER VIOLATION OF THE AUTOMATIC STAY

50. Moreover, by virtue of having proposed Modification 12, the government entered into an absolute obligation to negotiate with INSLAW and to resolve the data rights issue. Indeed, as Mr. Videnieks categorically stated in urging the procedure embodied in Modification 12:

The parties to the contract must resolve the issues of 'proprietary enhancements' as soon as possible, but no later than the first PROMIS implementation on Government Furnished Equipment. [PX 70]

51. Mr. Videnieks, in his own words, stated the procedure that was to be followed regarding the use by DOJ of IN-SLAW's proprietary property to be as follows:

Following resolution of the data rights issue, the Government will review the effect of any enhancements which are determined to be proprietary, and then either direct INSLAW to delete those enhancements from the versions of PROMIS to be delivered under the contract or negotiate with INSLAW regarding the inclusion of those enhancements in that software. The Government would then either destroy or return the "enhanced" versions of PROMIS in exchange for the Government PROMIS software including only those enhancements that should be included in the software. [PX 70]

It is obvious that the government understood that it had an absolute obligation to resolve and to negotiate the data rights issue and thereafter to negotiate its use of the proprietary property of INSLAW, *before* it could use that property.

52. For this reason, DOJ's ostensible concern with the "commingling" of the public domain and enhanced PROMIS software, and DOJ's contention that INSLAW "chose" to include the enhancements in the Executive Office Prime version are without merit. DOJ knew the enhancements were "commingled" before proposing Modification 12, and indeed proposed Modification 12 specifically in order to "get" those "goods." DOJ agreed to decide which enhancements it wished to retain, with the explicit understanding that INSLAW would remove any enhancements DOJ did not wish to license. It is undisputed that the independent subsystem enhancements may be removed without interfering with the operation of PROMIS, and that INSLAW's precise method of documenting software changes permit restoration of the code to an unenhanced version.

53. The Court further finds that because DOJ entered into Modification 12 without any intention to negotiate with IN-SLAW, as required under Modification 12, INSLAW has demonstrated by clear and convincing evidence that DOJ fraudulently induced INSLAW into agreeing to provide the proprietary enhancements to DOJ. "Where a party to a contract enters into the contract with a preconceived and undisclosed intention not to perform his obligations thereunder, he will be subject to an

action for fraud." *Robbins v. Ogden Corp.*, 490 F.Supp. 801, 809 (S.D.N.Y.1980), *citing Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957). A contract is voidable for fraudulent misrepresentation in the inducement where a party makes false assertions regarding essential terms of the contract, which reasonably induce assent by the other party who neither knew or had reason to know the true essential terms. *Robbins v. Ogden, supra; Greene v. Gibraltar Mortgage Inv. Corp.*, 488 F.Supp. 177, 179 (D.D.C.1980). *See also*, Restatement (Second) of Contracts §§ 164, 167.

54. DOJ's fraud, perpetrated to trick, to deceive and to induce INSLAW into providing enhanced PROMIS to DOJ, itself constitutes a violation of the automatic stay. Although DOJ committed the initial deceit underlying Modification 12 prior to IN-SLAW's bankruptcy, to the extent that DOJ continued to exercise unlawful control over INSLAW's property, DOJ was required to cure its past conduct once the automatic stay came into effect. DOJ's continuing failure to negotiate in good faith with INSLAW regarding its need for and remuneration due for the enhancements pursuant to Modification 12 entitles INSLAW to damages under 11 U.S.C. § 362, especially § 362(h).

55. The automatic stay "is one of the fundamental protections provided by the bankruptcy laws." H.R.Rep. No. 95–595 at 340, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6296. Section 362(a)(6) proscribes *"any* act" to collect, to assess or to recover upon pre-petition claims made against the debtor.

> Essential to any analysis of the meaning of and policy behind any section of the bankruptcy code is the recognition that a bankruptcy court is a court of equity. Bankruptcy courts do not read statutory words with a computer's ease, but operate on the overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction.

*In re Briggs Transportation Co.*, 780 F.2d 1339, 1343 (8th Cir.1985). Thus, the equitable powers of the Bankruptcy Courts

under 11 U.S.C. § 362 generally and especially § 362(h) must be broad enough to remedy any acts that harass the debtor or continue those financial pressures that drove it into bankruptcy. H.R.Rep. No. 95–595, *supra* at 340.

56. Acts described in § 362(a) that are committed pre-petition may have consequences that continue into the post-petition period protected by the automatic stay. Post-petition consequences of such acts themselves constitute violations of the automatic stay, such that the automatic stay effectively imposes upon the creditor a duty to cure and to prevent the continuation of pre-petition conduct. Inactivity on the part of a creditor with notice is as offensive to the automatic stay provision as is activity. *See, e.g., In re Holland*, 21 B.R. 681 (Bankr.N.D.Ind.1982). *See also In re Elder*, 12 B.R. 491 (Bankr.M.D.Ga. 1981).

## IV. DOJ's FAILURE TO CURE THE CONTINUING EFFECTS OF BIAS AGAINST INSLAW FURTHER VIOLATES THE AUTOMATIC STAY

57. Thus, the DOJ's failures to act to remedy past acts of bias, impartiality and harassment against INSLAW, also constitute actionable violations of the automatic stay provisions.

58. Clearly, the bias and lack of impartiality on the part of Mr. Brewer and others, which INSLAW repeatedly brought to the attention of the DOJ, are forbidden to government employees. The government-wide standard of conduct set forth at 5 C.F.R. § 735, and incorporated into the DOJ regulations at 28 C.F.R. § 45.735(1)(b), specifically provides:

> An employee shall avoid any action, whether or not specifically prohibited by this subpart, which might result in, or create the appearance of: ...
>
> > (d) Losing complete independence or impartiality.

5 C.F.R. § 735.201(a) (1986). This same prohibition also is incorporated in the Federal Acquisition Regulations ("FAR"), which require that:

Government business shall be conducted with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest in Government contractor relationships.

48 C.F.R. § 3.101–1. "Impartiality" as used in these regulations is further defined in the FAR at § 503.101–3 by reference to the General Service Administration Standards of Conduct at 41 C.F.R. § 105–735.202(c):

> *Impartiality in conduct of official business.* GSA personnel shall not allow themselves to be placed in a position in which a conflict of interest might arise or might justifiably be suspected. Such a conflict may arise or appear to arise ... *by any action which could reasonably be interpreted as influencing the strict impartiality that must prevail in all business relationships involving the government.* Strict impartiality is often difficult to maintain when business relationships are allowed to become overly personal.... (Emphasis added).

These same standards—avoiding even the appearance of a loss of complete independence or impartiality—are echoed throughout the regulations governing the conduct of virtually every government agency. *See, e.g.,* Standards of Conduct of the Department of Interior (43, C.F.R. § 20.735–6(b)(1)(i–vi)), Department of Transportation (49 C.F.R. § 99.735–7(a)(1–6) (1986)), Department of Housing and Urban Development (24 C.F.R. § 40–735–210(a-f) (1986)), and Environment Protection Agency (40 C.F.R. § 3.103(d)(1–6) (1986)).

59. When such apparent bias or lack of impartiality exists, the course that must be followed is clear: either the employees must recuse themselves, or it is the duty of their superiors to recuse these employees. The Office of Government Ethics, which is charged with advising and enforcing the standards of government conduct, notes that the decision whether to recuse a government employee should ordinarily be left to the supervisory agency. *See* Office of Government Ethics Informed Advisory Opinion Nos. 86 × 19 (Dec. 15, 1986), 85 × 14 (Sept. 23, 1985), and 83 × 18 (Nov. 16, 1983). If the agency fails to take the necessary actions to remove an employee who has lost complete independence or impartiality, the courts can condemn the failure to recuse as an abuse of discretion. *Center for Auto Safety v. F.T.C.,* 586 F.Supp. 1245 (D.D.C.1984).

## V. INSLAW IS ENTITLED TO PERMANENT INJUNCTIVE RELIEF

60. Pursuant to 11 U.S.C. § 105 and Bankruptcy Rule 7065, this Court is empowered to enjoin conduct in violation of the automatic stay. Injunctive relief seeks not only to eliminate the effect of past wrongdoing, but also to prevent its recurrence. *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Swift & Co. v. United States,* 276 U.S. 311, 326, 48 S.Ct. 311, 315, 72 L.Ed. 587 (1928). The courts are given a wide range of discretion in framing the terms of injunctions to afford complete relief to the aggrieved party. *United States v. Crescent Amusement Co.,* 323 U.S. 173, 185, 65 S.Ct. 254, 260, 89 L.Ed. 160 (1944).

61. The Court finds that the facts of this case warrant the grant of injunctive relief to INSLAW.

62. INSLAW has demonstrated that it will suffer irreparable injury unless it receives immediate injunctive relief. Monetary remuneration for past damage and even future liability will not adequately compensate INSLAW for its injuries. INSLAW's enhancements to PROMIS are its lifeblood, the nucleus of its assets. To retain the ability to market these enhancements, INSLAW must be able to maintain control over its trade secrets, without fear of the trade secrets dissipating into the public domain. It is noteworthy in this regard that trade secrets receive different statutory treatment than other forms of intellectual property. Patents and registered copyrights, which are dedicated to the public, are subject to compulsory li-

cense by the government pursuant to 28 U.S.C. § 1498, which provide that damages are the exclusive remedies for infringement. No equivalent statutory provision exists for trade secrets, thus permitting suit for injunctive relief for trade secret violations.

63. Moreover, certainty over title and control over these trade-secret enhancements will significantly assist INSLAW's efforts to emerge successfully from Chapter 11 bankruptcy as a healthy and promising corporate entity. Injunctive relief will, therefore, assure both INSLAW and the public at large that INSLAW has the ability to provide the public with the enhanced version of PROMIS.

64. Further, only injunctive relief can assure INSLAW and its creditors that the government's biased conduct will be relegated to the past. Despite the termination of the Executive Office contract, a number of outstanding issues remain for resolution and continue to jeopardize INSLAW's chances for survival. Moreover, and more importantly, INSLAW still wishes again to be able to provide PROMIS users in the U.S. Attorneys' Offices with future updates and service that could significantly improve the existing USAO PROMIS operations. INSLAW has received inquiries from U.S. Attorneys' Offices that wish to receive the most up-to-date PROMIS enhancements from INSLAW. However, neither a fair resolution of past matters nor pursuit of new business opportunities is possible until and unless the consuming influence of bias can be enjoined.

65. The second factor, the balance of the harms, also strongly favors the issuance of the requested injunctive relief. The injunctive relief grants an adequate remedy for INSLAW without imposing undue hardship upon DOJ. Certain elements of the requested relief impose no burden whatsoever upon DOJ, but merely seek to enforce in this instance statutory and regulatory protections already in existence that heretofore improperly have been ignored by DOJ. Thus, the injunctive sanctions requested by INSLAW are reasonable in light of the purposes of the bankruptcy

laws and the exigencies of maintaining trade secret protections. Thus, there would be little or no detriment to the government. Because INSLAW's risk of the entire loss of its proprietary trade-secret enhancements to PROMIS is far greater than any risk to DOJ, the balance of harms strongly favors the grant of injunctive relief.

66. The public interest, the third factor to be considered, would best be served by enforcement of the automatic stay and prevention of future violations of the stay by the DOJ.

67. The public has a strong interest in promoting the purposes underlying the Bankruptcy Code, and in assuring INSLAW's emergence from Chapter 11 bankruptcy as a healthy, thriving corporation that is able to avail itself of future business opportunities, without limitation. This is especially true for INSLAW, which since its inception as the Institute has been dedicated to improving the efficiency of this nation's resources for law enforcement, prosecution and correction.

68. Further, this Court cannot ignore that in this case, the party violating the automatic stay is the Department of Justice. Public confidence in our legal system erodes when the very agencies entrusted with law enforcement fail to follow their mandate and are permitted to willfully disobey the law. The Department of Justice should be for this nation a paradigm of the legal foundation upon which this country stands. As noted by the Supreme Court in *Berger v. United States*, the interest of the United States as a litigant "is not that it shall win a case, but that justice shall be done." 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). And in *Owen v. City of Independence*, 445 U.S. 622, 651, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980): "How 'uniquely amiss' it would be ... if the government itself—'the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct'—were permitted to disavow liability for the injury it has begotten...." As Justice Brandeis stated

in the following passage from his dissent in *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):

> *Decency, security, and liberty alike demand that government officials shall be subjected to the rules of conduct that are commands to the citizen.* In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or ill, it teaches the whole people by its example. Crime is contagious. *If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.* (Emphasis added.)

The disregard shown by DOJ for the Bankruptcy Code and for the standards of conduct for government employees disserves the public trust, and, therefore, should be enjoined in order to foster the public interest.

## VI. INSLAW IS FURTHER ENTITLED TO ITS COSTS AND ATTORNEYS' FEES

69. In addition, under 11 U.S.C. § 362(h), Congress mandated that violations of the automatic stay be compensated with awards of actual damages, including costs to the debtor. In this case, INSLAW has been required to devote extraordinary resources to the prosecution of these violations, including substantial hours of labor by INSLAW executives and staff. The Court, therefore, will award INSLAW its costs to date of prosecuting these violations in this adversary proceeding.

70. Finally, section 362(h) specifies as an element of mandatory damages the debtor's attorneys' fees and costs of prosecuting violations of the automatic stay. It is appropriate for DOJ to be required to pay at this time INSLAW's attorneys' fees and costs to date in this proceeding.

71. As a further alternative ground for the imposition of attorney's fees, this Court concludes on the basis of the foregoing findings of fact that the United States of America and DOJ acted in bad faith, vexatiously, wantonly, and for oppressive reasons. Accordingly, the United States of America and DOJ are liable for INSLAW's reasonable attorney's fees. 28 U.S.C. § 2412(b); see *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975).

For all the reasons set forth in these Findings of Fact and Conclusions of Law, and for the reasons stated in the Court's bench ruling on September 28, 1987, this Court is today issuing its Final Judgment and Order granting INSLAW declaratory and injunctive relief as well as attorneys' fees and costs, but (for reasons stated in that Order) deferring for later determination INSLAW's request for punitive damages.

## APPENDIX A

SG SYSTEMS TIME SHEET FOR THE MONTH OF December 1983.    Page ___

| DATE | DAY | Si Go | | | | | | TOTAL Hours |
|------|-----|-------|---|---|---|---|---|-------------|
| 12/1 | Thu | | | | | | | |
| 12/2 | Fri | | | | | | | |
| 12/5 | Mon | | | | | | | |
| 12/6 | Tue | | | | | | | |
| 12/7 | Wed | | | | | | | |
| 12/8 | Thu | | | PLAINTIFFS EXHIBIT # 10 | | | | |
| 12/9 | Fri | | | | | | | |
| 12/12 | Mon | | | | | | | |
| 12/13 | Tue | | | | | | | |
| 12/14 | Wed | | | | | | | |
| 12/15 | Thu | | | | | | | |
| 12/16 | Fri | | | | | | | |
| 12/19 | Mon | | | | | | | |
| 12/20 | Tue | 4 | | Meetig A Jackson, M. Deith | | | | |
| 12/21 | Wed | | | UPI Quote system study | | | | |
| 12/22 | Thu | 4 | | | | | | |
| 12/23 | Fri | | | | | | | |
| 12/26 | Mon | Holiday | | | | | | |
| 12/27 | Tue | 4 | | Meetig A. Jackson, E DeLong | | | | |
| 12/28 | Wed | 4 | | PC interface improvements | | | | |
| 12/29 | Thu | | | | | | | |
| 12/30 | Fri | | | | | | | |
| | | | | | | | | |
| TOT. Hours | | | | | | | | |
| TOTAL Days | | 2 | | | | | | |

(Page 1 of 2)

STR CORP. TIME SHEET FOR THE MONTH OF December 1983.    Page ___

| DATE | DAY | MaryAnn Huang | Si Go | | | | | TOTAL Hours |
|------|-----|---------------|-------|---|---|---|---|-------------|
| 12/1 | Thu | 7 | 7 | | | | | |
| 12/2 | Fri | 7 | | | | | | |
| 12/5 | Mon | 7 | 7 | | | | | |
| 12/6 | Tue | 7 | 7 | | | | | |
| 12/7 | Wed | 7 | | | | | | |
| 12/8 | Thu | 7 | | | | | | |
| 12/9 | Fri | 7 | 7 | | | | | |
| 12/12 | Mon | 7 | | | | | | |
| 12/13 | Tue | 7 | | | | | | |
| 12/14 | Wed | 7 | 7 | | | | | |
| 12/15 | Thu | 7 | 7 | | | | | |
| 12/16 | Fri | 7 | | | | | | |
| 12/19 | Mon | 7 | 7 | | | | | |
| 12/20 | Tue | 7 | | | | | | |
| 12/21 | Wed | 7 | 7 | | | | | |
| 12/22 | Thu | 7 | | | | | | |
| 12/23 | Fri | 7 | 7 | | | | | |
| 12/26 | Mon | HOLIDAY | | | | | | |
| 12/27 | Tue | 7 | | | | | | |
| 12/28 | Wed | 7 | | | | | | |
| 12/29 | Thu | 7 | 7 | | | | | |
| 12/30 | Fri | 7 | 7 | | | | | |
| | | | | | | | | |
| TOT. Hours | | | | | | | | |
| TOTAL Days | | 21 | 11 | | | | | |

## APPENDIX B
### INSLAW, INC.

### TIME AND ATTENDANCE REPORT

NAME _____

DIVISION _____

PAY PERIOD:

FROM _____ TO _____

PLAINTIFF'S EXHIBIT

| PROJECT NO. | SUN | MON | TUE | WED | THU | FRI | SAT | SUN | MON | TUE | WED | THU | FRI | SAT | REG* | O/T** | SICK | VACA | ACCOUNTING USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | |
| HOLIDAY | | | | | | | | | | | | | | | | | | | |
| SICK LEAVE | | | | | | | | | | | | | | | | | | | |
| ANNUAL LEAVE | | | | | | | | | | | | | | | | | | | |
| TOTAL HOURS | | | | | | | | | | | | | | | | | | | |

TOTALS

IN-KIND SERVICE CONTRIBUTION (Memo Only)

TOTAL

*REG - Up to 40 Hrs/Week;  **O/T - Hrs Over 40/Week   (Support Staff Only)

Employee Signature _____   Date _____

Approved by (Division Director) _____   Date _____